# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

CASA, INC.,
8151 15th Avenue
Hyattsville, MD 20528

        *Plaintiff*,

    v.

KRISTI NOEM, Secretary of Homeland
Security, in her official capacity,
2707 Martin Luther King Jr. Ave, SE
Washington, D.C. 20528


U.S. DEPARTMENT OF HOMELAND
SECURITY,
2707 Martin Luther King Jr. Ave, SE
Washington, D.C. 20528

        *Defendants*.

**Case No.:** 8:25-cv-1484

**COMPLAINT**

## INTRODUCTION

1.     Plaintiff CASA, Inc., challenges U.S. Secretary of Homeland Security Kristi Noem's unlawful attempt to terminate the Temporary Protected Status (TPS) designations for Afghanistan and Cameroon. Each designation was first made in 2022, in response to the prolonged armed conflicts, hunger, and human rights abuses afflicting both countries. Each designation was extended fewer than 18 months ago for similar reasons. Under the designations, thousands of Afghans and thousands of Cameroonians have been able to lawfully live and work in this country.

2.     Afghanistan's currently authorized TPS designation period expires on May 20, 2025, while Cameroon's expires on June 7, 2025. The TPS statute requires the Secretary to either terminate or extend both countries' TPS designations in advance of those deadlines. On April 11,

2025, various news outlets reported that that Secretary Noem had terminated both designations, based on an email to the media from Department of Homeland Security (DHS) Assistant Secretary Tricia McLaughlin. To CASA's knowledge, Assistant Secretary McLaughlin's email has never been publicly disclosed. The news articles reporting on the email are the only publicly available information about the purported terminations.

3.    A TPS designation cannot be terminated in this manner. Instead, Congress established a strict process for terminating TPS designations, one that required Secretary Noem to publish notice of her decision in the Federal Register at least 60 days before the current designation period ends. *See* 8 U.S.C. § 1254a(b)(3)(B). The statute further prescribes what happens when the Secretary fails to follow that process: the TPS designation is automatically extended for at least another six months. *Id.* § 1254a(b)(3)(C).

4.    Congress required the Secretary to abide by this process for good reason. Although a TPS designation is temporary by design, individuals who benefit from a designation order their lives around it. Termination may leave them without income or the ability to support and protect themselves and their families. It may further require them to return to their countries of origin or move elsewhere to rebuild a life—including by findings jobs, housing, and medical care—with few or no community connections. Accordingly, Congress required the Secretary to give these individuals adequate notice so that they could prepare to depart. Secretary Noem failed to follow these basic steps.

5.    Secretary Noem's actions are also unlawful because they were driven not by the considerations set forth by statute but at least in part by racial animus. That animus is evidenced by the Trump Administration's efforts to eliminate lawful immigration status for noncitizens from countries the Administration believes are predominantly non-white, while simultaneously

removing immigration barriers to noncitizens from countries the Administration believes are predominately white.  The departure from the regular process used to terminate TPS with respect to the designations for Afghanistan and Cameroon, as well as President Donald Trump's and Secretary Noem's explicitly racist attacks on non-white immigrants, further demonstrate that the termination decisions were based at least in part on racial animus.

6.      For these reasons, CASA respectfully asks the Court to declare unlawful and set aside the purported decisions to terminate the TPS designations for Afghanistan and Cameroon as "not in accordance with law," "contrary to constitutional right," and "without observance of procedure required by law" under the Administrative Procedure Act.  5 U.S.C. § 706(2)(A), (B), (D).

7.      CASA also asks this Court to declare that the Afghanistan and Cameroon TPS designations have been automatically extended by at least six months—until at least November 20, 2025, for Afghanistan and until at least December 20, 2025, for Cameroon.

## JURISDICTION AND VENUE

8.      The Court has federal question jurisdiction over claims arising under these statutes pursuant to 28 U.S.C. §§ 1331 and 1343(a).

9.      This action arises under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Fifth Amendment of the United States Constitution.

10.     Venue is proper in this District under 28 U.S.C. § 1391(e) and in this division because Defendants are officers and employees of the United States or an agency thereof acting in their official capacities; Plaintiff CASA, Inc., has its principal place of business in this division

and District; and a substantial part of the events or omissions giving rise to this action are occurring in this division and District.

## PARTIES

11.     Plaintiff CASA, Inc., is a national nonprofit membership-based immigrant rights organization headquartered in Prince George's County, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia.  Founded in 1985, CASA has more than 173,000 lifetime members, including over 100 Afghan members and more than 5,700 members from Cameroon. These two groups of members include many TPS beneficiaries, as do CASA's other member groups.  CASA's members are predominantly noncitizens.

12.     CASA's mission is to create a more just society by building power and improving the quality of life in working Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities.  In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia, as well as a more limited suite of remote services to members across the United States.

13.     Among the services that CASA provides are free immigration legal consultations for members and full legal representation for members applying for TPS, as well as for members applying for other types of immigration status.  CASA has developed specific resources to help members apply for TPS and to educate communities about TPS designations.  Since its founding, CASA has provided direct assistance on approximately 1,000 TPS applications for members. Beyond those members, many more CASA members, including those from Afghanistan and Cameroon, have obtained TPS without being directly represented by CASA, either by submitting applications on their own or with assistance from private counsel or other non-profit organizations.

14.     In addition to the legal services CASA offers members seeking TPS, the organization is a leader in advocating for TPS nationally.  CASA serves as a founding member of the TPS Funding Collaborative, which has raised more than $3 million to support organizations advocating for TPS.

15.     To become a CASA member, an individual must apply for membership, pay dues (or have the dues requirement waived), and subscribe to the principles of CASA.  A CASA member shares CASA's values, envisions a future of full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in working-class and immigrant communities.  CASA members play an important role in deciding what campaigns CASA works on and how CASA serves the community.

16.     One of many CASA members affected by the challenged actions is A.F., an Afghan citizen living in Virginia who currently has TPS under the Afghanistan TPS extension until May 20, 2025.  A.F. depends on TPS for his work authorization, which allows him to support himself, his mother, and his brother financially.  Losing TPS will almost certainly lead A.F. to lose his job and would put him at risk of being removed to a country where he has no family or other ties because he has never lived there.

17.     Among CASA's impacted Cameroonian members is J.K., who lives in Maryland and has TPS under the Cameroon TPS extension until June 7, 2025.  J.K. suffers from several serious health issues, which can be life-threatening.  She relies on work authorization pursuant to her TPS.  Without her TPS work authorization and other protections, J.K. faces uncertainty over whether she could receive and afford the medical care she requires.

18.     Cameroonian CASA member O.M. is also affected by the challenged actions.  O.M. lives in Maryland, works as a home health aide, and has TPS under the current Cameroon TPS

extension.  Losing TPS would put O.M.'s livelihood and financial stability in jeopardy.  It would also increase her risk of being removed to a country where she had previously suffered physical abuse and fears she would face violence and instability once more.

19.    Another impacted Cameroonian CASA member is C.N., who lives in Maryland and has TPS under the current Cameroon TPS extension.  C.N. works as a hairstylist, actively contributes to her local community, and is a vocal member of the Cameroonian community in the United States.  Losing TPS would expose C.N. to financial hardship and increase her risk of being removed to a country where she fears she would be in danger of physical violence.

20.    D.L. is a Cameroonian CASA member who is impacted by the challenged actions.  D.L. lives in Maryland and has TPS under the current Cameroon TPS extension.  His wife, who is pregnant, and his brother depend on D.L. for their family's income.  Losing TPS would expose D.L and his family to severe economic hardship and additionally place him at risk of removal to a country where he has experienced persecution.

21.    D.T. is another Cameroonian CASA member who has TPS under the current Cameroon extension and is impacted by the challenged actions.  D.T. lives in Maryland, works as an assisted-living caregiver, and helps support his wife and three children, including two children who are United States citizens.  Losing TPS would expose D.T. and his family to severe economic hardship and the resulting risk of his removal, to Cameroon or elsewhere, could separate him from his U.S.-citizen children.

22.    Defendant U.S. Department of Homeland Security is a cabinet agency of the United States responsible for administering federal immigration laws and programs, including TPS.

23.    Defendant Kristi Noem is the Secretary of Homeland Security.  She is sued in her official capacity.

## STATUTORY FRAMEWORK

24.     TPS provides temporary immigration relief to foreign nationals in the United States who cannot safely return to their home nation because of an armed conflict, natural disasters, or other "extraordinary and temporary conditions in the foreign state."  8 U.S.C. § 1254a(a)(1), (b). Congress created TPS in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil," rather than relying on ad hoc presidential action for those purposes.  H.R. Rep. No. 100-627, at 4 (1988).

25.     Under the TPS statute, the Secretary of Homeland Security may designate a country for TPS if the Secretary, after consultation with appropriate agencies of the Government, finds that

> (A) . . . there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
>
> (B) . . . (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected, (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and (iii) the foreign state officially has requested designation under this subparagraph; or
>
> (C) . . . there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).[1]

---

[1] The statute originally provided the Attorney General with this authority.  While the text continues to refer to the Attorney General, in 2003, Congress transferred authority for TPS designation, extension, and termination to the Secretary of the Department of Homeland Security.  6 U.S.C. § 557; *see* Homeland Security Act of 2002, Pub. L. No. 107-296, tit. XV, § 1517, 116 Stat. 2135, 2311 (2002).  Thus, references to the Attorney General in the TPS statute are now deemed to refer to the Secretary of Homeland Security.  *See* 8 U.S.C. § 1103(a).

26.     TPS allows nationals of a designated country (and individuals with no nationality who last habitually resided in the designated country) who are present in the United States at the time of the designation and meet other stringent eligibility criteria to remain lawfully in the United States for the duration of the designation.  *Id.* § 1254a(a)(1)(A), (c).

27.     To be eligible for protected status, individuals from a designated country must have been physically present in the United States continuously since the most recent designation date and have continuously resided in the United States "since such date as the [Secretary] may designate"; meet criteria for admissibility as an immigrant; not have a disqualifying criminal history (i.e., more than one misdemeanor conviction or a felony conviction); and submit an application, documentation and fees, among other requirements.  *Id.* § 1254a(c)(1); 8 C.F.R. §§ 244.2, 244.4, 244.9.

28.     Congress made clear that TPS beneficiaries will be able to live and work in the United States without fear of removal.  The TPS statute forbids DHS from removing or detaining those with TPS from the United States.  8 U.S.C. § 1254a(a)(1)(A), (d)(4).  Individuals with TPS also are authorized to "engage in employment" in the United States, and the Secretary must provide TPS recipients with an "'employment authorized' endorsement or other appropriate work permit." *Id.* § 1254a(a)(1)(B).  Such work authorization is "effective throughout the period" that a noncitizen has TPS.  *Id.* § 1254a(a)(2).  TPS also allows a noncitizen to "travel abroad with prior consent" of the Secretary, *id.* § 1254a(f)(3), and constitutes "lawful status as a nonimmigrant" for purposes of adjustment of status to lawful permanent residence or other nonimmigrant classification, *id.* § 1254a(f)(4).

29.     Once a country is designated for TPS, the designation "shall remain in effect until the effective date of the termination of the designation."  *Id.* § 1254a(b)(2)(B).

30.     After a country is designated for TPS, the statute provides a process for the Secretary to review that designation. *See generally Saget v. Trump*, 375 F. Supp. 3d 280, 346–347 (E.D.N.Y. 2019) (reviewing the statute's "plain[] outline[]" of the procedures the Secretary must follow in deciding whether to terminate TPS for a recipient country).  At least 60 days before the end of the initial designation period or any extended designation period, the Secretary shall, "after consultation with appropriate agencies of the Government," "review the conditions in the foreign state (or part of such foreign state) for which designation is in effect" and "determine whether the conditions for such designation under this subsection continue to be met."    8 U.S.C. § 1254a(b)(3)(A).  The Secretary "shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register." *Id.*

31.     The statute also details the process that must be followed to terminate a TPS designation.  The Secretary may terminate a designation only if, following her periodic review (which is to occur at least 60 days before the end of the TPS designation), she determines that the designated country "no longer continues to meet the conditions of designation." *Id.* § 1254a(b)(3)(A)–(B).  The statute provides no other permissible grounds for termination. *See id.*

32.     Should the Secretary determine that the designated country no longer meets the conditions of designation, she "shall terminate the designation by publishing notice in the Federal Register of [her] determination . . . (including the basis for the determination)." *Id.* § 1254a(b)(3)(B).  The termination "shall not be effective earlier than 60 days after the date the notice is published." *Id.*

33.     If the Secretary does *not* determine that a country's TPS designation should be terminated or fails to memorialize a determination in the Federal Register, "the period of designation of the foreign state *is extended* for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C) (emphasis added).  In other words, a failure to terminate a TPS designation consistent with the procedures set forth in the statute results in the automatic extension of that designation by at least six months. The TPS statute requires DHS to publish the duration of any extension of a TPS designation in the Federal Register.  *Id.* § 1254a(b)(3)(A), (C).

34.     These procedural requirements serve an important purpose.  A country is only designated for TPS if the Secretary concludes that the conditions in the country are dire, and that requiring nationals of those countries to return would pose a threat to their safety (or that the country is unable to handle their return).  Securing TPS allows individuals to live full lives in the United States—to be free from detention on the basis of their immigration status, to work, and to contribute to their communities.  And while a TPS designation is temporary by design, Congress has mandated that a termination occur in an orderly way, to allow those who rely on TPS to have adequate notice so that they may make necessary arrangements, including potentially preparing to return to their countries of origin.  As detailed below, *see* ¶¶ 90 –93, *infra*, the failure to follow these basic procedural requirements inflicts great harm on those who have TPS, as well as the families and communities who rely on them.

## FACTUAL BACKGROUND

### A.  TPS Designations for Afghanistan

35.     Afghanistan was initially designated for TPS on May 20, 2022, due to armed conflict and an ongoing "humanitarian disaster."  Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30,976, 30,977 (May 20, 2022).

36.    The TPS designation came after the Taliban took over in Kabul in 2021, the culmination of its 20-year insurgency against the government of Afghanistan and U.S. and North Atlantic Treaty Organization (NATO) forces.  *Id.*  Even before the withdrawal of U.S. and NATO troops, the conflict had taken a "high toll on Afghan civilians": the United Nations Assistance Mission in Afghanistan recorded more than 116,000 civilian deaths and injuries between 2009 and June 2021.  *Id.* at 30,978.

37.    Armed conflict continued after the withdrawal of U.S. and NATO troops.  *Id.*  The Taliban targeted old adversaries, including former Afghan police and military personnel.  *Id.*  The Islamic State in Iraq and the Levant-Khorasan Province (ISIS-K) also posed an increasing threat to civilians.  *Id.*  This group, which the U.S. Department of State designated as a foreign terrorist organization in 2016, was waging its own insurgency against the Taliban.  *Id.* at 30,978–30,979. Conflicts between the two groups frequently resulted in civilian casualties.  *Id.* at 30,979.  Among other things, ISIS-K claimed responsibility for the August 26, 2021, suicide attack outside Kabul airport.  *Id.*  By November of 2021, ISIS-K was present in nearly all of Afghanistan's provinces, and the number of ISIS-K attacks had increased by more than five-and-a-half times from the previous year.  *Id.*

38.    Afghanistan also faced significant challenges due to the destruction of vital infrastructure.  *Id.*  The Taliban reportedly had targeted power stations, dug up roads, destroyed cell towers, and damaged schools and medical facilities during its insurgency.  *Id.*  The country's education system was also "at risk of complete collapse due to the economic crisis," and the conflict had "left the Afghan countryside 'littered with abandoned and decaying power plants, prisons, schools, factories, office buildings and military bases.'"  *Id.* (citation omitted).

39.     Afghans faced a host of other dangers, including undetonated "[e]xplosive remnants of war," *id.*; rising internal displacement, *id.* at 30,980; a "cessation of purchasing power of the Afghan population as a result of the termination of international assistance once used to pay salaries," *id.*; lack of access to food, potable water, and healthcare, *id.* at 30,980–30,981; and human rights abuses against women and girls, ethnic minorities, and the disabled, *id.* at 30,981–30,984.

40.     On September 25, 2023, then-Secretary of Homeland Security Alejandro Mayorkas extended TPS for Afghanistan for an additional 18 months, until May 20, 2025 (the "2023 Afghanistan Extension"). Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,728 (Sept. 25, 2023). This extension allowed Afghans who already had TPS to re-register. *Id.* In the same notice, Secretary Mayorkas redesignated Afghanistan for TPS, allowing Afghan nationals (or individuals having no nationality who last habitually resided in Afghanistan) to apply for TPS for the first time if they met certain conditions. *Id.* at 65,729.

41.     In extending and redesignating TPS for Afghanistan, Secretary Mayorkas explained that since the August 2021 Taliban takeover, the "conflict and insurgency [had] continue[d] to cause insecurity and widespread harm throughout the country." *Id.* at 65,730. He further cited the ongoing conflict between the Taliban and ISIS-K. *Id.* at 65,731. The human rights situation in Afghanistan had developed into a "worsening crisis," as the Taliban responded aggressively to any resistance to its rule with "summary killings, disappearances, information blackouts, and physical abuse." *Id.* The Taliban had also adopted an "extremely repressive" regime with respect to women and girls—against whom sexual violence "occur[ed] regularly"—and ethnic and religious minorities. *Id.* The humanitarian situation in Afghanistan was also "dire, with 15 million people

facing acute food insecurity, as well as limited access to clean water and healthcare, destruction of infrastructure, and economic disability." *Id.* at 65,732.

42.     Consistent with past practice, the 2023 Afghanistan Extension established a 60-day re-registration period for existing TPS beneficiaries. *Id.* at 65,728. It further established a registration period during which first-time applications could be submitted. *Id.* It also provided instructions on how beneficiaries could register or re-register, and how they could obtain an employment authorization document (EAD), including by identifying which forms needed to be filled out, what supporting documentation was required, and where the relevant materials needed to be mailed. *Id.* at 65,733–65,737.

43.     Due to the redesignation of Afghanistan in the 2023 Afghanistan extension, an estimated 14,600 individuals became eligible to apply for TPS. Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 9 (updated Dec. 5, 2024). As of September 30, 2024, 9,630 nationals of Afghanistan had received TPS. *Id.*

44.     On April 11, 2025, various news outlets reported that Secretary Noem had terminated Afghanistan's TPS designation, based on an email to the media from Assistant Secretary McLaughlin.[2] To CASA's knowledge, Assistant Secretary McLaughlin's email has never been publicly disclosed. The news articles reporting on the email are the only publicly available information about the purported termination. As of the date of the filing of this Complaint, DHS has not published the statutorily required notice of its decision to terminate the TPS designation of Afghanistan in the Federal Register. Secretary Noem's acts and omissions have created great uncertainty as to whether Afghans with TPS will maintain that status beyond

---

[2] *See* Hamed Aleaziz, *Trump Will End Temporary Protections for Afghans and Cameroonians*, N.Y. Times (Apr. 11, 2025), https://tinyurl.com/5e5fruuc.

May 20, 2025, whether they will be able to continue to work after that date, and whether they will be forced to leave the country after that date.

**B. TPS Designations for Cameroon**

45.    Cameroon was initially designated for TPS on June 7, 2022, due to the conflict between government forces and armed separatists in the country, as well as deadly attacks by multiple terrorist organizations.  *See* Designation of Cameroon for Temporary Protected Status, 87 Fed. Reg. 34,706, 34,706 (June 7, 2022).

46.    Since 2016, armed conflict has raged throughout the Anglophone regions of Cameroon, which make up approximately 20 percent of the country's population, due to the emergence of an Anglophone separatist movement.  *Id.* at 34,708.[3]  Since that time, over 6,000 people have died and at least a million have been displaced either internally or to neighboring countries.[4]  The conflict has caused the country's economy and basic infrastructure to collapse, and led to widespread human rights abuses, including torture and sexual violence.[5]

47.    In designating Cameroon for TPS, Secretary Mayorkas cited the extreme violence between government forces and armed separatists, noting the crisis was "more severe than any other in contemporary Cameroon."  *Id.* at 34,708.  The notice additionally stated that one in three people in certain regions were in need of humanitarian aid.  *Id.*

---

[3] *See also* Nalova Akua, *"What Were You Expecting?  A Bloodless War?": How Cameroon Became Trapped in a Forgotten Standoff, The Guardian* (Nov. 21, 2024), https://perma.cc/5936-WJRG

[4] *Id.*

[5] *Id.*

48.    The notice also described attacks by Boko Haram and other terrorist organizations in the country, as well as a growing humanitarian crisis that led to economic deterioration, destruction of critical infrastructure and increasing food insecurity.  *Id.* at 34,709.

49.    On October 10, 2023, Secretary Mayorkas extended TPS for Cameroon for a period of 18 months, until June 7, 2025 (the "2023 Cameroon Extension").  Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945, 69,945 (Oct. 10, 2023).  This extension allowed Cameroonians who already had TPS to re-register.  In the same notice, Secretary Mayorkas redesignated Cameroon for TPS, allowing nationals of Cameroon to apply for TPS for the first time if they met certain conditions.  *Id.*

50.    In deciding to extend the designation, Secretary Mayorkas again cited the ongoing armed conflict between the government and nonstate armed groups, as well as conflicts between the government and the Anglophone separatist groups.  *Id.* at 69,947.  These battles had led to widespread killing, kidnapping, displacement and destruction of civilian infrastructure.  *Id.*  The Secretary also noted that the conflict had resulted in the destruction of hundreds of homes and left many in Cameroon without access to health services and education.  *Id.* at 69,947–69,948.  In addition, individuals who had engaged in peaceful protests had been abducted, tortured, and shot. *Id.* at 69,948.  Children had also been abducted for use as child soldiers.  *Id.* at 69,947.  At the time of the 2023 Cameroon Extension, one in every six people in Cameroon needed humanitarian assistance and protection, but providing that assistance was difficult because armed groups controlled the movement of goods in areas under their control.  *Id.* at 69,948.  An estimated three million people faced food insecurity; and the country was experiencing a cholera outbreak.  *Id.* at 69,949.

51.     Consistent with past practice, the 2023 Cameroon Extension established a 60-day re-registration period for existing TPS beneficiaries.  *Id.* at 69,945.  It further established a registration period during which first-time applications could be submitted.  *Id.*  It also provided instructions on how beneficiaries could register or re-register, and how they could obtain an EAD, including by identifying which forms needed to be filled out, what supporting documentation was required, and where the relevant materials needed to be mailed.  *Id.* at 69,949–69,953.

52.     Due to the redesignation of Cameroon in the 2023 Cameroon Extension, an estimated 7,900 individuals became eligible to apply.  Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 11 (updated Dec. 5, 2024).  As of September 30, 2024, 3,485 nationals of Cameroon had received TPS.  *Id.*

53.     On April 11, 2025, various news outlets reported that that Secretary Noem had terminated Cameroon's TPS designation, based on an email to the media from Assistant Secretary McLaughlin.[6]   To CASA's knowledge, Assistant Secretary McLaughlin's email has never been publicly disclosed.  The news articles reporting on the email are the only publicly available information about the purported termination.  As of the date of the filing of this Complaint, DHS has not published the statutorily required notice of its decision to terminate the designation of Cameroon in the Federal Register.  Secretary Noem's acts and omissions have created great uncertainty as to whether Cameroonians with TPS will maintain that status beyond June 7, 2025, whether they will continue to be authorized to work after that date, and whether they will be forced to leave the country after that date.

---

[6] *See* Aleaziz, *supra* note 2.

**C. The Purported Termination of the TPS Designations for Afghanistan and Cameroon Were Motivated at Least in Part by Racial Animus**

54.    In addition to failing to follow the statutorily required process, Secretary Noem's purported terminations of the TPS designations for Afghanistan and Cameroon are invalid because they were motivated at least in part by racial animus.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–266 (1977) (government actions violate equal protection principles "[w]hen there is a proof that a [racially] discriminatory purpose has been a motivating factor" for the action).

55.    Overwhelming evidence supports this claim.  *See id.* at 266–267 (identifying factors to consider when determining whether a facially neutral policy is motivated at least in part by racially discriminatory intent).  The purported terminations of TPS for Afghanistan and Cameroon are part of a broader effort by the Trump Administration to eliminate lawful immigration status for noncitizens from countries the Administration believes are predominantly non-white, while simultaneously removing immigration barriers to noncitizens from countries the Administration believes are predominately white.  *See id.* at 266 (whether the "impact of the official action . . . bears more heavily on one race than other . . . may provide an important starting point" in the equal protection analysis (internal quotation marks omitted)).

56.    For example, besides the purported termination of the TPS designations for Afghanistan and Cameroon, DHS also purported to vacate the most recent extension of TPS designations for Haiti and Venezuela.  *See* Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10511 (Feb. 24, 2025); Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8805 (Feb. 3, 2025).  *But see Nat'l TPS Alliance v. Noem*, ___ F. Supp. 3d ____, 2025 WL 957677, at *47 (N.D. Cal. Mar. 31, 2025) (issuing order postponing the Venezuela vacatur).

57.    DHS also announced the termination of parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela and their immediate family members.  *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025).

58.    The Trump Administration also has revoked over 1,000 visas for students participating in the Student and Exchange Visitor Information System program.[7]  The ten countries with the greatest number of affected students are India, China, South Korea, Saudi Arabia, Nigeria, Nepal, Bangladesh, Columbia, Mexico, and Iran.[8]  After encountering intense judicial scrutiny from multiple federal courts, Administration officials have recently represented that many students' visas have been restored while DHS develops a new system for reviewing and terminating student visas.[9]

59.     In stark contrast to the Trump Administration's actions toward non-white immigrants, shortly after taking office President Trump signed Executive Order No. 14204, "Addressing Egregious Actions of the Republic of South Africa," which in part directs the Secretary of State and the Secretary of Homeland Security to "take appropriate steps, consistent with law, to prioritize humanitarian relief, including admission and resettlement through the United States Refugee Admissions Program, for Afrikaners in South Africa who are victims of unjust racial discrimination."  90 Fed. Reg. 9497 (Feb. 7, 2025).  Afrikaners, who President Trump claims are being targeted by a South African land expropriations law, are descendants of white

---

[7] Joann Ng Hartmann, *New Insights into the Growing Number of Actions Against International Students and Scholars*, NAFSA (Apr. 25, 2025), https://perma.cc/Q7V2-RWYR.

[8] *Id.*

[9] Zach Montague & Hamed Aleaziz, *U.S. Restores Legal Status for Many International Students, But Warns of Removals to Come*, N.Y. Times (Apr. 25, 2025), https://tinyurl.com/s9ph5zkm.

Dutch, French, and German colonial settlers who arrived in South Africa over 300 years ago.[10]

60.     President Trump also has announced that he is creating a new visa program that he is calling the "gold card."[11]  Under this program, noncitizens who, in President Trump's words, are "very high-level people" would be able to purchase a visa for $5 million that allows them to live permanently in the United States and provides them with a pathway to citizenship.[12]  This program will disproportionately reduce immigration barriers to white individuals: after the United States, Western Europe has the largest percentage (28 percent) of the world's millionaires.[13]  Aside from the United States, the places with the highest proportion of millionaires per capita are Luxembourg, Switzerland, Hong Kong, Australia, New Zealand, Netherlands, and Denmark.[14]

61.     The conclusion that the purported terminations of TPS for Afghanistan and Cameroon were motivated at least in part by racial animus is also supported by the fact that Secretary Noem bypassed the standard process for conducting TPS reviews.  *See Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

62.     TPS review typically begins with career specialists preparing an objective country conditions report, a process spanning months.  This report then informs the U.S. Citizenship and Immigration Services Director's decision memos to the Secretary and, ultimately, the Federal

---

[10] Gerald Imray, *Trump Says Some White South Africans Are Oppressed and Could Be Resettled in the U.S. They Say No Thanks*, AP News (Feb. 8, 2025), https://tinyurl.com/s9ph5zkm.

[11] Shawn McCreesh, *Trump Plans "Gold Card" Alternative to Green Cards for 'High Level People'*, N.Y. Times (Feb. 25, 2025), https://tinyurl.com/2a7c9szj.

[12] Ryan Mac & Hamed Aleaziz, *Musk's Team Is Building a System to Sell 'Gold Card' Immigrant Visas*, N.Y. Times (Apr. 16, 2025), https://tinyurl.com/bdycjm6c.

[13] *Global Wealth Report 2024*, UBS 23 (2024), https://perma.cc/NST7-WZDR.

[14] *Id.* at 24.

Register notices announcing DHS's decision.  Moreover, the TPS statute requires the Secretary to consult with "appropriate agencies," 8 U.S.C. § 1254a(b)(3)(A), and in the past the Secretary has typically consulted with State Department officials during its review.[15]

63.    For example, during the first Trump Administration, President Trump attempted to terminate the TPS designation of several countries, but only after lengthy periods of review.  The first concerned Sudan.  DHS announced that termination decision in October 2017—nearly nine months into President Trump's first term—and delayed its effective date until more than a full year later.  Termination of the Designation of Sudan for TPS, 82 Fed. Reg. 47,228 (Oct. 11, 2017). Attempted terminations of TPS designations for Nicaragua, El Salvador, Haiti, and Nepal occurred even later during President Trump's first term and provided similarly lengthy deferral of effective dates.  Termination of the Designation of Nicaragua for TPS, 82 Fed. Reg. 59,636 (Dec. 15, 2017) (designating termination effective January 5, 2019); Termination of the Designation of El Salvador for Temporary Protected Status, 83 Fed. Reg. 2,564 (Jan. 18, 2018) (designating termination effective September 9, 2019); Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2,648 (Jan. 18, 2018) (designating termination effective July 22, 2019); Termination of the Designation of Nepal for Temporary Protected Status, 83 Fed. Reg. 2,3705 (May 21, 2018) (designating termination effective June 24, 2019).

64.    In stark contrast to the lengthy process described above, Secretary Noem decided to terminate the TPS designations for Afghanistan and Cameroon within less than three months of taking office.

65.    Secretary Noem could not have engaged in the typical review process within the

---

[15] *See* U.S. Gov't Accountability Off., *Temporary Protected Status: Steps Taken to Inform and Communicated Secretary of Homeland Security's Decisions* 2 (2020), https://perma.cc/V7YF-CZ5Y.

shortened timeframe of at most three months, and any consultation with the State Department or other government agencies was at best cursory.

66.     Moreover, as outlined above, *see* ¶¶ 29–34, 44, 53, *supra*, Secretary Noem's purported termination decisions failed to comply with the statutorily required timelines and publication requirements that provide certainty to TPS beneficiaries and an orderly transition in the event of a termination.

67.     President Trump's and Secretary Noem's repeated statements further demonstrate that the purported terminations of the TPS designations for Afghanistan and Cameroon were partially motivated by racial animus.  *See Arlington Heights*, 429 U.S. at 268 ("contemporary statements by members of the decisionmaking body" may be "highly relevant" in the racial animus analysis).

68.     During his first presidency, President Trump explicitly questioned why the United States would want immigrants from "shithole countries" in Africa rather than places like Norway.[16]

69.     President Trump furth disparaged other non-white immigrants, falsely claiming that Haitian visa folders "all have AIDS," and complaining that Nigerian migrants would never "go back to their huts."[17]

70.     President Trump later in his first term falsely equated Middle Eastern and other non-white migrants with crime when discussing a migrant caravan, claiming, "You're going to

---

[16] Josh Dawsey, *Trump Derides Protections for Immigrants from "Shithole" Countries*, Wash. Post (Jan. 12, 2018), https://tinyurl.com/yhuf9p5p.

[17] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://tinyurl.com/23jmwvrb.

find MS-13, you're going to find Middle Eastern, you're going to find everything. And guess what, we're not allowing them in our country. We want safety, we want safety."[18]

71.    In a March 2024 interview with Right Side Broadcasting Network, President Trump compared non-white immigrants to the fictional serial killer Hannibal Lecter. He stated "They're rough people, in many cases from jails, prisons, from mental institutions, insane asylums. You know, insane asylums, that's 'Silence of the Lambs' stuff . . . . We don't want 'em in this country."[19]

72.    During a June 2024 rally, President Trump repeated a common campaign talking point that "very bad people" from "Congo and Africa," "from Asia," "from the Middle East," and "from South America" have entered the United States "so illegally."[20]

73.    President Trump doubled down on these statements during later campaign events. In September 2024, he stated, "They emptied their jails in Venezuela, emptied their criminals, emptied their nests. They call them nests of bad people. They're all now in the United States and they're taking over cities. It's like an invasion from within."[21]

74.    During the September 2024 presidential debate, President Trump repeatedly used language seeking to dehumanize and spread misinformation about non-white immigrants, falsely claiming that Haitian immigrants in Springfield, Ohio, were "eating the dogs, the people that came

---

[18] *"Bigoted Rhetoric": Trump Warns of Middle Easterners Amongst US-Bound Migrants*, Middle East Eye (Oct. 23, 2018), https://perma.cc/9LFL-D5WV.

[19] Megan Lebowitz & Jake Traylor, *Trump compares migrants to Hannibal Lecter in 'The Silence of the Lambs'*, NBC News (Mar. 4, 2024), https://tinyurl.com/y2dns8je.

[20] *Speech: Donald Trump Holds Political Rally in Racine, Wisconsin – June 18, 2024*, Roll Call, https://perma.cc/D2LK-FRXW (last visited May 6, 2025).

[21] Ariana Baio, *Trump Says His Mass Deportation Will Begin in Ohio Town Where He Falsely Claimed Haitians Were Eating Pets*, The Independent (Sept. 13, 2024), https://perma.cc/7Z6X-T4ZF .

in, they're eating the cats . . . They're eating the pets of the people that live there, and this is what's happening in our country, and it's a shame."[22]  Following these inflammatory remarks, Springfield received more than 33 bomb threats, forcing schools to evacuate.[23]

75.    Since taking office, during a speech addressed to Republican Senators, President Trump stated that there were "[m]any, many thousands and thousands of murderers" let into the country "from all over the world."[24]  He went on to falsely allege that "some of these countries allowed [in] every single prisoner . . . . [T]hese are countries also from Africa, from Asia, not just South America, a lot, a lot from South America, but not even the most."[25]

76.    An analysis of President Trump's public comments shows that he has focused his racial animus towards non-white immigrants from across the world.  Specifically, he has described immigrants from Venezuela, the Democratic Republic of Congo, El Salvador, Honduras, Mexico, and Guatemala as "criminals" dozens of times.[26]

77.    Research from across the political spectrum flatly contradicts President Trump's association of immigrants, whether documented or undocumented, with criminal activity. According to a 2024 study commissioned by the U.S. Department of Justice's National Institute of Justice and based on Texas criminal records, "undocumented immigrants are arrested at less than half the rate of native-born U.S. citizens for violent and drug crimes and a quarter the rate of

---

[22] *Simulcast – ABC News Presidential Debate*, C-SPAN (Sept. 10, 2024), https://tinyurl.com/bdeyphda.

[23] Phil Helsel, *More than 30 Bomb Threats Made in Springfield, Ohio, After False Pets Claims*, NBC News (Sept. 16, 2024), https://tinyurl.com/yv5e9ump.

[24] *Speech: Donald Trump Addresses GOP Senators at Dinner at Mar-a-Lago – February 7, 2025*, Roll Call, https://perma.cc/EXQ5-TSBP (last visited May 6, 2025).

[25] *Id.*

[26] *See* Russell Contreras et al., *Trump keeps calling Venezuelan and Congolese migrants criminals*, Axios (Oct. 5, 2024), https://tinyurl.com/yzu5akvy.

native-born citizens for property crimes."[27]  The Cato Institute, a libertarian think tank, came to a

similar conclusion, noting in a 2020 working paper that, "[t]he illegal immigrant criminal

conviction rate was 45 percent below that of native-born Americans in Texas.  The legal immigrant

criminal conviction rate was 62 percent below that of native-born Americans."[28]

      78.    News sources have also repeatedly debunked the claim that any country is

"emptying" prisons and mental health institutions to send people to the United States.[29]

      79.    President Trump also has repeatedly stated that immigrants are "poisoning the

blood of our country," echoing the racist rhetoric of white supremacists.[30]  He first used this term

in an October 2023 interview, falsely stating that "Nobody has any idea where these people are

coming from, and we know they come from prisons.  We know they come from mental institutions

and insane asylums.  We know they're terrorists.  Nobody has ever seen anything like we're

witnessing right now.  It is a very sad thing for our country.  It's poisoning the blood of our country.

---

[27] U.S. Dep't of Just., Nat'l Inst. of Just., *Undocumented Immigrant Offending Rate Lower Than U.S.-Born Citizen Rate* 1 (2024), https://perma.cc/DBS2-LB8H.

[28] Alex Nowrasteh et al., *Illegal Immigration and Crime in Texas*, 4 (Cato Inst., Working Paper No. 60, 2020), https://tinyurl.com/3v9s2xf9 .  A March 2024 research paper from Stanford University reached an even broader conclusion: "As a group, immigrants have had lower incarceration rates than the US-born for 150 years.  Moreover, relative to the US-born, immigrants' incarceration rates have declined since 1960: immigrants today are 60% less likely to be incarcerated (30% relative to US-born whites)."  Ran Abramitzky et al., *Law-Abiding Immigrants: The Incarceration Gap Between Immigrants and the US-born, 1870–2020*, (Nat'l Bureau of Econ. Rsch., Working Paper No. 31440, 2024), https://perma.cc/59XW-SULP.

[29] Angelo Fichera, *Fact Checking Trump's Recent Immigration Claims,* N.Y. Times (Dec. 24, 2023), https://tinyurl.com/3wjk2w96; Lori Robertson, et al., *FactChecking Trump's Rally, Fox Interview*, FactCheck.org (Mar. 30, 2023), https://tinyurl.com/4s83pur2; Daniel Dale, *Fact check: Trump's Own Campaign Can't Find Proof for His 'Mental Institutions' Immigration Story*, CNN (Apr. 29, 2023), https://perma.cc/32JU-MK7L; *Fact-checking Over 12,000 of Donald Trump's Quotes About Immigrants,* The Marshall Project (Oct. 21, 2024), https://perma.cc/UNV2-AT9H.

[30] Russell Contreras, *Axios Explains: The Racist History of Trump's "Poisoning the Blood,"* Axios (Dec. 30, 2023), https://tinyurl.com/4u94adu2.

It's so bad, and people are coming in with disease.  People are coming in with every possible thing that you could have."[31]

80.     In the months that followed, President Trump doubled down on this rhetoric, drawing condemnation from Republican lawmakers.[32]  In a December 2023 rally in New Hampshire, President Trump stated "[t]hey're poisoning the blood of our country . . . . [N]ot just in South America, not just [the] three or four countries that we think about, but all over the world. They're coming into our country from Africa, from Asia, all over the world."[33]

81.     In March 2024, on multiple occasions, President Trump went even further, stating that immigrants from Latin America were inhuman.  In a speech, he stated: "I don't know if you call them 'people,' in some cases. They're not people, in my opinion."[34]  Later at a campaign rally, President Trump reiterated his association of immigrants with crime and disease: "You ever see the parks of our cities?  They're migrant camps, and I'll not let them turn the USA into a crime-filled, disease-ridden dumping ground, which is what they're doing."[35]  In an interview, President Trump further dehumanized immigrants and said their languages "are, like, from, from the planet

[31] Trip Gabriel, *Trump Escalates Anti-Immigrant Rhetoric With 'Poisoning the Blood' Comment*, N.Y. Times (Oct. 5, 2023), https://tinyurl.com/457zk5ze ("In 'Mein Kampf,' . . . there are several passages in which Hitler used the words 'poison' and 'blood' in attacking people he deemed a threat to the purity of the Aryan race.").

[32] Megan Lebowitz, *Trump Sparks Republican Backlash After Saying Immigrants Are 'Poisoning the Blood' of the U.S.*, NBC News (Dec. 19, 2023), https://tinyurl.com/5693a3f2.

[33] Ginger Gibson, *Trump Says Immigrants Are 'Poisoning the Blood of Our Country.' Biden Campaign Likens Comments to Hitler*, NBC News (Dec. 17, 2023), https://tinyurl.com/myvdd3yu.

[34] Maggie Astor, *Trump Doubles Down on Migrants 'Poisoning' the Country*, N.Y. Times (Mar. 17, 2024), https://tinyurl.com/mtfasf49 .

[35] WFMY News 2, *Trump Speaks on Border Security, Immigration and Law Enforcement in Greensboro*, YouTube (Mar. 2, 2024), https://tinyurl.com/3rrdbaur.

Mars."[36]

82.    In April 2024, President Trump continued to broadcast his dehumanizing views regarding immigrants. He noted, "The Democrats say, 'Please don't call them animals. They're humans.' I said, 'No, they're not humans, they're not humans, they're animals.' Nancy Pelosi told me that. She said, 'Please don't use the word animals when you're talking about these people.' I said, 'I'll use the word animal because that's what they are.'"[37]

83.    In October 2024, President Trump suggested that immigrants who commit crimes do so because "it's in their genes," and further asserted, "[a]nd we got a lot of bad genes in our country right now."[38]

84.    This is in sharp juxtaposition to a statement President Trump made that earlier that year lamenting the dearth of immigrants from "nice countries" like Denmark, Switzerland, and Norway.[39]

85.    Secretary Noem has made clear that she is fully committed to carrying out President Trump's mission to reduce the number of non-white immigrants in this country.

86.    For example, she has repeatedly referred to immigrants as "dirt bags."[40]

87.    And in a CBS News Interview on March 5, 2024, Secretary Noem made

---

[36] Lebowitz & Traylor, *supra* note 19.

[37] The National Desk, *Trump on Migrant Criminals: "They're Not Humans. They're Animals . . . That's What They Are,"* YouTube (Apr. 3, 2024), https://tinyurl.com/277wapx6.

[38] Patrick Svitek, *Trump Suggests 'Bad Genes' to Blame for Undocumented Immigrants Who Commit Murders*, Wash. Post (Oct. 7, 2024), https://tinyurl.com/4ye6bp65.

[39] Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries*, N.Y. Times (Apr. 7, 2024), https://tinyurl.com/47sd77h9.

[40] @Sec_Noem, X (Jan. 28, 2025, 7:35 AM), https://perma.cc/55YD-CGDL ("Getting the dirt bags off the streets."); CBS Mornings, *DHS Secretary Kristi Noem Joins Federal Agents on Immigration Raids in New York*, YouTube (Jan. 29, 2025), https://tinyurl.com/44xwtxzy ("These guys are dirtbags. They have come in and perpetuated violence in this country."). The

disparaging remarks about non-white immigrants, claiming, "We've seen these countries that hate us empty out their prisons, their mental institutions."[41]

88.    Similarly, at her confirmation hearing, Secretary Noem falsely conflated TPS holders with criminals, stating, "[T]his extension [of TPS] of over 600,000 Venezuelans . . . is alarming when you look at what we've seen in different states including Colorado with gangs doing damage and harming the individuals and the people that live there."[42]

89.    Secretary Noem's history of derogatory remarks towards non-white immigrants predated her term as Secretary.  Before her nomination to DHS, she stated, "Venezuela didn't send us their best. They emptied their prisons and sent criminals to America.  Deportations need to start on DAY ONE of [President Trump's] term" in office.[43]

### D.  Impact of the Purported Decisions to Terminate TPS for Cameroon and Afghanistan on CASA, Its Members, and Their Communities

90.    CASA members who received TPS pursuant to the designations of Afghanistan and Cameroon face irreparable harm if those TPS designations are terminated.  These members may

---

CBS reporter who accompanied Secretary Noem on New York City raids reported that nearly half of those arrested had no criminal history.  CBS Mornings, *supra*.

[41] *South Dakota Gov. Kristi Noem calls on Nikki Haley to exit 2024 race*, CBS News (Mar. 4, 2024), https://perma.cc/49GH-PMDL.

[42] *Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), https://tinyurl.com/yhh4ze7r.

[43] @KristiNoem, X (Feb. 26, 2024, 2:19 PM), https://perma.cc/D58Z-4X8H ("Nations like Venezuela are emptying their prisons of dangerous criminals to send them to America."); @KristiNoem, X (Feb. 27, 2024, 8:26 PM), https://perma.cc/Z9J5-8V22 ("Venezuela emptied their prisons and sent criminals to America."); @KristiNoem, Instagram, Mar. 6, 2024, https://tinyurl.com/5nx7w6wc ("Countries like Venezuela are emptying their prisons, their mental institutions, and sending them to America."); @KristiNoem, X (Mar. 14, 2024, 12:24 PM), https://perma.cc/T8KG-82DK ("Remember, Venezuela emptied their prisons and told them to come to America."); @KristiNoem, Instagram (Dec. 9, 2024), https://tinyurl.com/2p5z96n9 ("[N]ations like Venezuela are using our open border to solve their own crime and mental health crises.").

lose their jobs, businesses, and homes.  They may be separated from family members and removed to a country where they face repression and abuse.  They may also lose access to critical medical care and basic services, and face political repression and abuse.  Moreover, this harm is not limited to the TPS holders themselves; as principal or sole income-earners for their families, a loss of TPS for these members may also mean a loss of financial security, health care, and other basic needs for their parents, siblings, spouses, and children—including infants and U.S.-citizen children.

91.    The experiences of CASA members vividly illustrate this irreparable harm.  For instance, A.F., an Afghan TPS holder, faces the loss of his job as a project manager if he loses TPS.  In addition to abruptly cutting off his income and depriving his mother and brother of the financial support that A.F. provides them, a TPS termination would leave him vulnerable to removal to a country in turmoil under Taliban rule, where he has no community ties.  Particularly in light of the country's economic crisis, its lack of infrastructure to support everyday life, and violence carried out under Taliban rule,[44] A.F. has no prospects for a safe or stable life in Afghanistan.

92.    Cameroonian TPS-holder J.K. also faces destabilizing economic hardship.  Not only would J.K. lose her job along with her TPS protections, but she would also lose the ability to afford the medical care for her many health issues, which include circulatory problems and frequent bouts of life-threatening pneumonia.  J.K. fled Cameroon more than two decades ago and now faces the prospect of returning to a country where she fears for her physical safety.  Indeed, Cameroon's infrastructure collapse, clashes between military and paramilitary groups, and terrorist

---

[44] *See, e.g.*, United Nations Assistance Mission in Afghanistan, Update on the human rights situation in Afghanistan: January – March 2025 Update, https://perma.cc/ECV8-WYSY.

attacks have resulted in widespread human rights abuses, food insecurity, and other forms of physical and economic violence against civilians in the country.[45]

93.    D.T. similarly fled violence in Cameroon and fears for his life if forced to leave the United States.  But D.T.'s concerns are not limited to his own safety and security—they extend to his wife and one of their children, who are also protected by TPS, as well as his two other children, who are United States citizens.  Termination of TPS for D.T. would mean the loss of income that supports his family and could also bring the devastating separation of their family members.

## CAUSES OF ACTION

### Count I
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)
### (Purported Afghanistan Termination)

94.    CASA re-alleges and incorporate by reference all of the allegations above.

95.    The Court is authorized to "hold unlawful and set aside agency action" found to be "not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2) (A), (D).

96.    Defendants' purported termination of the TPS designation for Afghanistan constitutes "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

97.    Defendants' purported termination of the TPS Designation for Afghanistan should be declared unlawful and set aside under the Administrative Procedure Act because it is scheduled to take effect on May 20, 2025, and the Secretary has not published the statutorily required notice of that purported termination in the Federal Register.  8 U.S.C. § 1254a(b)(3)(A), (B).

---

[45] *See, e.g.*, U.S. Committee for Refugees and Immigrants, Timeline: Cameroon & the "Anglophone Crisis" (March 28, 2025), https://perma.cc/PZH4-PZ3C; U.S. Department of State, 2023 Country Reports on Human Rights Practices: Cameroon, https://perma.cc/ZR6K-AEPQ

98.     In addition, because the Secretary did not publish notice of her termination decision in the Federal Register, Afghanistan's TPS designation is automatically extended by at least six months.  8 U.S.C. § 1254a(b)(3)(A), (C).

## Count II
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)
### (Purported Cameroon Termination)

99.     CASA re-alleges and incorporate by reference all of the allegations above.

100.    This Court is authorized to "hold unlawful and set aside agency action" found to be "not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

101.    Defendants' purported termination of the TPS designation for Cameroon constitutes "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

102.    Defendants' purported termination of the TPS Designation for Cameroon should be declared unlawful and set aside under the Administrative Procedure Act because it is scheduled to take effect on June 7, 2025, and the Secretary has not published the statutorily required notice of that purported termination in the Federal Register.  8 U.S.C. § 1254a(b)(3)(A), (B).

103.    In addition, because the Secretary did not publish notice of her termination decision in the Federal Register, Cameroon's TPS designation is automatically extended by at least six months.  8 U.S.C. § 1254a(b)(3)(A), (C).

## Count III
### Violation of the Administration Procedure Act, 5 U.S.C. § 706(2)(A), (B)
### (Purported Afghanistan and Purported Cameroon Terminations)

104.    CASA re-alleges and incorporate by reference all of the allegations above.

105.    This Court is authorized to hold unlawful and set aside agency action found to be "not in accordance with law" and "contrary to constitutional right."  5 U.S.C. § 706(2)(A), (B).

106.    Defendants' purported terminations of the TPS designation for Afghanistan and Cameroon constitute "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

107.    The equal protection component of the Fifth Amendment's Due Process Clause prohibits the federal government from taking action for which discriminatory intent or purpose is a motivating factor.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–266 (1977); *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

108.    Defendants' purported terminations of Afghanistan's and Cameroon's TPS designations were motivated by the Trump Administration's discriminatory intent to remove Afghans and Cameroonians with TPS because of their race, ethnicity, and national origin.  The discriminatory intent is evidenced by, *inter alia*, the Trump Administration's efforts to eliminate lawful immigration status for noncitizens from countries that the Administration believes are predominantly non-white, while simultaneously removing immigration barriers to noncitizens from countries the Administration believes are predominately white; the procedural and substantive departures from the typical decision-making process for TPS termination determinations; and contemporaneous statements by Secretary Noem and President Trump displaying their animus toward non-white immigrants.

109.    The purported terminations of Afghanistan's and Cameroon's TPS designations therefore violate the Fifth Amendment's guarantee of equal protection, and are therefore "not in accordance with law" and "contrary to constitutional right."  5 U.S.C. § 706(2)(A), (B).

## PRAYER FOR RELIEF

For the foregoing reasons, CASA respectfully requests that this Court:

   a.  Declare unlawful and set aside the purported termination of the TPS designation for Afghanistan;

b. Declare unlawful and set aside the purported termination of the TPS designation for Cameroon;

c. Declare that the TPS designation for Afghanistan is extended until at least November 20, 2025;

d. Declare that the TPS designation for Cameroon is extended until at least December 7, 2025;

e. Enter such orders as are necessary to give effect to the foregoing declarations of law;

f. Enter such preliminary relief as will preserve the parties' rights and prevent irreparable harm until the Court reaches final judgment;

g. Grant an award of attorneys' fees and costs; and

h. Grant any other and further relief that this Court may deem fit and proper.


May 7, 2025

Nicholas Katz, Esq. (D. Md. 21920)
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783
240-491-5743
nkatz@wearecasa.org

Ryan C. Downer*
Sarah L. Bessell (D. Md. 30969)
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. #400
Washington, D.C. 20005
Tel. (202) 319-1000
Fax (202) 319-1010
ryan_downer@washlaw.org
sarah_bessell@washlaw.org

_s/ Jonathan L. Backer_
Jonathan L. Backer (D. Md. 20000)
Rupa Bhattacharyya*
Julia Gegenheimer[†]
Joseph W. Mead (D. Md. 22335)
Mary B. McCord (D. Md. 21998)
Samuel P. Siegel[†]
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 661-6671
Fax: (202) 661-6730
jb2845@georgetown.edu
jg1370@georgetown.edu
jm3468@georgetown.edu
mbm7@georgetown.edu
rb1796@georgetown.edu
ss5427@georgetown.edu

_Attorneys for Plaintiff CASA, Inc._

*Motion for admission pro hac vice forthcoming.

[†]*Motion for admission pro hac vice forthcoming.  DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*