## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

CASA, INC.

        *Plaintiff*,

    v.

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security, & UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY

        *Defendants*.

**Case No.** 8:25-cv-1484

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A STAY OF AGENCY ACTION OR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

## CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

I.    Temporary Protected Status ................................................................. 3

II.   Afghanistan's TPS Designations and Its Purported
      Termination ........................................................................................ 4

III.  Cameroon's TPS Designation and Its Purported
      Termination ........................................................................................ 7

IV.   This Action ....................................................................................... 10

LEGAL STANDARDS ...................................................................................... 10

ARGUMENT ..................................................................................................... 11

I.    CASA Is Entitled to a Stay of the Effective Dates of the
      Purported TPS Designation Terminations .................................... 12

A.    CASA Is Likely to Prevail on the Merits of Its Procedural
      Claims ............................................................................................. 12

B.    CASA's Members Will Be Irreparably Harmed by
      Defendants' Unlawful Termination of the TPS
      Designations for Afghanistan and Cameroon ............................. 18

C.    The Equities and Public Interest Favor Postponement ............. 21

II.   The Court Should Grant Summary Judgment as to CASA's
      Procedural Claims ......................................................................... 22

CONCLUSION ................................................................................................. 23

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Federal Cases**

*Am. Hosp. Ass'n v. Dep't of Health & Hum. Servs.*,
    No. 18-cv-2112, 2018 WL 5777397 (D.D.C. Nov. 2, 2018)....................................................22

*CASA de Maryland, Inc. v. Wolf*,
    486 F. Supp. 3d 928 (D. Md. 2020) ...........................................................................10, 20–21

*CASA, Inc. v. Trump*,
    No. CV DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025) .....................................20–21

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
    332 F. Supp. 3d 393 (D. Mass. 2018) .............................................................................14–16

*City of Columbus v. Cochran*,
    523 F. Supp. 3d 731 (D. Md. 2021) .....................................................................................22

*Delgadillo v. Carmichael*,
    332 U.S. 388 (1947)..............................................................................................................19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)....................................................................................................................2

*District of Columbia v. U.S. Dep't of Agric.*,
    444 F. Supp. 3d 1 (D.D.C. 2020) .........................................................................................10

*Documented v. Dep't of Homeland Sec.*,
    No. 21-cv-3142, 2024 WL 4253130 (D.D.C. Sept. 20, 2024)...............................................14

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ...............................................................................................11

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2019)..................................................................................................21

*Morton v. Ruiz*,
    415 U.S. 199 (1974)..............................................................................................................16

*NAACP v. U.S. Dep't of Homeland Sec.*,
    364 F. Supp. 3d 568 (D. Md. 2019) .....................................................................................15

*Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*,
    421 F. Supp. 3d 102 (D. Md. 2019) .....................................................................................11

**Page(s)**

*Nken v. Holder*,
    556 U.S. 418 (2008)................................................................................21

*North Ala. Express, Inc. v. United States*,
    585 F.2d 783 (5th Cir. 1978) ..........................................................16

*Padilla v. Kentucky*,
    559 U.S. 356 (2010)................................................................................19

*Rock Island, A. & L. R. Co. v. United States*,
    254 U.S. 141 (1920)................................................................................2

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ........................................................21

*Roe v. Dep't of Defense*,
    947 F.3d 207 (4th Cir. 2020) ..........................................................21

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y 2019) .........................................15

*St. Regis Paper Co. v. United States*,
    368 U.S. 208 (1961)................................................................................2

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ..........................................................21

*Winter v. Nat. Res. Def. Council, In*c.,
    555 U.S. 7 (2008)...........................................................................10–11

*Ysleta Del Sur Pueblo v. Texas*,
    596 U.S. 685 (2022)................................................................................16

**Federal Statutes**

6 U.S.C. § 557.............................................................................................3

Administrative Procedure Act
    5 U.S.C. § 551................................................................................10
    5 U.S.C. § 705........................................................................ *passim*
    5 U.S.C. § 706................................................................12, 22
    5 U.S.C. § 706(2)(A)................................................................22
    5 U.S.C. § 706(2)(D)................................................................22

Page(s)

Immigration and Nationality Act
    8 U.S.C. § 1103(a) .................................................................3
    8 U.S.C. § 1254a(a)(1) ...........................................................3
    8 U.S.C. § 1254a(a)(1)(A) ..................................................3, 16
    8 U.S.C. § 1254a(a)(1)(B) ..................................................4, 16
    8 U.S.C. § 1254a(b) ................................................................3
    8 U.S.C. § 1254a(b)(1) ..........................................................16
    8 U.S.C. § 1254a(b)(1)(A) ...................................................6, 9
    8 U.S.C. § 1254a(b)(1)(C) ...................................................6, 9
    8 U.S.C. § 1254a(b)(2)(B) ....................................................13
    8 U.S.C. § 1254a(b)(3) ............................................................1
    8 U.S.C. § 1254a(b)(3)(A) .............................................. *passim*
    8 U.S.C. § 1254a(b)(3)(B) .............................................. *passim*
    8 U.S.C. § 1254a(b)(3)(C) .............................................. *passim*
    8 U.S.C. § 1254a(b)(4) ..........................................................18
    8 U.S.C. § 1254a(c) ................................................................3
    8 U.S.C. § 1254a(d)(4) ...........................................................3
    8 U.S.C. § 1254a(f)(3) ............................................................4
    8 U.S.C. § 1254a(f)(4) ............................................................4

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 .........................................3

**Other Authorities**

65 Fed. Reg. 15,016 (Mar. 20, 2000).............................................................17

65 Fed. Reg. 33,356 (May 23, 2000).............................................................17

65 Fed. Reg. 52,789 (Aug. 30, 2000)............................................................17

65 Fed. Reg. 58,806 (Oct. 2, 2000)..............................................................17

65 Fed. Reg. 67,404 (Nov. 9, 2000).............................................................17

65 Fed. Reg. 67,405 (Nov. 9, 2025).............................................................17

65 Fed. Reg. 67,407 (Nov. 9, 2020).............................................................17

65 Fed. Reg. 69,789 (Nov. 20, 2000)............................................................17

82 Fed. Reg. 59,630 (Dec. 15, 2017).............................................................17

87 Fed. Reg. 30,976 (May 20, 2022).........................................................4–5

87 Fed. Reg. 34,706 (June 7, 2022) .........................................................7–8

**Page(s)**

88 Fed. Reg. 65,728 (Sept. 25, 2023) .................................................................. *passim*

88 Fed. Reg. 69,945 (Oct. 10, 2023) ................................................................... *passim*

90 Fed. Reg. 19,217 (May 6, 2025) ..............................................................................17

Fed. R. Civ. P. 56(a) ......................................................................................................11

Fed. R. Civ. P. 56(b) ...............................................................................................11, 22

Fed. R. Civ. P. 65(a)(2) ................................................................................................22

Hamed Aleaziz, *Trump Will End Temporary Protections for Afghans and Cameroonians*,
    N.Y. Times, Apr. 11, 2025, https://tinyurl.com/5e5fruuc ............................7, 9, 12

H.R. Rep. No. 100-627 (1988) .......................................................................................3

Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred
    Enforced Departure* (updated Dec. 5, 2024) .......................................................7, 9

Nalova Akua, *"What Were You Expecting?  A Bloodless War?": How Cameroon
    Became Trapped in a Forgotten Standoff*, The Guardian, Nov. 21, 2024,
    https://perma.cc/5936-WJRG ......................................................................................8

U.S. Citizenship & Immigr. Servs., *Temporary Protected Status Designated Country:
    Afghanistan*, https://www.uscis.gov/humanitarian/temporary-protected-
    status/temporary-protected-status-designated-country-afghanistan
    (last visited May 7, 2025) ............................................................................................7

U.S. Citizenship & Immigr. Servs., *Temporary Protected Status Designated Country:
    Cameroon*, https://www.uscis.gov/humanitarian/temporary-protected-
    status/temporary-protected-status-designated-country-cameroon
    (last visited May 7, 2025) ............................................................................................9

## INTRODUCTION

Thousands of Afghan and Cameroonian nationals have lawfully lived and worked in the United States for years under the protection of Temporary Protected Status (TPS), but that protection will purportedly and abruptly end—unlawfully—on May 20, 2025, for Afghanistan, and June 7, 2025, for Cameroon.  Defendants' attempts to terminate Afghanistan's and Cameroon's TPS designations flout the plain language of the TPS statute and should be stopped immediately.

A TPS designation represents a promise that the United States will not remove TPS holders to a country where conditions are dangerous or unstable.  By statute, TPS designations are made initially for a period between 6 and 18 months.  Qualified nationals of countries with TPS designations are legally present in the United States, are authorized to work, and cannot be removed while they possess such status.  The TPS statute includes safeguards to ensure that a TPS designation cannot be terminated without warning.  TPS designations are automatically extended unless the Secretary of Homeland Security publishes a determination that country conditions have improved in the Federal Register at least 60 days in advance of the scheduled expiration of a designation.  *See* 8 U.S.C. § 1254a(b)(3).  This process ensures that TPS holders have ample notice of any change to their status, and provides stability to allow TPS holders to build a successful life in the United States conditions in the home country improve.

The Department of Homeland Security (DHS) has unlawfully attempted to terminate Afghanistan's and Cameroon's TPS designations without observing these mandatory and important procedures.  On April 11, 2025, various news outlets reported that Secretary of Homeland Security Kristi Noem had terminated both designations, based on an email to the media from Assistant Secretary of Public Affairs Tricia McLaughlin.  That email has never been publicly

disclosed; it certainly does not comply with the TPS statute's requirement that termination notices be published in the Federal Register; and it issued less than 60 days before the scheduled expiration of each country's designation.  If allowed to go into effect, these purported terminations would result in the loss of lawful presence in the United States for Afghan and Cameroonian TPS holders in a matter of weeks, placing them at risk of removal to countries that DHS deemed dangerous less than 18 months ago and jeopardizing their ability to support themselves and their families with lawful employment.

This Court's prompt intervention is needed before DHS's purported termination of Afghanistan's and Cameroon's TPS designations can take effect.  The claims raised in this motion are purely legal:  that Defendants failed to comply with statutorily mandated procedures for terminating Afghanistan's and Cameroon's TPS designations.  Plaintiff CASA, Inc., thus asks this court to finally adjudicate those claims now.  But if this Court chooses to delay final judgment, CASA respectfully requests preliminary relief under 5 U.S.C. § 705.

Justice Holmes "famously wrote that 'men must turn square corners when they deal with the Government.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (brackets omitted) (quoting *Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920)). "But it is also true, particularly when so much is at stake, that 'the Government should turn square corners in dealing with the people.'"  *Id.* (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)).  Secretary Noem was required to make a decision in a timely manner, and then publish notice of that decision in the Federal Register.  Her failure to do so means that the TPS designations for Afghanistan and Cameroon are extended for at least six

months, and this Court should so declare to provide the certainty and notice that the TPS statute requires.

## BACKGROUND

### I.    Temporary Protected Status

TPS provides temporary immigration relief to foreign nationals in the United States who cannot safely return to their home nation because of an armed conflict, natural disasters, or other "extraordinary and temporary conditions in the foreign state."   8 U.S.C. § 1254a(a)(1), (b). Congress created TPS in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil," rather than relying on the prior practice of ad hoc presidential action for those purposes.   H.R. Rep. No. 100-627, at 4 (1988).

Under the TPS statute, the Secretary of Homeland Security may designate a country for protected status for renewable periods of up to 18 months "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1254a(b).[1]  Once a country has been designated for TPS, nationals of that country (and individuals with no nationality who last habitually resided in that country) who are present in the United States and meet other stringent criteria may remain lawfully in the United States for the duration of the designation.  *Id.* § 1254a(a)(1)(A), (c).  TPS holders may not be detained or removed on the basis of their immigration status.  *Id.* § 1254a(d)(4).  And the Secretary "shall authorize" those with TPS to "engage in employment in the United States"

---

[1] The statute originally provided the Attorney General with this authority.  While the text continues to refer to the Attorney General, in 2003 Congress transferred authority for TPS designation, extension, and termination to the Secretary of Homeland Security.  6 U.S.C. § 557; *see* Homeland Security Act of 2002, Pub. L. No. 107-296, tit. XV, § 1517, 116 Stat. 2135, 2311.  As a result, references to the Attorney General in the TPS statute are now deemed to refer to the Secretary of Homeland Security.  *See* 8 U.S.C. § 1103(a).

and provide them with an employment authorization document (EAD). *Id.* § 1254a(a)(1)(B); *see also id.* § 1254a(f)(3), (4) (detailing other benefits associated with TPS).

Once a country has been designated for TPS, the Secretary must periodically review the conditions in that country and "determine whether the conditions for such designation . . . continue to be met."  8 U.S.C. § 1254a(b)(3)(A).  As discussed in the greater detail below, the statute provides strict procedures and timeframes that must be followed when conducting this review. *See* pp. 13–14, *infra*.  At the end of that process, the Secretary must make one of two decisions:  Either extend the TPS designation for at least six months, *see* 8 U.S.C. § 1254a(b)(3)(C), or terminate the designation, *id.* § 1254a(b)(3)(B).  Notice of either decision must be published in the Federal Register. *Id.* § 1254a(b)(3)(A).  The Federal Register notices, as well as the U.S. Citizenship and Immigration Services (USCIS) website, typically provide details on how potential beneficiaries can obtain TPS and the associated benefits. *See* pp. 6–7, 9, *infra*.

## II.    **Afghanistan's TPS Designations and Its Purported Termination**

Afghanistan was initially designated for TPS on May 20, 2022, due to armed conflict and an ongoing "humanitarian disaster" (the "2022 Afghanistan Designation").  Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30,976, 30,977 (May 20, 2022).  The TPS designation came after the Taliban took over Kabul in 2021, the culmination of its 20-year insurgency against the government of Afghanistan and U.S. and North Atlantic Treaty Organization (NATO) forces. *Id.*  Even before the withdrawal of U.S. and NATO troops, the conflict had taken a "high toll on Afghan civilians":  the United Nations Assistance Mission in Afghanistan recorded more than 116,000 civilian deaths and injuries between 2009 and June 2021. *Id.* at 30,978.

Armed conflict continued after the withdrawal of U.S. and NATO troops. *Id*.  The Taliban targeted old adversaries, including former Afghan police and military personnel. *Id.*  The Islamic

4

State in Iraq and the Levant-Khorasan Province (ISIS-K) also posed an increasing threat to civilians. *Id.* This group, which the U.S. Department of State designated as a foreign terrorist organization in January 2016, had been waging its own insurgency against the Taliban. *Id.* at 30,978–30,979. The battle between the two groups frequently resulted in civilian casualties. *Id.* at 30,979. Among other things, ISIS-K claimed responsibility for the August 26, 2021, suicide attack outside Kabul airport. *Id.* By November 2021, ISIS-K was present in nearly all of Afghanistan's provinces, and the number of ISIS-K attacks had increased by more than five-and-a-half times from the prior year. *Id.*

Afghanistan also faced significant challenges due to the destruction of vital infrastructure. *Id.* The Taliban had targeted power stations, dug up roads, destroyed cell towers, and damaged schools and medical facilities during their insurgency. *Id.* The country's education system was also "at risk of complete collapse due to the economic crisis," and the conflict had "left the Afghan countryside 'littered with abandoned and decaying power plants, prisons, schools, factories, office buildings and military bases.'" *Id.* (citation omitted). Afghans faced a host of other dangers, including undetonated "[e]xplosive remnants of war," *id.*; rising internal displacement, *id.* at 30,980; a "cessation of purchasing power of the Afghan population as a result of the termination of international assistance once used to pay salaries," *id.*; lack of access to food, potable water, and healthcare, *id.* at 30,980–30,981; and human rights abuses against women and girls, ethnic minorities, and the disabled, *id.* at 30,981–30,984.

On September 25, 2023, then-Secretary of Homeland Security Alejandro Mayorkas extended the 2022 Afghanistan Designation for a period of 18 months, until May 20, 2025 (the "2023 Afghanistan Extension"). Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,728 (Sept. 25, 2023). The extension established a

registration period during which first-time applications could be submitted. *Id.* at 65,729. In taking those actions, Secretary Mayorkas explained that since the August 2021 Taliban takeover, the "conflict and insurgency [had] continue[d] to cause insecurity and widespread harm throughout the country." *Id.* at 65,730. He further cited the ongoing conflict between the Taliban and ISIS-K. *Id.* at 65,731. The human rights situation in Afghanistan had developed into a "worsening crisis," as the Taliban responded aggressively to any resistance to its rule with "summary killings, disappearances, information blackouts, and physical abuse." *Id.* The Taliban had also adopted an "extremely repressive" regime with respect to women and girls—against whom sexual violence "occur[ed] regularly"—and ethnic and religious minorities. *Id.* The humanitarian situation in Afghanistan was also "dire, with 15 million people facing acute food insecurity, as well as limited access to clean water and healthcare, destruction of infrastructure, and economic disability." *Id.* at 65,732.

In light of these conditions, Secretary Mayorkas determined that there "continues to be an ongoing armed conflict in Afghanistan" and that requiring Afghans to return to Afghanistan would "pose a serious threat to their personal safety." *Id.* (citing 8 U.S.C. § 1254a(b)(1)(A)). He further determined that there "continue to be extraordinary and temporary conditions in Afghanistan" that prevented Afghans from "returning to Afghanistan in safety," and that it was "not contrary to the national interest of the United States to permit Afghan TPS beneficiaries to remain in the United States temporarily." *Id.* (citing 8 U.S.C. § 1254a(b)(1)(C)).

Consistent with past practice, the 2023 Afghanistan Extension established a 60-day re-registration period for existing TPS beneficiaries. *Id.* at 65,728. It further established a registration period during which first-time applications could be submitted. *Id.* It also provided instructions for how beneficiaries could register or re-register, and how they could obtain an EAD, including

by identifying which forms needed to be filled out, what supporting documentation was required, and where the relevant materials needed to be mailed. *Id.* at 65,733–65,737. USCIS's website provided similar details. *See* U.S. Citizenship & Immigr. Servs., *Temporary Protected Status Designated Country: Afghanistan*, https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-afghanistan (last visited May 7, 2025). As a result of the redesignation of Afghanistan in the 2023 Afghanistan Extension, an estimated 14,600 individuals became eligible to apply. Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 9 (updated Dec. 5, 2024). As of September 30, 2024, 9,630 nationals of Afghanistan had received TPS. *Id.*

On April 11, 2025, various news outlets reported that Secretary Noem had terminated Afghanistan's TPS designation, based on an email to the media from Assistant Secretary for Public Affairs Tricia McLaughlin. *See* Hamed Aleaziz, *Trump Will End Temporary Protections for Afghans and Cameroonians*, N.Y. Times, Apr. 11, 2025, https://tinyurl.com/5e5fruuc. To Plaintiff CASA's knowledge, Assistant Secretary McLaughlin's email has never been publicly disclosed. The news articles reporting on the email are the only publicly available information about the purported termination. As of the date of the filing of this motion, DHS has not published the statutorily required notice of its decision to terminate the TPS designation for Afghanistan in the Federal Register.

## III.    Cameroon's TPS Designation and Its Purported Termination

Cameroon was initially designated for TPS on June 7, 2022, due to armed conflict between government forces and armed separatists in the country, as well as deadly attacks by multiple terrorist organizations. Designation of Cameroon for Temporary Protected Status, 87 Fed. Reg. 34,706 (June 7, 2022). Since 2016, armed conflict has erupted in the English-speaking regions of Cameroon (which make up approximately 20 percent of the country's population) due to the

emergence of an Anglophone separatist movement. *Id.* at 34,708. More than 6,000 people have died as a result of the conflict; and more than a million have been displaced either internally or to neighboring countries. *See* Nalova Akua, *"What Were You Expecting? A Bloodless War?": How Cameroon Became Trapped in a Forgotten Standoff*, The Guardian, Nov. 21, 2024, https://perma.cc/5936-WJRG. The conflict caused the economy and infrastructure to collapse, and led to widespread human rights abuses, including torture and sexual violence. *Id.* In designating the country for TPS, Secretary Mayorkas cited the extreme violence between government forces and armed separatists, noting the crisis was "more severe than any other in contemporary Cameroon." 87 Fed. Reg. at 34,708. He further noted that one in three people in the Anglophone regions of Cameroon were in need of humanitarian aid; there were ongoing attacks by Boko Haram and other terrorist organizations; and food insecurity was increasing. *Id.* at 34,708–34,709.

On October 10, 2023, Secretary Mayorkas extended TPS for Cameroon for a period of 18 months, until June 7, 2025 (the "2023 Cameroon Extension"). Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945, 69,945 (Oct. 10, 2023). In deciding to extend the status, the Secretary noted the ongoing armed conflict between the government and nonstate armed groups, as well as conflict between the government and the Anglophone separatist groups. *Id.* at 69,947. The conflicts had led to widespread killing, kidnapping, and displacement, as well as destruction of civilian infrastructure. *Id.* The Secretary further noted that the conflicts had destroyed hundreds of homes, and that many civilians did not have access to health services and education. *Id.* at 69,947–69,948. Individuals engaged in peaceful protests had been abducted, tortured, and shot, and children had been abducted for use as soldiers. *Id.* An estimated three million people were facing food insecurity in 2023, and the country was experiencing a cholera outbreak. *Id.* at 69,949. In light of these conditions, Secretary

Mayorkas determined that there "continues to be an ongoing armed conflict in the Far North region of Cameroon" and that requiring Cameroonians to return to Cameroon would "pose a serious threat to their personal safety." *Id.* (citing 8 U.S.C. § 1254a(b)(1)(A)).  He further determined that there "continue[d] to be extraordinary and temporary conditions in Cameroon" that prevent Cameroonians from "returning to Cameroon in safety," and that it was "not contrary to the national interest of the United States to permit Cameroonian TPS beneficiaries to remain in the United States temporarily." *Id.* (citing 8 U.S.C. § 1254a(b)(1)(C)).

Consistent with past practice, the 2023 Cameroon Extension established a 60-day re-registration period for existing TPS beneficiaries. *Id.* at 69,945.  It further established a registration period during which first-time applications could be submitted. *Id.*  It also provided instructions for how beneficiaries could register or re-register, and how they could obtain an EAD, including by identifying which forms needed to be filled out, what supporting documentation was required, and where the relevant materials needed to be mailed. *Id.* at 69,949–69,953.  USCIS's website provided similar details.  U.S. Citizenship & Immigr. Servs., *Temporary Protected Status Designated Country: Cameroon*, https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-cameroon (last visited May 7, 2025).  As a result of the redesignation of Cameroon in the 2023 Cameroon Extension, an estimated 7,900 individuals became eligible to apply.  Wilson, *supra*, at 11.  As of September 30, 2024, 3,485 Cameroonians had received TPS. *Id.*

On April 11, 2025, various news outlets reported that Secretary Noem had terminated Cameroon's TPS designation, based on an email to the media from Assistant Secretary McLaughlin. *See* Aleaziz, *supra*.  Again, to CASA's knowledge, that email has never publicly disclosed, and the news articles reporting on the email are the only publicly available information

about the purported termination.  As of the date of the filing of this motion, DHS has not published the statutorily required notice of its decision to terminate the TPS designation for Cameroon in the Federal Register.

## IV.    This Action

CASA is a membership organization dedicated to advancing immigrants' rights.  CASA's members include Afghan and Cameroonian TPS holders who rely on TPS to live and work in the United States lawfully, and who fear the prospect of being removed from the United States and relocated to countries experiencing dangerous conditions.  On behalf of those members, CASA brings three claims under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, challenging the purported terminations of the TPS designations for Afghanistan and Cameroon. Counts I and II (the "procedural claims") challenge Defendants' failure to comply with the TPS statute's procedural requirements for terminating a country's TPS designation, while Count III challenges the purported terminations under the Fifth Amendment's equal protection component. See Compl. ¶¶ 94–109.

## LEGAL STANDARDS

Section 705 of the APA permits courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve the status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay."  *CASA de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)).  That is, courts review whether (1) the requesting party is likely to succeed on the merits of their claim; (2) the requesting party is experiencing irreparable harm that will continue absent preliminary relief; (3) the balance of equities are in the requesting party's favor; and (4) relief would be in the public interest.  *See Winter v. Nat. Res. Def. Council, In*c., 555

U.S. 7, 20 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall issue summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That standard "does not apply," however, in cases such as this one involving review of final agency action under the APA. *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 114 (D. Md. 2019). Instead, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record." *Id.* A party may move for summary judgment "at any time," Fed. R. Civ. P. 56(b), "even as early as the commencement of the action," *id.*, advisory committee's note to 2009 amendment.

## ARGUMENT

This motion seeks relief for CASA's procedural claims challenging Defendants' failure to comply with statutorily mandated procedures for terminating Afghanistan's and Cameroon's TPS designations (Counts I and II). Those purely legal claims are ready for immediate summary judgment. All of the facts relevant to CASA's procedural claims are a matter of public record. In fact, the central legal infirmity underlying both claims is Secretary Noem's failure to publish any notice whatsoever in the Federal Register concerning the fate of both countries' TPS designations. Thus, even review of the administrative record—assuming one exists—would have no bearing on CASA's procedural claims here.

If, however, this Court believes that additional factual development would aid its resolution of these claims, CASA respectfully requests preliminary relief under 5 U.S.C. § 705. Time is of the essence. Then-Secretary Mayorkas extended Afghanistan's TPS designation in 2023, and that

designation expires on May 20, 2025.  *See* Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, (Sept. 25, 2023).  Then-Secretary Mayorkas also extended Cameroon's TPS designation in 2023, and that designation expires on June 7, 2025. *See* Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945 (Oct. 10, 2023).  In light of Defendants' purported termination of Afghanistan's and Cameroon's TPS designations, TPS holders from those countries are facing great uncertainty as to whether they retain legal status, whether they may continue to work, and whether they will be forced to depart the United States, leaving their families and communities behind.  In the absence of final relief under 5 U.S.C. § 706, preliminary relief is urgently needed under Section 705 to provide the certainty that the procedures flouted by Defendants are designed to ensure.

## I.    CASA Is Entitled to a Stay of the Effective Dates of the Purported TPS Designation Terminations

### A.    CASA Is Likely to Prevail on the Merits of Its Procedural Claims

In 2023, then-Secretary Mayorkas extended the TPS designations for Afghanistan and Cameroon until May 20 and June 7, 2025, respectively.  *See* 88 Fed. Reg. at 65,728; 88 Fed. Reg. at 69,945.  By statute, these designations are automatically extended *unless* the Secretary of Homeland Security publishes a termination notice in the Federal Register setting forth the basis for that termination at least 60 days in advance of any scheduled expiration of a TPS designation. Rather than comply with either the timing or publication requirements, Assistant Secretary McLaughlin sent an email on April 11, 2025, to reporters stating that Secretary Noem had terminated both countries' TPS designations.  *See* Aleaziz, *supra*.  This email does not comply with the statutory requirements, and should not be permitted to effectuate an end to TPS designations for Afghanistan and Cameroon.

### 1.     Statutory Framework

As detailed above, under the TPS statute, the Secretary may designate a country for temporary protected status for renewable periods of up to 18 months. *See* p. 3, *supra*; *see also* 8 U.S.C. § 1254a(b)(2)(B), (3)(C). After a country is designated for TPS, the statute sets forth a mandatory process for periodic review. *Id.* § 1254a(b)(3)(A). At least 60 days before the end of each designation period, the Secretary, "after consultation with appropriate agencies of the Government," must "review the conditions" in the country and determine whether the conditions for TPS designation "continue to be met." *Id.* The output of this review process is binary: Either the Secretary terminates the country's TPS designation upon the expiration of the designation period or the TPS designation is extended. *Id.* § 1254a(b)(3)(B)–(C). Whatever the outcome of the review process, the Secretary must publish "notice of each such determination (including the basis for the determination)" in the Federal Register "on a timely basis." *Id.* § 1254a(b)(3)(A).

If the Secretary determines that the country "no longer continues to meet the conditions" for TPS designation, the Secretary "shall terminate the designation by publishing notice in the Federal Register." *Id.* § 1254a(b)(3)(B). But the statute ensures that TPS holders receive adequate notice of any termination so that they have time to make the necessary arrangements to reorder their lives. The statute provides that a termination of a TPS designation "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension" of the country's TPS designation. *Id.* Thus, a termination notice must be published in the Federal Register at least 60 days before the expiration date for any TPS designation.

If the Secretary "does *not* determine" that the country "no longer meets the conditions" for TPS designation, the country's TPS designation "*is extended* for a period of 6 months" or for a period of 12 or 18 months, at the Secretary's discretion. *Id.* § 1254a(b)(3)(C) (emphases added).

Thus, an extension of a country's TPS designation can occur either through "an affirmative determination" by the Secretary that the conditions for TPS designation "continue to be met," *id.* § 1254a(b)(3)(A), or "automatically" if "the Secretary does not make a decision to terminate or extend a country's TPS designation by the 60th day before its designation period is set to expire." *Documented v. Dep't of Homeland Sec.*, No. 21-cv-3142, 2024 WL 4253130, at *1 (D.D.C. Sept. 20, 2024); *see also Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 403 (D. Mass. 2018) (noting that Honduras received an "automatic" extension of its TPS designation in 2018 due to the Acting Secretary of Homeland Security's "failure to make a determination by the statutory deadline"). When the Secretary extends a country's TPS designation, the required notice in the Federal Register must set forth "the period of extension of designation." 8 U.S.C. § 1254a(b)(3)(A).

### 2.    Defendants Have Made No Legally Enforceable Decision to Terminate TPS Designations of Afghanistan or Cameroon

Although Secretary Noem has purportedly determined that Afghanistan and Cameroon no longer meet the conditions for TPS designation, DHS has not published any notice of those determinations in the Federal Register. In fact, the only "notice" disseminated by DHS was via news articles published on April 11, 2025, which reported that Assistant Secretary McLaughlin had emailed a statement to reporters that Secretary Noem had terminated Afghanistan's and Cameroon's TPS designations. *See* pp. 7, 9–10, *supra.* That is no substitute for publication in the Federal Register. To CASA's knowledge, Assistant Secretary McLaughlin's email has never been publicly disclosed. The news articles reporting on it are thus the only publicly available information about the purported terminations of Afghanistan's and Cameroon's TPS designations.

Such "notice" is insufficient as a matter of law. The plain language of Section 1254a(b)(3)(B) clearly requires publication of TPS determinations in the Federal Register and

provides no alternative mechanisms for the Secretary to terminate a designation.  *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 298 (E.D.N.Y. 2019) ("The Secretary *must* timely publish the decision to extend or terminate TPS, including the basis for that determination, *in the Federal Register*." (emphases added)); *NAACP v. U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 571–572 (D. Md. 2019) (same); *Centro Presente*, 332 F. Supp. 3d at 398 (same).  By failing to publish notices in the Federal Register, Secretary Noem has not terminated TPS in the manner specifically prescribed by statute.  Her purported terminations therefore cannot be "effective" under law. 8 U.S.C. § 1254a(b)(3)(B).  Secretary Noem's purported decisions to terminate Afghanistan's and Cameroon's TPS designations therefore lack any legal force.

### 3.    Afghanistan's and Cameroon's TPS Designations Are Automatically Extended By At Least Six Months

Because DHS has not published a timely notice of termination with regard to Afghanistan's or Cameroon's TPS designations, each of those designations "is extended."  8 U.S.C. § 1254a(b)(3)(C).  The 2023 Afghanistan Extension expires on May 20, 2025, and the 2023 Cameroon extension expires on June 7, 2025.  88 Fed. Reg. at 65,728; 88 Fed. Reg. at 69,945. Any termination of Afghanistan's TPS designation therefore must have been published in the Federal Register no later than March 21, 2025.  The corresponding deadline for Cameroon was April 8, 2025.  Because DHS has not published a termination notice with regard to either Afghanistan or Cameroon, it has "not determine[d]" that either country "no longer meets the conditions" for TPS designation.  8 U.S.C. § 1254a(b)(3)(C).  Accordingly, each country's TPS designation is subject to an "automatic" extension.  *Centro Presente*, 332 F. Supp. 3d at 403.

Defendants cannot evade the automatic extension required by Section 1254a(b)(3)(C) by pointing to Assistant Secretary McLaughlin's email to the press.  The plain language of the statute makes clear that termination of a country's TPS designation can be effected only "by publishing

notice in the Federal Register."  8 U.S.C. § 1254a(b)(3)(B).  That publication requirement would be superfluous if DHS could achieve the same result by issuing press statements.  *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698–699 (2022) (noting that one of the "longstanding canons of statutory construction" is that courts "must normally seek to construe Congress's work so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant" (internal quotation marks omitted)).  "Federal Register publication is not an empty or formal gesture," but, rather, "an indispensable jurisdictional requirement" that ensures "adequate notice" for those affected by agency action.  *N. Ala. Express, Inc. v. United States*, 585 F.2d 783, 789 (5th Cir. 1978).  Moreover, publication in the Federal Register distinguishes mere pronouncements of the Executive Branch's intent from those that are "endowed with the force of law."  *Morton v. Ruiz*, 415 U.S. 199, 234 (1974).

And receiving notice is especially important for TPS beneficiaries.  The Secretary designates a country for TPS only upon concluding that the conditions in the country are dire, and that requiring nationals of those countries to return would pose a threat to their safety (or that the country is unable to handle their return).  *See* 8 U.S.C. § 1254a(b)(1).  Securing TPS allows individuals to live full lives in the United States—to be free from detention on the basis of their immigration status, to work, to support their families, and to contribute to their communities.  *See id.* §§ 1254a(a)(1)(A)–(B).  Giving those who have TPS—and their families—adequate notice allows them to make necessary arrangements in response, including potentially preparing to return to their countries of origin or elsewhere.

Indeed, in comparable situations, DHS has recognized that Section 1254a(b)(3)(C) automatically extends countries' TPS designations.  Just days ago, DHS published a notice in the Federal Register that South Sudan's TPS designation—which was set to expire on May 3, 2025—

was "automatically extended" because the Secretary "was unable to make an informed determination about South Sudan's designation by the March 4, 2025, statutory deadline due to the lack of an updated analysis of current country conditions in South Sudan."  Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217 (May 6, 2025).  That action was consistent with the federal government's nearly uniform practice since Congress first created TPS in 1990:  that a TPS designation is automatically extended any time the agency fails to issue a termination notice at least 60 days prior to the expiration of a designation period.[2]  The same result obtains here.[3]

### 4.    DHS Must Provide Notice of the Automatic Extensions of Afghanistan's and Cameroon's TPS Designations

Although Afghanistan's and Cameroon's TPS designations are automatically extended by operation of Section 1254a(b)(3)(C), DHS still must provide notice of those extensions.  As noted, the TPS statute requires "publication of notice of each . . . determination" that the

---

[2] *See* Extension of the Designation of Honduras for Temporary Protected Status, 82 Fed. Reg. 59,630, 59,631 (Dec. 15, 2017); Extension of Designation of Somalia Under Temporary Protected Status Program, 65 Fed. Reg. 69,789, 69,790 (Nov. 20, 2000); Extension of Designation of Sudan Under the Temporary Protected Status Program, 65 Fed. Reg. 67,407, 67,408 (Nov. 9, 2020); Extension of Designation of Sierra Leone Under the Temporary Protected Status Program, 65 Fed. Reg. 67,405, 67,406 (Nov. 9, 2000); Extension of Designation of Burundi Under the Temporary Protected Status Program, 65 Fed. Reg. 67,404 (Nov. 9, 2000); Extension of Designation of Montserrat Under the Temporary Protected Status Program, 65 Fed. Reg. 58,806, 58,807 (Oct. 2, 2000); Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program, 65 Fed. Reg. 52,789 (Aug. 30, 2000); Termination of the Province of Kosovo in the Republic of Serbia in the State of the Federal Republic of Yugoslavia (Serbia-Montenegro) Under the Temporary Protected Status Program, 65 Fed. Reg. 33,356 (May 23, 2000); Six-Month Extension and Termination of Designation of Guinea-Bissau Under the Temporary Protected Status Program, 65 Fed. Reg. 15,016 (Mar. 20, 2000).

[3] In light of Section 1254a(b)(3)(C)'s plain text and the federal government's past practice there is no doubt that Afghanistan's and Cameroon's TPS designations are automatically extended by at least six months.  If, however, this Court disagrees, no termination of either country's TPS designation is "effective . . . earlier than 60 days after the date" notice of such termination is published in the Federal Register.  8 U.S.C. § 1254a(b)(3)(B).

Secretary makes with regard to the extension or termination or TPS designations.  8 U.S.C.

§ 1254a(b)(3)(A); *see also id.* § 1254a(b)(4) (requiring the Secretary to "make available

information respecting the temporary protected status . . . to aliens who are nationals of such

designated foreign state").  Such notice is necessary because although six months is the

minimum for any such extension, the Secretary also has discretion to designate such extensions

for a 12- or 18-month period.  *Id.* § 1254a(b)(3)(C).  The TPS statute therefore specifically

requires the notice in the Federal Register to set forth "the period of extension of designation."

*Id.* § 1254a(b)(3)(A).  Notice also confers important benefits to those beyond TPS recipients,

such as their employers, who may not know whether they will be able to continue to lawfully

employ TPS beneficiaries beyond the end of the designation period.  And notice is all the more

important here in light of DHS's inaccurate public representations that it has terminated

Afghanistan's and Cameroon's TPS designations without adhering to its statutory obligations.

With only days remaining for the current designation periods for Afghanistan and Cameroon are

set to expire, DHS has not met its obligation to provide notice of the automatic extensions "on a

timely basis."  *Id.* § 1254a(b)(3)(A), (C).

### B.    CASA's Members Will Be Irreparably Harmed by Defendants' Unlawful Termination of the TPS Designations for Afghanistan and Cameroon

Absent immediate relief, Defendants' unlawful actions will upend the lives of more than

9,000 Afghan and 3,000 Cameroonian TPS holders and their families, causing profound and

irreparable harm.  As long as they have TPS, Afghan and Cameroonian TPS holders are allowed

to live and work in the United States.  For many, loss of that status will require them to return to

countries that just 18 months ago were determined to "pose a serious threat to their personal

safety."  88 Fed. Reg. at 65,732 (Afghanistan); *see also* 88 Fed. Reg. at 69,949 (same for Cameroon).

It is beyond question that removal from this country—"'the equivalent of banishment or exile,'" *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (quoting *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947))—is irreparable harm.  Removal would rip many Afghan and Cameroonian TPS holders and their families away from their homes, jobs, families, neighbors, and communities. *See e.g.*, Escobar Decl. ¶¶ 15–20, 22.  And many fear for their safety should they be forced to return.  *Id.* ¶¶ 15–17, 19.  For example, J.K. fled Cameroon more than two decades ago, and has been living and working in the United States ever since.  *Id.* ¶ 15.  If her TPS is ended, she may be forced to return to a country where her life may be in danger.  *Id.*  Similarly, individuals like C.N. and O.M., who fled violence in Cameroon, also fear for their safety should they lose TPS and be removed to Cameroon.  *Id.* ¶¶ 16–17; *accord id.* ¶ 19 (D.T. and his wife and children are TPS beneficiaries who fear for their family's future and safety if they lose TPS and are forced to leave their home in the United States.).  J.K. also would not be able get the health care that she needs for numerous health conditions if she were forced to return to Cameroon.  *Id.* ¶ 15.  And although A.F. is a citizen of Afghanistan, he has never lived there and has spent only a few weeks visiting the country as a child.  *Id.* ¶ 20.  Removal would thus force him to live in a county where he has no immediate family or connections and where he has dim prospects of building a safe or stable life. *Id*.

Severe economic harm will also ensue if the purported terminations take effect.  Many TPS holders, including CASA's members, rely on their TPS-based employment authorization to provide for themselves and their families.  *See, e.g.*, Escobar Decl. ¶¶ 15–20, 22.  Even now, the impending loss of work authorization has already caused many TPS holders residing in the United

States to fear an imminent loss of income, which would have devastating consequences on those individuals and their families.  J.K., for instance, is a home health aide who relies on her TPS to work.  *Id.* ¶ 15.  J.K. suffers from numerous health issues and, without TPS protection and the associated work authorization, she would not be able to afford medical care.  *Id.*  Another similarly situated individual is O.M., a 66-year-old CASA member who fled violence in Cameroon and relies on her TPS for work authorization.  *Id.* ¶ 16.  Losing TPS would put O.M.'s livelihood in danger.  *Id.*  A.F.'s employer has already begun the process of transitioning his work to other employees in anticipation that termination of Afghanistan's TPS designation would render him unable to continue working in the United States.  *Id.* ¶ 20.  The loss of his job would have serious ramifications not just for A.F., but also for his mother and brother whom he financially supports. *Id.*  There is no serious question that the loss of employment is irreparable harm.  *See Wolf*, 486 F. Supp. 3d at 968–969 (D. Md. 2020) (finding agency action caused irreparable harm where plaintiffs' members would be required to wait an additional 215 days to apply for work authorization and then wait indefinitely for a decision).

Furthermore, Secretary Noem's failure to comply with the TPS statute's procedural requirements for termination or extension of TPS designations exacerbates the harms that TPS holders from Afghanistan and Cameroon are experiencing.  The TPS statute requires ample notice, recognizing the need for stability and the severe consequences of abruptly losing one's home and livelihood.  In contrast, armed solely with news articles of DHS's purported statements regarding purported terminations, Afghan and Cameroonian TPS holders can do nothing but speculate about whether they can continue to work and live in the United States.  Without receiving any official notice, TPS holders and their family are unable to take reasonable measures to plan for their and their families' futures.  *See, e.g.*, *CASA, Inc. v. Trump*, No. CV DLB-25-201, 2025 WL 408636, at

*15 (D. Md. Feb. 5, 2025) (noting that "instability and uncertainty" caused by unlawful government action that places individuals at potential risk of removal from the country constitute irreparable harm).

### C.     The Equities and Public Interest Favor Postponement

The final two considerations supporting relief under Section 705—the balance of the equities and public interest—merge when the government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2008).  Here, both strongly support postponing the purported terminations.  "There is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2019); *see also Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (same).  To the contrary, the public "undoubtedly has an interest in seeing its governmental institutions follow the law."  *Roe v. Dep't of Defense*, 947 F.3d 207, 230–231 (4th Cir. 2020) (internal quotation marks omitted).   In contrast to the serious consequences that TPS holders face, Defendants will face no material harm from an order that "merely ends an unlawful practice."  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).  An "agency cannot itself violate [the law], then claim irreparable harm because it is held to account for such violations."  *Wolf*, 486 F. Supp. 3d at 970.

In addition to the obvious public interest in having the Executive Branch follow the law, there are compelling practical reasons for postponing the agency action here.  CASA's members face direct immediate consequences from the impending end of the TPS designations for Afghanistan and Cameroon.  *See* pp. 18–20, *supra*.  Removal from this country, and loss of employment would not only harm them, but also their families.  Moreover, postponing the purported terminations merely delays those actions pending resolution of this case on the merits— something that, as described immediately below, should not take long.

**II.    The Court Should Grant Summary Judgment as to CASA's Procedural Claims**

In addition, the purely legal issues raised in CASA's procedural claims (Counts I and II) are ready for immediate summary judgment.  The federal rules expressly authorize a motion for summary judgment to be filed "at any time until 30 days after the close of all discovery," Fed. R. Civ. P. 56(b), "even as early as the commencement of the action," *id.*, advisory committee's note to 2009 amendment; *see also* Fed. R. Civ. P. 65(a)(2) (providing that a court "may advance the trial on the merits and consolidate it with the hearing" on a motion for a preliminary injunction). Early summary judgment is appropriate where, as here, there are no factual disputes and the question is a straightforward question of law.  *Am. Hosp. Ass'n v. Dep't of Health & Hum. Servs.*, No. 18-cv-2112, 2018 WL 5777397, at *2 (D.D.C. Nov. 2, 2018) ("[I]n APA cases early summary judgment motions are often appropriate as the entire case on review is a question of law, and only a question of law." (internal quotation marks, brackets, and citation omitted)).

CASA requests that this Court grant swift relief from Defendants' unlawful attempts to terminate Afghanistan's and Cameroon's TPS designations without adhering to the procedures mandated by the TPS statute.  There is, however, no reason why this Court cannot immediately issue permanent relief to these procedural claims.  Indeed, the APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D); *see also City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 772 (D. Md. 2021) ("Where agency action is found contrary to law, it is clear that vacatur is required.").  As discussed, *see* pp. 14–15, *supra*, Defendants' purported terminations of Afghanistan's and Cameroon's TPS designations are contrary to law and without observance of required procedure because Secretary Noem failed to comply with the TPS statute's mandate that notice of any termination be published in the Federal Register at least 60 days before the expiration of a designation period.  8 U.S.C. § 1254a(b)(3)(B).  And as further

discussed, *see* pp. 15–17, *supra*, Secretary Noem's procedural defaults have triggered automatic extensions of both countries' TPS designations of at least six months, as set forth in Section 1254a(b)(3)(C).  Accordingly, this Court should declare unlawful and set aside the purported terminations of Afghanistan's and Cameroon's TPS designations and declare that each country's designation is extended by at least six months from the date of the prior extension.

## CONCLUSION

For all the foregoing reasons, CASA respectfully requests that this Court grant summary judgment on its procedural claims or, in the alternative, issue preliminary relief pursuant to 5 U.S.C. § 705.  CASA respectfully requests that this Court grant the requested relief no later than **May 20, 2025**, to ensure that the purported termination of Afghanistan's TPS designation does not take effect.

May 7, 2025

                                          *s/ Jonathan L. Backer*

Nicholas Katz, Esq. (D. Md. 21920)        Jonathan L. Backer (D. Md. 20000)
CASA, INC.                                Rupa Bhattacharyya*
8151 15th Avenue                          Julia Gegenheimer[†]
Hyattsville, MD 20783                     Joseph W. Mead (D. Md. 22335)
240-491-5743                              Mary B. McCord (D. Md. 21998)
nkatz@wearecasa.org                       Samuel P. Siegel[†]
                                          INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                            AND PROTECTION
Ryan C. Downer*                           Georgetown University Law Center
Sarah L. Bessell (D. Md. 30969)           600 New Jersey Ave., N.W.
WASHINGTON LAWYERS' COMMITTEE FOR         Washington, D.C. 20001
CIVIL RIGHTS AND URBAN AFFAIRS            Phone: (202) 661-6671
700 14th St. #400                         Fax: (202) 661-6730
Washington, D.C. 20005                     jb2845@georgetown.edu
Tel. (202) 319-1000                        jg1370@georgetown.edu
Fax (202) 319-1010                         jm3468@georgetown.edu
ryan_downer@washlaw.org                    mbm7@georgetown.edu
sarah_bessell@washlaw.org                  rb1796@georgetown.edu

ss5427@georgetown.edu

*Attorneys for Plaintiff CASA, Inc.*

*\*Motion for admission pro hac vice forthcoming.*

[†]*Motion for admission pro hac vice forthcoming.  DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*