IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| CASA, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> KRISTI NOEM, Secretary of Homeland Security, in her official capacity, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY, <br><br> *Defendants*. | Case No. |

# DECLARATION OF GEORGE ESCOBAR, CHIEF OF PROGRAMS AND SERVICES, CASA, INC.

I, George Escobar, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Chief of Programs and Services of CASA, Inc. ("CASA"). I have worked at CASA for fourteen years. In my role, I oversee CASA's portfolio of community-facing direct services, including its health, legal, and educational services; employment and workforce development programs; financial literacy and tax programs; and parent engagement programs. An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address those needs. I therefore speak frequently with community members and receive feedback from my staff regarding CASA members' fears, concerns, and decisions.

2. I make this statement based upon personal knowledge, files, and documents of CASA that I have reviewed (such as case files, reports, and collected case metrics), as well as information supplied to me by employees of CASA whom I believe to be reliable. These files,

documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting CASA business.

3.  CASA is a nonprofit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, Pennsylvania, and Georgia.

4.  Founded in 1985, CASA has more than 173,000 lifetime members from across the United States. CASA's members are predominantly noncitizens in a variety of immigration statuses.

**CASA's Mission and Activities**

5.  A CASA member is a person who shares CASA's values, envisions a future where we can achieve full human rights for all, and is convinced that, when united and organized, we can create a more just society by building power in our working-class and immigrant communities. CASA members play an important role in deciding what campaigns we work on and how CASA serves the community.

6.  CASA membership is voluntary. In order to become a member, an individual must apply for membership, pay dues, and subscribe to the principles of CASA. CASA members also must self-identify as members of an immigrant or working-class community.

7.  Currently, the annual fee for CASA membership is $35. Alternatively, individuals may pay a recurring membership fee of $5 per month. The membership fee can be waived for individuals who experience financial hardship or are otherwise unable to pay. Members are also offered the opportunity, for an additional $5, to obtain a CASA ID. This is a physical, picture identification card that contains basic information about the member. For many of our immigrant members, this card may be the only type of picture identification they have, other than documents from their home country. In certain jurisdictions, CASA IDs are recognized for the purposes of

engaging with certain government agencies, including the police.

8. CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. From CASA's beginnings in a church basement, we have envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

9. In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities, with a particular focus in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also offers a more limited suite of services remotely to our members across the United States. Those individuals who are not geographically close to a physical CASA office are offered the opportunity to join a national organizing committee, whose members are entitled to vote on CASA's organizational priorities and integrated into our member-led system of internal democratic governance. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of government benefits. In addition, CASA provides our members with free remote legal assistance, including free legal consultations on immigration issues.

**Harm to CASA's Members From the Cameroon and Afghanistan Terminations**

10. CASA has approximately 100 members from Afghanistan and more than 5,700 members from Cameroon, many of whom are TPS holders.

11. Because of the services that we provide our members, we are acutely aware of the harms that Secretary Noem's reported TPS terminations will cause to Cameroonian and Afghan TPS holders.

12. Since its founding, CASA has provided direct assistance on approximately 1,000 TPS applications for our members, including providing legal services to over 300 Cameroonian members seeking TPS. Beyond that, many more CASA members have obtained TPS without being directly represented by CASA.

13. In addition to the legal services that CASA offers members seeking TPS, the organization is also a leader in advocating for TPS nationally. CASA serves as a founding member of the TPS Funding Collaborative, which has raised more than $3 million to support organizations advocating for TPS.

14. Based on CASA's records, I have determined that the following individuals are TPS holders, and hold TPS-based work authorization where noted, which they will lose as a result of the Terminations. Additionally, based on inquiries of our members, I have identified the following additional harms that these individuals are incurring as a result of the Terminations:

15. J.K. is a CASA member and TPS holder from Cameroon.[1] She is a grandmother and resides in Maryland. Under her TPS-based work authorization, J.K. currently works as a home health aide, helping to care for the elderly. Although she has not had a conversation with her employer about what will happen if her TPS-based work authorization ends, she thinks that her employer will not allow her to continue working. As a senior she will have great difficulty supporting herself without being able to work, because she is not entitled to benefit from government assistance. J.K. suffers from numerous health issues, including circulatory issues, diabetes, pterygium (which affects her eyesight), and frequent bouts of pneumonia, which can be life-threatening. She currently has charity care to cover the costs of her medical care, but that health insurance is not guaranteed—it is at the discretion of the provider to renew each year.

---

[1] To protect the privacy and security of our members, I am using initials to identify them. The identity of each of these individuals is known to me personally.

Without TPS protections, including the associated work authorization, she fears that she would not be able to secure or afford the necessary medical care in the future. J.K. is also afraid that she could be removed to Cameroon, a country she fled more than two decades ago. J.K. believes her life could be in danger in Cameroon: she was caught in the middle of the country's civil conflict, with one Anglophone parent and one Francophone parent, leading her to be targeted by both sides and not accepted anywhere. And physical safety concerns aside, J.K. would not be able to get the health care in Cameroon that she needs to survive.

16. O.M. is a 66-year-old CASA member and TPS holder from Cameroon. O.M. additionally has TPS-based work authorization. O.M. fled violence in Cameroon and is currently living in Maryland. She works as a home health assistant, helping people with disabilities. She relies on her TPS status for her work authorization. O.M. is afraid of losing TPS protections because it would put her livelihood in danger. Although she has not had a conversation with her employer about what will happen when her work permit expires, she was required to provide her work permit when she was hired and understands that she won't be able to work once it expires. In addition, losing TPS would expose her to the risk of being forced to return to a country where she does not feel safe. When living in Cameroon, she was subjected to physical abuse due to her religious faith. O.M. fears that if she is forced to return to Cameroon, she could suffer further abuse.

17. C.N. is a CASA member and TPS holder from Cameroon. C.N. lives in Maryland and works as a hairstylist. She is very active in her community, volunteering with local charities and distributing clothing to those in need. C.N. fled violence in Cameroon and is afraid to return, in part because she has been a vocal activist in the Cameroonian community in the U.S and her family has warned her that she could be in danger if she returns. Although she does not currently

rely on her TPS for work authorization, C.N. may need to rely on it in the future. Accordingly, both her livelihood and personal safety would be at risk if she were to lose TPS protection.

18. D.L. is a CASA member and TPS holder from Cameroon. D.L. lives in Maryland and currently works as a ride-share driver. Previously he worked in home health services. D.L. is active with CASA's community organizing work and in his Pentecostal church. He fled Cameroon after experiencing persecution and experienced ICE detention after entering the U.S. His wife, who is pregnant, and his younger brother, neither of whom are TPS holders, depend on him for their family's income. Although he currently has work authorization through another mechanism, he is not confident that he will be able to maintain that authorization and would thus need to rely on TPS-based work authorization in the future, since he has no other status to rely upon. Losing TPS and the related risk of removal threatens to separate D.L. from his family members and would place the whole family, including his pregnant wife, at risk financially.

19. D.T. is a CASA member and TPS holder from Cameroon who fled violence there. D.T. lives in Maryland and works as a caregiver in an assisted living community. He is a loving husband and the father of three children, two of whom are United States citizens. His third child and his wife are also TPS beneficiaries. D.T. proudly pays his taxes and supports his community, and he is a vocal advocate for Cameroonians in the United States. If D.T. and his family lose their TPS protections, D.T. is afraid his family will not be able to support themselves and that their lives could be at risk if they were forced to leave the United States. He also fears that TPS termination could separate him from his children, with the two children who are United States citizens able to remain in the United States while his other child might be forced to leave the country with D.T. and his wife. In addition, though neither D.T. nor his wife currently rely on their TPS for work authorization, they are afraid that their other basis for working legally in the United States could

expire or be revoked, thus forcing them to seek and rely on TPS-based work authorization.

20. A.F. is a CASA member and Afghanistan TPS holder who lives in Virginia. He has an engineering degree and works as a project manager under his TPS-based work authorization. A.F. thus depends on work authorization through TPS to support himself and to be able to send money to his mother and brother. A.F. is afraid that when his current TPS-based employment authorization ends on May 20, his employer could terminate him or, at best, place him on a lengthy unpaid administrative leave as a precursor to firing him. He cannot afford either option. His employer has already begun the process of preparing to transition A.F.'s work to other employees, in anticipation of his inability to work. A.F. has had to advocate for himself with the employer's HR Department, educating them about his immigration status. In addition, A.F. fears being vulnerable to removal to Afghanistan. Although he is a citizen of Afghanistan, he has never lived there and has spent only around five weeks of his life in the country, when he was a child. A.F. has no immediate family in Afghanistan and no prospects of building a safe or stable life there.

21. As these individuals' circumstances demonstrate, the communities and members that CASA serves will be harmed by each Termination.

22. CASA members who receive TPS for Afghanistan and Cameroon face irreparable harm if the TPS programs are terminated, including if the members (and other TPS holders) are deported. If TPS is terminated, CASA members may lose their jobs, businesses, and homes. They may be left unable to support their families. They may lose access to critical medical care and basic services. And they may be separated from their families and deported to a country where they may face political repression and abuse.

23. Since the reports of the Terminations, we have begun to observe the impact on our

members. As described above, members have expressed fear over the loss of protection from removal and face increasing anxiety about potential deportation. In addition, members face severe mental anguish at the prospect of losing work authorization as a result of the Terminations, as they rely on their income to provide basic needs and critical medical care for themselves and their family members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 6, 2025                    Respectfully submitted,

*George Escobar*
George Escobar