**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |
|---|---|
| CASA, INC.<br><br>    *Plaintiff,*<br><br>  v.<br><br>KRISTI NOEM, in her official capacity as<br>Secretary of Homeland Security, & UNITED<br>STATES DEPARTMENT OF HOMELAND<br>SECURITY<br><br>    *Defendants.* | **Case No.** 8:25-cv-1484 |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OR A STAY OF AGENCY ACTION**</u>

## TABLE OF CONTENTS

**Page**

## CONTENTS

TABLE OF AUTHORITIES ........................................................................................ i

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 3

    I.     Temporary Protected Status ................................................... 3

    II.    Afghanistan's TPS Designation and Its Attempted
           Termination .......................................................................... 5

    III.   Cameroon's TPS Designation ................................................ 9

    IV.   This Action ............................................................................ 11

LEGAL STANDARDS ............................................................................................ 11

ARGUMENT ........................................................................................................ 12

    I.     The Attempted Termination of Afghanistan's TPS
           Designation Should Be Set Aside ........................................ 12

    A.    Defendants Acted Too Late to Terminate Afghanistan's
           TPS Designation .................................................................. 13

    B.    Defendants Based their Decision to Terminate
           Afghanistan's TPS Designation on Improper
           Considerations...................................................................... 21

    C.    In the Alternative, This Court Should Postpone the
           Effective Date of the Termination of Afghanistan's TPS
           Designation .......................................................................... 27

    II.    Cameroon's TPS Designation Also Is Automatically
           Extended .............................................................................. 30

CONCLUSION...................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Appalachian Voices v. U.S. Dep't of Interior*,
    25 F.4th 259 (4th Cir. 2022) ............................................................................ 22

*CASA de Maryland, Inc. v. Wolf*,
    486 F. Supp. 3d 928 (D. Md. 2020)............................................................. 12, 29

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
    332 F. Supp. 3d 393 (D. Mass. 2018) ...................................................... 14, 16, 20

*Cowpasture River Preservation Ass'n v. Forest Serv.*,
    911 F.3d 150 (4th Cir. 2018), *rev'd on other grounds sub nom.*,
    *U.S. Forest Serv. v. Cowpasture River Preservation Ass'n*, 590 U.S. 605 (2020) ................. 26

*Delgadillo v. Carmichael*,
    332 U.S. 391 (1947)......................................................................................... 27

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019)................................................................................... 21, 26

*Documented v. Dep't of Homeland Sec.*,
    No. 21-cv-3142, 2024 WL 4253130 (D.D.C. Sept. 20, 2024)................................. 14

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ............................................................................ 12

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)............................................................................... 29

*NAACP v. U.S. Dep't of Homeland Sec.*,
    364 F. Supp. 3d 568 (D. Md. 2019)................................................................... 16

*Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*,
    421 F. Supp. 3d 102 (D. Md. 2019) ................................................................... 12

*Nken v. Holder*,
    556 U.S. 418 (2009)......................................................................................... 29

*Padilla v. Kentucky*,
    559 U.S. 356 (2010)......................................................................................... 27

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .......................................................................... 29

**Page(s)**

*Roe v. U.S. Dep't of Defense*,
  947 F.3d 207 (4th Cir. 2020) ................................................................... 21, 22, 29

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...................................................... 16, 22, 26

*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ............................................................................... 29

*Winter v. Nat. Res. Def. Council, In*c.,
  555 U.S. 7 (2008).................................................................................................. 12

**Statutes**

6 U.S.C. § 557 ............................................................................................................ 4

Administrative Procedure Act
  5 U.S.C. § 551 ..................................................................................................... 11
  5 U.S.C. § 705 ............................................................................................... *passim*
  5 U.S.C. § 706(2) ................................................................................................ 20
  5 U.S.C. § 706(2)(A) ...................................................................................... *passim*
  5 U.S.C. § 706(2)(D) ..................................................................................... 11, 15

Immigration and Nationality Act
  8 U.S.C. § 1103(a) ............................................................................................... 4
  8 U.S.C. § 1254a(a)(1).......................................................................................... 3
  8 U.S.C. § 1254a(a)(1)(A) ............................................................................... 4, 24
  8 U.S.C. § 1254a(a)(1)(B) .................................................................................... 4
  8 U.S.C. § 1254a(b)(1) ....................................................................................... 3, 4
  8 U.S.C. § 1254a(b)(1)(A) .............................................................................. *passim*
  8 U.S.C. § 1254a(b)(1)(C) .............................................................................. *passim*
  8 U.S.C. § 1254a(b)(2)(B) ................................................................................... 13
  8 U.S.C. § 1254a(b)(3)........................................................................................... 2
  8 U.S.C. § 1254a(b)(3)(A) .............................................................................. *passim*
  8 U.S.C. § 1254a(b)(3)(B) .............................................................................. *passim*
  8 U.S.C. § 1254a(b)(3)(C) .............................................................................. *passim*
  8 U.S.C. § 1254a(b)(4) ........................................................................................ 20
  8 U.S.C. § 1254a(c) ............................................................................................... 4
  8 U.S.C. § 1254a(d)(3) ............................................................................... 8, 15, 17
  8 U.S.C. § 1254a(d)(4) ......................................................................................... 4
  8 U.S.C. § 1254a(f)(3) .......................................................................................... 4
  8 U.S.C. § 1254a(f)(4) .......................................................................................... 4

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 ......................... 4

Page(s)

**Other Authorities**

58 Fed. Reg. 7,582 (Feb. 8, 1993) ................................................................................ 20

63 Fed. Reg. 15,437 (Mar. 31, 1998) ........................................................................... 19

65 Fed. Reg. 33,356 (May 23, 2000) ............................................................................ 18

67 Fed. Reg. 66,423 (Oct. 31, 2002) ............................................................................ 18

69 Fed. Reg. 40,642 (July 6, 2004) .............................................................................. 19

72 Fed. Reg. 61,172 (Oct. 29, 2007) ............................................................................ 19

82 Fed. Reg. 47,228 (Oct. 11, 2017) ............................................................................ 19

82 Fed. Reg. 59,630 (Dec. 15, 2017) ............................................................................ 18

82 Fed. Reg. 59,636 (Dec. 12, 2017) ............................................................................ 19

83 Fed. Reg. 2,654 (Jan. 18, 2018) ............................................................................... 19

83 Fed. Reg. 26,074 (June 5, 2018) .............................................................................. 19

87 Fed. Reg. 30,976 (May 20, 2022) ................................................................. 2, 5, 6, 24

87 Fed. Reg. 34,706 (June 7, 2022) ............................................................................... 9

88 Fed. Reg. 65,728 (Sept. 25, 2023) .................................................................... *passim*

88 Fed. Reg. 69,945 (Oct. 10, 2023) ....................................................................... 9, 10

90 Fed. Reg. 20,309 (May 13, 2025) ..................................................................... *passim*

90 Fed. Reg. 8,337 (Jan. 20, 2025) ............................................................................... 23

90 Fed. Reg. 8,443 (Jan. 20, 2025) ......................................................................... 23, 25

90 Fed. Reg. 8,805 (Feb. 3, 2025) ........................................................................... 18, 19

90 Fed. Reg. 9,040 (Feb. 5, 2025) ................................................................................ 19

Fed. R. Civ. P. 56(a) .................................................................................................... 12

Fed. R. Civ. P. 56(b) .................................................................................................... 12

Fed. R. Civ. P. 56, advisory committee's note to 2009 amendment ............................ 12

H.R. Rep. No. 100-627 (1988) ............................................................................... 4, 24

Hamed Aleaziz, *Trump Will End Temporary Protections for Afghans and Cameroonians*, N.Y. Times (Apr. 11, 2025), https://tinyurl.com/5e5fruuc ............................................ 8, 11, 30

Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* (updated Dec. 5, 2024) ...................................................................................... 7, 11

Nalova Akua, *"What Were You Expecting?  A Bloodless War?": How Cameroon Became Trapped in a Forgotten Standoff*, The Guardian (Nov. 21, 2024), https://perma.cc/5936-WJRG. ................................................................................................. 9

Thomas Mackintosh & Regan Morris, *Trump to End Temporary Protected Status for Afghans and Cameroonians*, BBC (Apr. 11, 2025), https://perma.cc/KYH9-V92S ................... 8, 11, 30

U.S. Citizenship & Immigr. Servs., *Temporary Protected Status Designated Country: Afghanistan*, https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-afghanistan (last visited May 19, 2025) .......................... 7

U.S. Citizenship & Immigr. Servs., *Temporary Protected Status Designated Country: Cameroon*, https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-cameroon (last visited May 19, 2025) ........................... 10

**INTRODUCTION**

Thousands of Afghan and Cameroonian nationals have lawfully lived and worked in the United States for years under the protection of Temporary Protected Status (TPS).  Secretary of Homeland Security Kristi Noem attempted to terminate that protection for Afghanistan last week.  If that attempted termination stands, Afghan TPS holders will lose their legal status and work authorization on July 14, 2025.  And public statements by the Department of Homeland Security (DHS), coupled with Secretary Noem's failure to publish a notice in the Federal Register memorializing an extension of Cameroon's TPS designation, have sown confusion over how long protections for Cameroonian TPS holder will remain in place.  Defendants' attempt to terminate Afghanistan's TPS designation flouts the plain language of the TPS statute and is clearly based on considerations other than those set forth in the statute.  This Court should set aside that attempted termination immediately and declare that Afghanistan's TPS designation is extended by at least six months, as dictated by the plain language of the TPS statute.  And it should declare that Cameroon's TPS designation is automatically extended by six months for the same reason.

A TPS designation represents a promise that the United States will not send TPS holders back to a country where conditions are dangerous or unstable.  By statute, TPS designations are made initially for a period between 6 and 18 months.  Qualified nationals of countries with TPS designations are legally present in the United States, are authorized to work, and cannot be detained or removed while they possess such status.  The TPS statute recognizes that those who hold that status rely on its promise and thus includes safeguards to ensure that a TPS designation cannot be terminated without warning.  TPS designations are automatically extended unless the Secretary of Homeland Security publishes a determination that country conditions have improved in the Federal Register at least 60 days in advance of the scheduled expiration of a designation.  8 U.S.C.

§ 1254a(b)(3).  This process ensures that TPS holders have ample notice of any change to their status, and provides the stability necessary to allow TPS holders to build a successful life in the United States until conditions in their home country improve.

DHS has unlawfully attempted to terminate Afghanistan's TPS designation without observing these mandatory and important procedures, and has not memorialized the extension of Cameroon's TPS designation as the statute requires.  Former Secretary of Homeland Security Alejandro Mayorkas extended both countries' TPS designations in 2023.  The designation for Afghanistan expires today (May 20, 2025), while the designation for Cameroon expires on June 7, 2025.  The statutory deadlines for publishing notice of a decision terminating the two countries' TPS designations in the Federal Register were March 21 and April 8, 2025, respectively.  Those deadlines came and went without any such notice.  As a result, each TPS designation is automatically extended by at least six months by operation of statute.

Beyond the procedural defectiveness of Secretary Noem's attempted termination of Afghanistan's TPS designation, her decision also is "arbitrary, capricious . . . [and] otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Under the TPS statute, the only permissible reason for terminating a country's TPS designation is a finding by the Secretary that the country "no longer continues to meet the conditions" for TPS designation.  8 U.S.C. § 1254a(b)(3)(B).  Former Secretary Mayorkas designated Afghanistan for TPS based on its "ongoing armed conflict" and on "extraordinary and temporary conditions" that prevented the safe return of Afghan nationals to that country.  Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30,976, 30,977 (May 20, 2022); *see also* 8 U.S.C. § 1254a(b)(1)(A), (C).  But Secretary Noem's termination notice makes clear that her decision to terminate Afghanistan's TPS designation was not based on a finding that those conditions no longer exist.  Instead, it was preordained by

presidential directive, a part of the Trump Administration's broader effort to reduce the number of non-white immigrants in this country. Moreover, the Secretary improperly justified the termination decision on the ground that an extension would be "contrary to the national interest." Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,310 (May 13, 2025) (quoting 8 U.S.C. § 1254a(b)(1)(C)). But this justification is not a permissible consideration for determining whether a designation based on an "ongoing armed conflict" should continue, *see* 8 U.S.C. § 1254a(b)(1)(A). Moreover, Secretary Noem's invocation of the "national interest" rested on allegations of purported individual wrongdoing on the part of TPS holders. *See* 90 Fed. Reg. at 20,311. These sorts of considerations are the antithesis of the evidence-based process that the statute requires when determining whether a TPS designation should be terminated.

The claims raised in this motion are purely legal: that Defendants failed to comply with statutorily mandated procedures for terminating Afghanistan's TPS designation; that the decision to terminate Afghanistan's TPS designation was arbitrary, capricious, and not in accordance with law; and that Afghanistan's and Cameroon's TPS designations are automatically extended by operation of statute. CASA thus asks this Court to finally adjudicate those claims now. But if this Court delays final judgment, CASA requests preliminary relief under 5 U.S.C. § 705.

## BACKGROUND

### I.     Temporary Protected Status

TPS provides temporary immigration relief to foreign nationals in the United States who cannot safely return to their home nation because of an armed conflict, natural disasters, or other "extraordinary and temporary conditions in the foreign state." 8 U.S.C. § 1254a(a)(1), (b)(1). Congress created TPS in 1990 to provide "a more formal and orderly mechanism for the selection, processing, and registration" of individuals "from countries experiencing turmoil," rather than

relying on the prior practice of ad hoc presidential action for those purposes.  H.R. Rep. No. 100-627, at 4 (1988).

Under the TPS statute, the Secretary of Homeland Security may designate a country for protected status for renewable periods of up to 18 months "after consultation with appropriate agencies of the Government."  8 U.S.C. § 1254a(b)(1).[1]  Once a country has been designated for TPS, nationals of that country (and individuals with no nationality who last habitually resided in that country) who are present in the United States and meet other stringent criteria may remain lawfully in the United States for the duration of the designation.  *Id.* § 1254a(a)(1)(A), (c).  TPS holders may not be detained or removed on the basis of their immigration status.  *Id.* § 1254a(a)(1)(A), (d)(4).  And the Secretary "shall authorize" those with TPS to "engage in employment in the United States" and provide them with an employment authorization document (EAD).  *Id.* § 1254a(a)(1)(B); *see also id.* § 1254a(f)(3), (4) (detailing other benefits associated with TPS).

Once a country has been designated for TPS, the Secretary "shall" periodically review the conditions in that country and "determine whether the conditions for such designation . . . continue to be met."  *Id.* § 1254a(b)(3)(A).  As discussed in the greater detail below, the statute provides strict procedures and timeframes that must be followed when conducting this review.  *See* pp. 13–15, *infra*.  At the end of that process, the Secretary must make one of two decisions:  Either extend the TPS designation for at least six months, *see* 8 U.S.C. § 1254a(b)(3)(C), or terminate the designation, *id.* § 1254a(b)(3)(B).  Notice of either decision must be published in the Federal

---

[1] The statute originally provided the Attorney General with this authority.  In 2003 Congress transferred authority for TPS designation, extension, and termination to the Secretary of Homeland Security.  6 U.S.C. § 557; *see* Homeland Security Act of 2002, Pub. L. No. 107-296, tit. XV, § 1517, 116 Stat. 2135, 2311.  References to the Attorney General in the TPS statute are now deemed to refer to the Secretary of Homeland Security.  *See* 8 U.S.C. § 1103(a).

Register.  *Id.* § 1254a(b)(3)(A).  The Federal Register notices, as well as the U.S. Citizenship and Immigration Services (USCIS) website, typically provide details on how potential beneficiaries can obtain TPS and the associated benefits.  *See* pp. 7, 10, *infra*.

## II.    Afghanistan's TPS Designation and Its Attempted Termination

Afghanistan was initially designated for TPS on May 20, 2022, due to armed conflict and an ongoing "humanitarian disaster."  Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30,976, 30,977 (May 20, 2022) (the "2022 Afghanistan Designation").  The TPS designation came after the Taliban took over Kabul in 2021, the culmination of its 20-year insurgency against the government of Afghanistan and U.S. and NATO forces.  *Id.*  Even before the withdrawal of U.S. and NATO troops, the conflict had taken a "high toll on Afghan civilians": the United Nations Assistance Mission in Afghanistan recorded more than 116,000 civilian deaths and injuries between 2009 and June 2021.  *Id.* at 30,978.

Armed conflict continued after the withdrawal of U.S. and NATO troops.  *Id.*  The Taliban targeted old adversaries, including former Afghan police and military personnel.  *Id.*  The Islamic State in Iraq and the Levant-Khorasan Province (ISIS-K) also posed an increasing threat to civilians.  *Id.*  This group, which the U.S. Department of State designated as a foreign terrorist organization in January 2016, had been waging its own insurgency against the Taliban.  *Id.* at 30,978–30,979.  The battle between the two groups frequently resulted in civilian casualties.  *Id.* at 30,979.  Among other things, ISIS-K claimed responsibility for the August 26, 2021, suicide attack outside Kabul airport.  *Id.*  By November 2021, ISIS-K was present in nearly all of Afghanistan's provinces, and the number of ISIS-K attacks had increased by more than five-and-a-half times from the prior year.  *Id.*

Afghanistan also faced significant challenges due to the destruction of vital infrastructure.  *Id.*  The Taliban had targeted power stations, dug up roads, destroyed cell towers, and damaged

schools and medical facilities during their insurgency. *Id.* The country's education system was also "at risk of complete collapse due to the economic crisis," and the conflict had "left the Afghan countryside 'littered with abandoned and decaying power plants, prisons, schools, factories, office buildings and military bases.'" *Id.* (citation omitted). Afghans faced a host of other dangers, including undetonated "[e]xplosive remnants of war," *id.*; rising internal displacement, *id.* at 30,980; a "cessation of purchasing power of the Afghan population as a result of the termination of international assistance once used to pay salaries," *id.*; lack of access to food, potable water, and healthcare, *id.* at 30,980–30,981; and human rights abuses against women and girls, ethnic minorities, and the disabled, *id.* at 30,981–30,984.

On September 25, 2023, then-Secretary of Homeland Security Alejandro Mayorkas extended the 2022 Afghanistan Designation for a period of 18 months, until May 20, 2025. Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,728 (Sept. 25, 2023) (the "2023 Afghanistan Extension"). The notice also established a registration period during which first-time applications could be submitted. *Id.* at 65,729. In taking those actions, Secretary Mayorkas explained that since the August 2021 Taliban takeover, the "conflict and insurgency [had] continue[d] to cause insecurity and widespread harm throughout the country." *Id.* at 65,730. He further cited the ongoing conflict between the Taliban and ISIS-K. *Id.* at 65,731. The human rights situation in Afghanistan had developed into a "worsening crisis," as the Taliban responded to any resistance to its rule with "summary killings, disappearances, information blackouts, and physical abuse." *Id.* The Taliban had also adopted an "extremely repressive" regime with respect to women and girls—against whom sexual violence "occur[ed] regularly"—and ethnic and religious minorities. *Id.* The humanitarian situation in Afghanistan

was also "dire, with 15 million people facing acute food insecurity, as well as limited access to clean water and healthcare, destruction of infrastructure, and economic instability." *Id.* at 65,732.

In light of these conditions, Secretary Mayorkas determined that there "continues to be an ongoing armed conflict in Afghanistan" and that requiring Afghans to return to Afghanistan would "pose a serious threat to their personal safety." *Id.* (citing 8 U.S.C. § 1254a(b)(1)(A)). He further determined that there "continue to be extraordinary and temporary conditions in Afghanistan" that prevented Afghans from "returning to Afghanistan in safety," and that it was "not contrary to the national interest of the United States to permit Afghan TPS beneficiaries to remain in the United States temporarily." *Id.* (citing 8 U.S.C. § 1254a(b)(1)(C)).

Consistent with past practice, the 2023 Afghanistan Extension established a 60-day re-registration period for existing TPS beneficiaries. *Id.* at 65,728. It further established a registration period during which first-time applications could be submitted. *Id.* It also provided instructions for how beneficiaries could register or re-register, and how they could obtain an EAD, including by identifying which forms needed to be filled out, what supporting documentation was required, and where the relevant materials needed to be mailed. *Id.* at 65,733–65,737. USCIS's website provided similar details. *See* U.S. Citizenship & Immigr. Servs., *Temporary Protected Status Designated Country: Afghanistan*, https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-afghanistan (last visited May 19, 2025), J.R. 25–31. As a result of the redesignation of Afghanistan in the 2023 Afghanistan Extension, an estimated 14,600 individuals became newly eligible to apply. Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 9 (updated Dec. 5, 2024). As of May 13, 2025, approximately 11,700 nationals of Afghanistan (or persons having no nationality who last habitually resided in Afghanistan) had received TPS. *See* Termination of the

Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,311 (May 13, 2025).

On April 11, 2025, various news outlets reported that Secretary Noem had terminated Afghanistan's TPS designation, based on an email to the media from Assistant Secretary for Public Affairs Tricia McLaughlin. *See* Hamed Aleaziz, *Trump Will End Temporary Protections for Afghans and Cameroonians*, N.Y. Times (Apr. 11, 2025), https://tinyurl.com/5e5fruuc, J.R. 33–35; Thomas Mackintosh & Regan Morris, *Trump to End Temporary Protected Status for Afghans and Cameroonians*, BBC (Apr. 11, 2025), https://perma.cc/KYH9-V92S, J.R. 37–41. The Secretary published a notice terminating Afghanistan's TPS designation on May 13, 2025, shortly after CASA filed this lawsuit. 90 Fed. Reg. at 20,309. According to the termination notice, the Secretary determined, based on her review and consultations with the Department of State, that there were "notable improvements in the security and economic situation such that requiring the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety due to armed conflict or extraordinary and temporary conditions." *Id.* at 20,310. The Secretary also concluded that an extension of Afghanistan's TPS designation would be "'contrary to the national interest'" because doing so would be at odds with President Trump's directive in Executive Order 14,159 to roll back TPS designations and would not "put American interests first." *Id.* at 20,311 (quoting 8 U.S.C. § 1254a(b)(1)(C)). She further alleged that certain Afghan TPS holders had been "the subject of administrative investigations for fraud, public safety, and national security." *Id.* Based on those considerations, the Secretary terminated Afghanistan's TPS designation with an effective date of July 14, 2025—60 days after the notice's publication—to provide for an "orderly transition." *Id.* (citing 8 U.S.C. § 1254a(d)(3)).

### III.    Cameroon's TPS Designation

Cameroon was initially designated for TPS on June 7, 2022, due to armed conflict between government forces and armed separatists in the country, as well as deadly attacks by multiple terrorist organizations.  Designation of Cameroon for Temporary Protected Status, 87 Fed. Reg. 34,706 (June 7, 2022).  Since 2016, armed conflict has raged in the English-speaking regions of Cameroon (which make up approximately 20 percent of the country's population) due to the emergence of an Anglophone separatist movement.  *Id.*  at 34,708.  More than 6,000 people have died as a result of the conflict; and more than a million have been displaced either internally or to neighboring countries.  *See* Nalova Akua, *"What Were You Expecting?  A Bloodless War?": How Cameroon Became Trapped in a Forgotten Standoff*, The Guardian (Nov. 21, 2024), https://perma.cc/5936-WJRG, J.R. 43–63.  The conflict caused the economy and infrastructure to collapse, and led to widespread human rights abuses, including torture and sexual violence.  *Id.*  In designating the country for TPS, Secretary Mayorkas cited the extreme violence between government forces and armed separatists, noting the crisis was "more severe than any other in contemporary Cameroon."  87 Fed. Reg. at 34,708.  He further noted that one in three people in the Anglophone regions of Cameroon were in need of humanitarian aid; there were ongoing attacks by Boko Haram and other terrorist organizations; and food insecurity was increasing.  *Id.* at 34,708–34,709.

On October 10, 2023, Secretary Mayorkas extended TPS for Cameroon for a period of 18 months, until June 7, 2025 (the "2023 Cameroon Extension").  Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945, 69,945 (Oct. 10, 2023).  In deciding to extend the status, the Secretary noted the ongoing armed conflict between the government and nonstate armed groups, as well as conflict between the government and the Anglophone separatist groups.  *Id.* at 69,947.  The conflicts had led to widespread killing,

kidnapping, and displacement, as well as destruction of civilian infrastructure. *Id.* The Secretary further noted that the conflicts had destroyed hundreds of homes, and that many civilians did not have access to health services and education. *Id.* at 69,947–69,948. Individuals engaged in peaceful protests had been abducted, tortured, and shot, and children had been abducted for use as soldiers. *Id.* An estimated three million people were facing food insecurity in 2023, and the country was experiencing a cholera outbreak. *Id.* at 69,949. In light of these conditions, Secretary Mayorkas determined that there "continues to be an ongoing armed conflict in the Far North region of Cameroon" and that requiring Cameroonians to return to Cameroon would "pose a serious threat to their personal safety." *Id.* (citing 8 U.S.C. § 1254a(b)(1)(A)). He further determined that there "continue[d] to be extraordinary and temporary conditions in Cameroon" that prevented Cameroonians from "returning to Cameroon in safety," and that it was "not contrary to the national interest of the United States to permit Cameroonian TPS beneficiaries to remain in the United States temporarily." *Id.* (citing 8 U.S.C. § 1254a(b)(1)(C)).

Consistent with past practice, the 2023 Cameroon Extension established a 60-day re-registration period for existing TPS beneficiaries. *Id.* at 69,945. It also established a registration period during which first-time applications could be submitted. *Id.* And it provided instructions for how beneficiaries could register or re-register, and how they could obtain an EAD, including by identifying which forms needed to be filled out, what supporting documentation was required, and where the relevant materials needed to be mailed. *Id.* at 69,949–69,953. USCIS's website provided similar details. U.S. Citizenship & Immigr. Servs., *Temporary Protected Status Designated Country: Cameroon*, https://www.uscis.gov/humanitarian/temporary-protected-status/temporary-protected-status-designated-country-cameroon (last visited May 19, 2025), J.R. 65–69. As a result of the redesignation of Cameroon in the 2023 Cameroon Extension, an

estimated 7,900 individuals became newly eligible to apply.  Wilson, *supra* p. 7, at 11.  As of September 30, 2024, 3,485 Cameroonians had received TPS.  *Id.*

On April 11, 2025, various news outlets reported that Secretary Noem had terminated Cameroon's TPS designation, based on an email to the media from Assistant Secretary McLaughlin.  *See* Aleaziz, p. 8, *supra*; Mackintosh & Regan, p. 8, *supra*.  As of the date of the filing of this motion, DHS has not published the statutorily required notice of any decision to terminate the TPS designation for Cameroon in the Federal Register.

## IV.    This Action

CASA is a membership organization dedicated to advancing immigrants' rights.  Its members include Afghan and Cameroonian TPS holders who rely on TPS to lawfully live and work in the United States, and who fear the prospect of being removed from the United States and relocated to countries experiencing dangerous conditions.  On behalf of those members, CASA bring two claims (Counts I and II) under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, challenging the attempted termination of Afghanistan's TPS designation as "without observance of procedure required by law," *id.* § 706(2)(D), and as "arbitrary, capricious" or "otherwise not in accordance with law, *id.* § 706(2)(A).  Counts III and IV seek declarations that Afghanistan's and Cameroon's TPS designations are automatically extended by at least six months by operation of the TPS statute.  Finally, Count V—for which CASA does not seek relief in this motion—challenges the attempted termination of Afghanistan's TPS designation under the Fifth Amendment's equal protection component.  *See* First Am. Compl. ¶¶ 112–132.

## LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall issue summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That standard "does not apply," however, in cases such as this one involving review of final agency action under the APA. *Nat'l Fed'n of the Blind v. U.S. Abilityone Comm'n*, 421 F. Supp. 3d 102, 114 (D. Md. 2019). Instead, "[s]ummary judgment . . . serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record." *Id.* A party may move for summary judgment "at any time," Fed. R. Civ. P. 56(b), "even as early as the commencement of the action," *id.*, advisory committee's note to 2009 amendment.

Section 705 of the APA permits courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve the status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *CASA de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (citation omitted). That is, courts review whether (1) the requesting party is likely to succeed on the merits of their claim; (2) the requesting party is experiencing irreparable harm that will continue absent preliminary relief; (3) the balance of equities are in the requesting party's favor; and (4) relief would be in the public interest. *See Winter v. Nat. Res. Def. Council, In*c., 555 U.S. 7, 20 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

## ARGUMENT

### I.    The Attempted Termination of Afghanistan's TPS Designation Should Be Set Aside

Defendants' attempted termination of Afghanistan's TPS designation should be set aside for two independent reasons. Count I of CASA's First Amended Complaint challenges the termination under the APA for failing to comply with the procedures set forth in the TPS statute for terminating a country's TPS designation. Defendants acted too late in attempting to terminate Afghanistan's TPS designation, and the result of their procedural default is that the designation is

automatically extended by at least six months.   Separately, Count II of the First Amended Complaint challenges the termination as "arbitrary [and] capricious" and "not in accordance with law," 5 U.S.C. § 706(2)(A), based on the reasoning for the termination set forth in the termination notice.   Based on either theory, this Court should set aside Defendants' attempted termination of Afghanistan's TPS designation, and, per Count III, it should declare that Afghanistan's TPS designation is automatically extended by at least six months.   If, however, this Court believes that further factual development is necessary to resolve those claims, it should at a minimum postpone the effective date of the attempted Afghanistan termination under 5 U.S.C. § 705.

**A.    Defendants Acted Too Late to Terminate Afghanistan's TPS Designation**

The TPS statute sets forth specific procedures for terminating a country's TPS designation. Under the statute, a country's TPS designation is automatically extended for at least six months *unless* the Secretary of Homeland Security publishes a termination notice in the Federal Register setting forth the basis for that termination at least 60 days in advance of any scheduled expiration of a TPS designation.   Although Defendants have attempted to terminate Afghanistan's TPS designation, they failed to do so within the timeframe set by the TPS statute.   As a result, Afghanistan's TPS designation is automatically extended by at least six months.

**1.    Statutory Framework**

As detailed above, under the TPS statute, the Secretary may designate a country for temporary protected status for renewable periods of up to 18 months.   *See* p. 4, *supra*; *see also* 8 U.S.C. § 1254a(b)(2)(B), (3)(C).   After a country is designated for TPS, the statute sets forth a mandatory process for periodic review.   8 § 1254a(b)(3)(A).   At least 60 days before the end of each designation period, the Secretary, "after consultation with appropriate agencies of the Government," must "review the conditions" in the country and determine whether the conditions for TPS designation "continue to be met."   *Id.*   The output of this review process is binary:   Either

the Secretary terminates the country's TPS designation upon the expiration of the designation period or the TPS designation is extended. *Id.* § 1254a(b)(3)(B)–(C). Whatever the outcome of the review process, the Secretary must publish "notice of each such determination (including the basis for the determination)" in the Federal Register "on a timely basis." *Id.* § 1254a(b)(3)(A).

If the Secretary determines that the country "no longer continues to meet the conditions" for TPS designation, the Secretary "shall terminate the designation by publishing notice in the Federal Register." *Id.* § 1254a(b)(3)(B). But the statute ensures that TPS holders receive adequate notice of any termination so that they can make the necessary arrangements to reorder their lives. The statute provides that a termination of a TPS designation "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension" of the country's TPS designation. *Id.* Thus, a termination notice must be published in the Federal Register at least 60 days before the expiration date for any TPS designation.

If the Secretary "does *not* determine" that the country "no longer meets the conditions" for TPS designation, the country's TPS designation "*is extended* for a period of 6 months" or for a period of 12 or 18 months, at the Secretary's discretion. *Id.* § 1254a(b)(3)(C) (emphases added). Thus, an extension of a country's TPS designation can occur either through "an affirmative determination" by the Secretary that the conditions for TPS designation "continue to be met," *id.* § 1254a(b)(3)(A), or "automatically" if "the Secretary does not make a decision to terminate or extend a country's TPS designation by the 60th day before its designation period is set to expire." *Documented v. Dep't of Homeland Sec.*, No. 21-cv-3142, 2024 WL 4253130, at *1 (D.D.C. Sept. 20, 2024); *see also Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 403 (D. Mass. 2018) (noting that Honduras received an "automatic" extension of its TPS designation in 2018 due to the Acting Secretary of Homeland Security's "failure to make a determination by

14

the statutory deadline"). When a country's TPS designation is extended, whether affirmatively or automatically, the required notice in the Federal Register must set forth "the period of extension of designation." 8 U.S.C. § 1254a(b)(3)(A).

If the Secretary terminates a country's TPS designation within the statutorily mandated timeframe, the TPS statute gives the Secretary discretion to permit existing TPS holders from that country to maintain their legal status and attendant benefits, including work authorization, for a specific period "to provide for an orderly transition." *Id.* § 1254a(d)(3). For example, after a timely termination of a TPS designation, the Secretary could choose to delay any ramifications for existing TPS holders' legal status and TPS benefits to provide more time beyond the 60-day floor required for notice for such individuals to reorder their lives and make plans to return to their country of origin.

### 2. Defendants Have Made No Legally Enforceable Decision to Terminate Afghanistan's TPS Designation

Although Secretary Noem has determined that Afghanistan no longer meets the conditions for TPS designation, she acted too late in making that determination. In 2023, then-Secretary Mayorkas extended Afghanistan's TPS designation until May 20, 2025. 88 Fed. Reg. at 65,728. The deadline for publication of any termination of Afghanistan's TPS designation was therefore 60 days before that date, or March 21, 2025. *See* 8 U.S.C. § 1254a(b)(3)(B). But Secretary Noem did not publish notice of her determination to terminate Afghanistan's TPS determination until May 13, 2025—more than seven weeks late. Defendants' attempted termination of Afghanistan's TPS determination must therefore be "set aside" as "not in accordance with law" and as not in "observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

That various news articles published on April 11, 2025, reported that Secretary Noem had terminated Afghanistan's TPS designation makes no difference. Those articles reported that

Assistant Secretary McLaughlin had emailed a statement to reporters that Secretary Noem had terminated Afghanistan's and Cameroon's TPS designations. *See* pp. 8, 11, *supra*. But, as Defendants rightly concede, a country's TPS designation cannot be terminated via press statements. Ex. 1, J.R. 2–3 (Case Mgmt. Conf. Tr. 4:25-5:3) (stating that as of the time of the May 8, 2025, Case Management Conference there had been "nothing published in the Federal Register that would terminate" Afghanistan's TPS designation and that "that would be the operative document that affects the TPS status . . . for folks from Afghanistan"); *id.* at 3 (6:1-2) ("[U]nder the statute, termination cannot occur until a notice is published in the Federal Register."). The plain language of Section 1254a(b)(3)(B) clearly requires publication of TPS determinations in the Federal Register and provides no alternative mechanisms for the Secretary to terminate a designation. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 298 (E.D.N.Y. 2019) ("The Secretary *must* timely publish the decision to extend or terminate TPS, including the basis for that determination, *in the Federal Register*." (emphases added)); *accord NAACP v. U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 571–572 (D. Md. 2019); *Centro Presente*, 332 F. Supp. 3d at 398. And, in any event, the news articles in question were published after the March 21, 2025, deadline for any termination of Afghanistan's TPS designation.

Nor does Defendants' delay of the termination's effective date rectify their procedural default. The Secretary attempted to account for the untimeliness of the Afghanistan termination notice by delaying the effective date of the termination until 60 days after publication, or July 14, 2025. 90 Fed. Reg. at 20,309, 20,311. Defendants cannot evade the statutorily mandated deadline in this manner. The TPS statute expressly provides that any extension of a country's TPS designation must be in increments of 6, 12, or 18 months. 8 U.S.C. § 1254a(b)(3)(C). Nothing in

the statute permits what amounts to a 55-day extension of a TPS designation (from May 20 to July 14, 2025) as the Secretary's notice here attempts to provide.

The Secretary cites Section 1254a(d)(3) of the TPS statute as the basis for this 55-day extension, *see* 90 Fed. Reg. at 20,311, but that provision provides no such authority. Section 1254a(d)(3) allows the Secretary to extend existing TPS holders' legal status and benefits beyond the termination of the TPS designation for their country of origin "to provide for an orderly transition." But this discretionary authority kicks in only if the Secretary "terminates the designation of a foreign state . . . under subsection (b)(3)(B)." 8 U.S.C. § 1254a(d)(3). Before the Secretary can take any steps to ensure an "orderly transition," she must therefore first terminate a country's TPS designation in a manner that complies with the procedural requirements set forth in Section 1254a(b)(3)(B)—which has not occurred here. Moreover, Section 1254a(d)(3) provides no authority to delay the effective date of a termination. The discretionary authority set forth in that provision concerns how a termination "appl[ies] to documentation and authorization issued or renewed after the effective date" of a termination notice. *Id.* In other words, Section 1254a(d)(3) allows the Secretary to mitigate the adverse effects of the termination of a country's TPS designation on existing TPS holders, but it does not allow the Secretary to buy more time to terminate a country's TPS designation when she has missed the deadline set forth in Section 1254a(b)(3)(B).

The federal government's prior practice confirms this reading of the TPS statute. Particularly instructive are the first Trump Administration's actions with respect to Honduras. On December 15, 2017, DHS issued a notice recognizing an automatic six-month extension of Honduras's TPS designation after the 60-day deadline for issuing any termination decision (November 6, 2017) had passed, but weeks before the expiration of the country's designation

period (January 5, 2018).  Extension of the Designation of Honduras for Temporary Protected Status, 82 Fed. Reg. 59,630 (Dec. 15, 2017).  DHS stated that the automatic extension took effect because "[t]he Secretary did not make a determination on Honduras's designation by November 6, 2017, *the statutory deadline*."  *Id.* at 59,631 (emphasis added).  Other notices memorializing automatic extensions of other countries' TPS designations are to a similar effect.  Extension of the Designation of Sierra Leone Under the Temporary Protected Status Program, 67 Fed. Reg. 66,423, 66,423 (Oct. 31, 2002) ("[A]s a result of the 60-day requirement prescribed by statute, this notice provides that the previous TPS designation for Sierra Leone has been extended pursuant to section 244(b)(3)(C) of the Act."); Termination of the Province of Kosovo in the Republic of Serbia in the State of the Federal Republic of Yugoslavia (Servia-Montenegro) Under the Temporary Protected Status Program, 65 Fed. Reg. 33,356, 33,356 (May 23, 2000) ("[B]ecause the Attorney General did not make this determination at least 60 days before the end of the current designation, the designation is automatically extended . . . for an additional 6 months.").

Even the current Administration very recently appears to have recognized that a termination of a country's TPS designation cannot be effective if the determination is made after the applicable 60-day deadline.  In February 2025, Secretary Noem purportedly vacated prior extensions of Venezuela's TPS designations.  Vacatur of 2025 Temporary Protected Status Decision for Venezuela, 90 Fed. Reg. 8,805 (Feb. 3, 2025).  The purported effect of the vacatur decision was to reinstate previously applicable expiration dates for Venezuela's TPS designations. *Id.* (Secretary Mayorkas took two actions, one extending the initial TPS designation made in 2021, and the other "redesignat[ing]" Venezuela in 2023.  *Id.*)  According to the vacatur notice, the 2023 redesignation would expire on April 2, 2025, and the 2021 designation (which had been extended) would expire on September 10, 2025. *Id.*  The notice further explained that "the Secretary *must*

*make a decision*" to terminate or extend those designations by February 1 and July 12, 2025, respectively—60 days before each purported expiration date. *Id.* (emphasis added).[2]

In several other instances, when the federal government has issued termination notices within the 60-day window, it has extended the relevant TPS designation by at least six months while specifying that the designation would terminate upon expiration of the extension.[3] To be sure, in most of those instances, the government characterized the extension as a delay of the termination's effective date "to provide for an orderly transition" under Section 1254a(d)(3), rather than an automatic extension under Section 1254a(b)(3)(C). *E.g.*, Termination of the Designation of Nicaragua for Temporary Protected Status, 82 Fed. Reg. 59,636, 59,637 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47,228, 47,230 (Oct. 11, 2017). As explained, *see* pp. 15, 17, *supra*, Section 1254a(d)(3) provides no such authority. But in those circumstances, the government's invocation of Section 1254a(d)(3) amounted to a semantic distinction without legal consequence. Whether labeled a delay of the effective date or an automatic extension, the aforementioned termination notices all provided the minimum six-month extension that Section 1254a(b)(3)(C) requires under such circumstances. And none of those notices even hinted that the government had discretion to extend the designations by only 55 days or anything less than six months.

The only exception to the federal government's otherwise uniform prior practice was INS's

---

[2] DHS ultimately attempted to terminate the 2023 Venezuela designation after the February 1, 2025 deadline. Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9,040 (Feb. 5, 2025). Consistent with DHS's attempt to rectify its procedural default here, DHS purported to delay the effective date of its termination of the 2023 Venezuela designation by 60 days. *Id.* at 9,043–9,044.

[3] 83 Fed. Reg. 26,074 (June 5, 2018) (Honduras); 83 Fed. Reg. 2,654 (Jan. 18, 2018) (El Salvador); 82 Fed. Reg. 59,636 (Dec. 15, 2017) (Nicaragua); 82 Fed. Reg. 47,228 (Oct. 11, 2017) (Sudan); 72 Fed. Reg. 61,172 (Oct. 29, 2007) (Burundi); 69 Fed. Reg. 40,642 (July 6, 2004) (Montserrat); 63 Fed. Reg. 15,437 (Mar. 31, 1998) (Liberia).

1993 termination of Lebanon's TPS designation. In that instance, as here, INS terminated Lebanon's TPS designation after the 60-day deadline had passed but before the country's designation period expired. Termination of Designation of Lebanon Under Temporary Protected Status Program, 58 Fed. Reg. 7,582 (Feb. 8, 1993). Also like here, INS delayed the effective date of the termination by 60 days in an attempt to rectify its procedural default. *Id.* But INS cited no authority—not even Section 1254a(d)(3) of the TPS statute—for its purported authority to rectify its failure to meet the 60-day deadline through an effective extension of Lebanon's TPS designation of less than six months. *Id.* This early and lightly reasoned instance of INS exercising its termination authority therefore provides little support for DHS's reading of the TPS statute put forward in the Afghanistan termination notice, especially when weighed against all of the other past administrative practice supporting CASA's reading of the statute.

Accordingly, this Court should "set aside" DHS's attempted termination of Afghanistan's TPS designation. 5 U.S.C. § 706(2).

### 3.    Afghanistan's TPS Designation Is Automatically Extended By At Least Six Months

Because DHS did "not determine" that Afghanistan "no longer meets the conditions" for TPS designation within the timeframe established by the statute, 8 U.S.C. § 1254a(b)(3)(C); *see also id.* § 1254a(b)(3)(B), its TPS designation is subject to an "automatic" extension, *Centro Presente*, 332 F. Supp. 3d at 403. DHS must provide notice of this extension. As noted, the TPS statute requires "publication of notice of each . . . determination" that the Secretary makes with regard to the extension or termination of TPS designations. 8 U.S.C. § 1254a(b)(3)(A); *see also id.* § 1254a(b)(4) (requiring the Secretary to "make available information respecting the temporary protected status . . . to aliens who are nationals of such designated foreign state"). Such notice is necessary because, although six months is the minimum for any such extension, the Secretary also

has discretion to extend for a 12- or 18-month period. *Id.* § 1254a(b)(3)(C). The TPS statute therefore specifically requires the notice in the Federal Register to set forth "the period of extension of designation." *Id.* § 1254a(b)(3)(A). Notice also confers important benefits to those beyond TPS recipients, such as their employers, who may not know whether they will be able to continue to lawfully employ TPS beneficiaries beyond the end of the designation period. And notice is all the more important here in light of the confusion that Defendants have caused through their procedurally defective attempt to terminate Afghanistan's TPS designation.

Accordingly, this Court should declare that Afghanistan's TPS designation is extended by at least six months and that any subsequent attempt to terminate Afghanistan's TPS designation must comply with the procedures set forth in Section 1254a(b)(3) of the TPS statute.

### B. Defendants Based their Decision to Terminate Afghanistan's TPS Designation on Improper Considerations

The decision to terminate Afghanistan's TPS designation is also "arbitrary, capricious . . . [and] not in accordance with law." 5 U.S.C. § 706(2)(A). "To comply with the APA, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Roe v. U.S. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020) (cleaned up). Courts must set aside agency action under the APA if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). Nor can agency action based on "contrived reasons" be sustained. *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). While courts "accord substantial deference to an agency's final action and presume it valid," APA review does not "reduce judicial review to a rubber stamp of agency action." *Roe*,

21

947 F.3d at 220 (citation omitted). The Court's review must be "searching and careful," to determine "whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 269 (4th Cir. 2022) (cleaned up).

The TPS statute sets forth a clear process for making, reviewing, and terminating TPS determinations. *See* pp. 3–5, 13–15, *supra*. "Congress's use of the word 'shall' in the periodic review and termination provisions of the statute evinces its intent to *require* the Secretary to follow the enumerated procedure." *Saget*, 375 F. Supp. 3d at 346 (quoting 8 U.S.C. § 1254a(b)(3)(A)–(B)). And "Congress's use of 'shall,' specifically in requiring the Secretary to 'review the conditions in the foreign state,' evinces its intent that the Secretary undertake a periodic review grounded in fact—*i.e.*, based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith." *Id.* (quoting 8 U.S.C. § 1254a(b)(3)(A)). The requirement that the Secretary publish notice of a termination decision in the Federal Register, "'including the basis for the determination,' further evinces Congress's intent in this regard." *Id.* (quoting 8 U.S.C. § 1254a(b)(3)(B)). Although the Secretary "exercises discretion to make the determination she deems fit," she must "base that discretion on the 'conditions in the foreign state' and on consultations with appropriate Government officials." *Id.* (quoting 8 U.S.C. § 1254a(b)(3)(A)). "[T]he Secretary may not provide sham or pretextual justifications as the basis for the decision under the statute, and the Secretary must review the conditions of the foreign state." *Id.*

Several parts of the Federal Register notice demonstrate that the Secretary's termination decision was not based on the considerations set forth in the statute, but instead on factors that Congress did not "intend[] [her] to consider." *Roe*, 947 F.3d at 220 (citation omitted). First, the

Federal Register notice overwhelmingly demonstrates that the decision to terminate Afghanistan's TPS designation was preordained by White House directive, motivated by the Administration's desire to reduce the number of non-white immigrants in this country.  For example, the notice repeatedly invokes Executive Order 14,159, titled "Protecting the American People Against Invasion." 90 Fed. Reg. 8,443 (Jan. 20, 2025).  *See* 90 Fed. Reg. at 20,310–20,311 & nn. 3, 22.  It explains that the decision challenged here is part of the Administration's broader effort to ensure that "the 'millions of illegal aliens who crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.'" *Id.* at 20,311 (quoting Exec. Order 14,159, 90 Fed. Reg. at 8,443).  The notice also states that the decision to terminate Afghanistan's TPS designation was based on the President's directive to "rescind policies that led to increased or continued presence of illegal aliens in the United States." *Id.* (citing Exec. Order 14,159, 90 Fed. Reg. at 8,446).  And it invokes the part of the Executive Order that explicitly directed the Secretary to "ensur[e] that the TPS designations are consistent with the TPS statute and 'made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* (quoting Exec. Order 14,159, 90 Fed. Reg. at 8,446).

Other parts of the notice similarly indicate that the decision to terminate Afghanistan's TPS designation was done at the President's behest, for reasons other than those set forth in the statute. The notice invokes Executive Order 14,150, America First Policy Directive to the Secretary of State, 90 Fed. Reg. 8,337 (Jan. 20, 2025).  *See* 90 Fed. Reg. at 20,311.  It explains that "as the President directed in [that Executive Order], 'the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'" *Id.* (quoting Exec. Order 14,150, 90 Fed. Reg. at 8,337).  It further states that "[c]ontinuing to permit

these Afghan nationals to remain in the United States does not champion core American interests or put American interests first," and that American "foreign policy interests are best served and protected by curtailing policies that facilitate or encourage destabilizing migration." *Id.* Terminating TPS designations based on such vague presidential pronouncements would be at odds with the "more formal and orderly" process that Congress intended to create through the TPS program. H.R. Rep. No. 100-627, at 4.

Second, the Federal Register notice makes clear that the Secretary's decision to terminate Afghanistan's TPS designation was based on her overriding conclusion that allowing Afghans to stay in this country was "contrary to the national interest of the United States." 90 Fed. Reg. at 20,310. Former Secretary Mayorkas designated Afghanistan for TPS based on its "ongoing armed conflict" and on "extraordinary and temporary conditions" that prevent the safe return Afghan nationals to that country. 87 Fed. Reg. at 30,977; *see also* 8 U.S.C. § 1254a(b)(1)(A), (C). The TPS statute provides that the Secretary may not designate a country for TPS based on "extraordinary and temporary conditions" if such designation would be "contrary to the national interest." 8 U.S.C. § 1254a(b)(1)(C). But a TPS designation based on an "ongoing armed conflict" makes no mention of the national interest. *See id.* § 1254a(b)(1)(A). A conclusion that a country "no longer continues to meet the conditions" for a TPS designation based on an ongoing armed conflict therefore cannot rest on an assessment of the national interest. *See id.* § 1254a(b)(3)(B). Instead, it must rest only on findings that there is no longer "an ongoing armed conflict" that would "pose a serious threat [TPS holders'] personal safety" if they are forced to return to their home country. *Id.* § 1254a(b)(1)(A).

Secretary Noem's determination that allowing Afghans who had been granted TPS to stay in the United States was "contrary to the national interest of the United States," 90 Fed. Reg. at

20,310, impermissibly infected her analysis of whether an ongoing armed conflict in Afghanistan would seriously threaten their safety. For example, in explaining her decision, the Secretary stated that she had "considered the national interest factors and determined that continuing to permit Afghan nationals . . . to reside in the United States on TPS would be inconsistent with E.O. 14,159 and otherwise contrary to the U.S. national interest, especially in light of the Secretary's determination that they may return in safety." *Id.* at 20,311. Elsewhere, after stating that the Secretary had determined that there had been "notable improvements in the security and economic situation" in Afghanistan, the notice states that the Secretary "further determined that permitting Afghan nationals to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* at 20,310.

Third, the notice explains that the Secretary's decision was based on DHS records indicating that "there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." 90 Fed. Reg. at 20,311. Yet it offers no reason why the fact that there have been "investigations" of these individuals has any bearing on the considerations set forth in the TPS statute. Nor does it explain why this asserted problem could not be addressed by filling any gaps in the vetting process rather than terminating protections for all Afghan TPS holders.

Together, these considerations make clear that the Secretary's decision was not based on the considerations set forth in the TPS statute. Instead, it was part of the Administration's broader effort to reduce the number of non-white immigrants lawfully in this country. The Secretary's repeated invocations of Executive Orders; the President's specific direction that the Secretary evaluate TPS designations as part of the Administration's broader effort to "Protect[] the American People Against Invasion," 90 Fed. Reg. at 8,443; the overriding focus on the "national interest"

even with respect to TPS determinations that do not turn on it, 90 Fed. Reg. at 20,311; and the unexplained statement that some Afghan TPS holders have been subject to "administrative investigations for fraud, public safety, and national security," *id.*, all demonstrate as much. The decision to terminate Afghanistan's TPS designation is therefore "arbitrary, capricious . . . [and] not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 179 (4th Cir. 2018) (setting aside agency action that was a "preordained decision" and where the agency "reverse engineered" its explanation to justify the outcome), *rev'd on other grounds sub nom.*, *U.S. Forest Serv. v. Cowpasture River Preservation Ass'n*, 590 U.S. 605 (2020); *Saget*, 375 F. Supp. 3d at 347 (concluding that plaintiffs were likely to succeed on their claim that the termination of a TPS designation was not a "real merits determination" but was instead "a pretextual edict" made in contravention of the "evidence-based review the TPS statue requires" (internal quotation marks omitted)).

To be sure, the notice also states that the Secretary's determination is based on certain on-the-ground improvements in Afghanistan, including that the number of Afghans in need of assistance had declined to 23.7 million people (from 29 million) and that "large-scale violence is at its lowest level in decades" even "[w]hile threats of violence and terrorism remain." 90 Fed. Reg. at 20,310. But the Secretary's heavy focus on other considerations that are irrelevant to TPS termination decisions suggests that those justifications are pretextual. Courts may not set aside agency decisions "solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Commerce*, 588 U.S. at 781. But where, as here, the reason given for an agency action so clearly embraces considerations that Congress did not intend it go consider, and is so clearly part of a politically-motivated effort to reduce the number of non-white immigrants in this country, it should be set aside.

26

**C.    In the Alternative, This Court Should Postpone the Effective Date of the Termination of Afghanistan's TPS Designation**

Should this Court conclude that further factual development is necessary on Counts I and II, CASA requests that this Court postpone the effective date of the termination of Afghanistan's TPS designation under 5 U.S.C. § 705 until it can reach final judgment.  CASA satisfies all four prongs of the Section 705 analysis.  For the reasons discussed, they are likely to succeed on the merits of these claims.  *See* pp. 13–26, *supra*.  And absent immediate relief, Defendants' unlawful actions will upend the lives of more than 11,000 Afghan TPS holders and their families, causing profound and irreparable harm.  As long as they have TPS, Afghan TPS holders are allowed to live and work in the United States.  For many, loss of that status will require them to return to a country that just 18 months ago was determined to "pose a serious threat to their personal safety."  88 Fed. Reg. at 65,732.

It is beyond question that removal from this country—"the equivalent of banishment or exile," *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010) (quoting *Delgadillo v. Carmichael*, 332 U.S. 388, 390–391 (1947))—is irreparable harm.  Removal would rip many Afghan TPS holders and their families away from their homes, jobs, families, neighbors, and communities.  *See e.g.*, Ex. 2, Escobar Decl., J.R. 21–23.  And many fear for their safety should they be forced to return.  *Id.* at 21–22.  For example, M.A. fled Afghanistan in 2021 when the Taliban returned to power.  *Id.*  If M.A.'s TPS is ended and he is forced to return to Afghanistan, M.A. fears that he will be targeted by the Taliban based on his past work on U.S.-funded programs in that country and because he studied and worked in the United States.  *Id.*  M.A. also fears that his wife and children's lives would be endangered if he is reunited with them in Afghanistan because any threats against him would likely extend to his family.  *Id.*  When B.S. lived in Afghanistan, she faced death threats for her work as an interpreter for international and United States agencies.  *Id.* at 22.  Based on those

past threats and reports of Taliban retribution against individuals associated with the United States, B.S. is terrified that losing her TPS status and being forced to return to Afghanistan will result in her being turned over to the Taliban. *Id.* Fear of what will happen to her and her family (who also are TPS holders) if they are forced to return to Afghanistan is causing B.S. significant anxiety and worsening the Post-Traumatic Stress Disorder that she suffers from her experiences in Afghanistan. *Id.* And although A.F. is a citizen of Afghanistan, he has never lived there and has spent only a few weeks visiting the country as a child. *Id.* at 21. Removal would thus force him to live in a county where he has no immediate family or connections and where he has dim prospects of building a safe or stable life. *Id.*

Severe economic harm will also ensue if the purported terminations take effect. Many Afghan TPS holders, including CASA's members, rely on their TPS-based employment authorization to provide for themselves and their families. *See, e.g.*, *id.* at 21–23. Even now, the impending loss of work authorization has already caused many TPS holders residing in the United States to fear an imminent loss of income, which would have devastating consequences on those individuals and their families. For example, A.F.'s employer has already begun the process of transitioning his work to other employees in anticipation that termination of Afghanistan's TPS designation would render him unable to continue working in the United States. *Id.* at 21. The loss of his job would have serious ramifications not just for A.F., but also for his mother and brother whom he financially supports. *Id.* M.A. similarly fears that he will have to quit his job at a consulting firm if he loses his TPS status. *Id.* at 21–22. His employment is the only source of income for him, as well as for his wife and two young children who still live in Afghanistan and depend on him for support because of the Taliban's oppressive restrictions on women and children. *Id.* There is no serious question that the loss of employment is irreparable harm. *See Wolf*, 486 F.

Supp. 3d 928, 969 (D. Md. 2020) (finding agency action caused irreparable harm where plaintiffs' members would be required to wait an additional 215 days to apply for work authorization and then wait indefinitely for a decision).

The final two considerations supporting relief under Section 705—the balance of the equities and public interest—merge when the government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, both strongly support postponing the attempted termination of Afghanistan's TPS designation. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (same). To the contrary, the public "undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe*, 947 F.3d at 230–231 (citation omitted). In contrast to the serious consequences that TPS holders face, Defendants will face no material harm from an order that "merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). An "agency cannot itself violate [the law], then claim irreparable harm because it is held to account for such violations." *Wolf*, 486 F. Supp. 3d at 970.

In addition to the obvious public interest in having the Executive Branch follow the law, there are compelling practical reasons for postponing the agency action here. CASA's members face direct immediate consequences from the impending end of the TPS designation for Afghanistan. *See* pp. 27–28, *supra*. Removal from this country, and loss of employment would not only harm them, but also their families. Moreover, postponing the attempted termination of Afghanistan's TPS designation merely delays those actions pending resolution of this case on the merits—something that, for the reasons described above, should not take long.

## II.    Cameroon's TPS Designation Also Is Automatically Extended

Although various news outlets reported that Secretary Noem has terminated Cameroon's TPS designation, *see* Aleaziz, *supra* p. 8; Mackintosh & Regan, *supra* p.8, no notice to that effect has yet been published in the Federal Register.  As Defendants have conceded, that means there has been no termination of Cameroon's TPS designation.  *See* p. 16, *supra*.  Whether or not any termination notice is forthcoming, Cameroon's TPS designation is automatically extended by at least six months under Section 1254a(b)(3)(C).  The 2023 Cameroon Extension expires on June 7, 2025.  That means that the deadline for any termination of Cameroon's TPS designation was April 8, 2025.  *See* 8 U.S.C. § 1254a(b)(3)(B).  As explained above, *see* pp. 13–21, *supra*, there is no mechanism by which Defendants can now avoid an automatic extension of Cameroon's TPS designation of at least six months.  Accordingly, this Court should grant summary judgment on Count IV and declare that Cameroon's TPS designation is extended until at least December 7, 2025.

## CONCLUSION

For the foregoing reasons, CASA respectfully requests that this Court grant summary judgment on Counts I through IV of the First Amended Complaint, set aside Defendants' attempted termination of Afghanistan's TPS designation, and declare that both Afghanistan's and Cameroon's TPS designations are automatically extended by at least six months.  To the extent that this Court believes that further factual development is necessary to resolve Counts I or II, CASA requests that this Court postpone the effective date of Afghanistan's termination pursuant to 5 U.S.C. § 705 until 60 days after a final judgment issues.

May 20, 2025

Nicholas Katz, Esq. (D. Md. 21920)
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783
240-491-5743
nkatz@wearecasa.org


Ryan C. Downer*
Sarah L. Bessell (D. Md. 30969)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. #400
Washington, D.C. 20005
Tel. (202) 319-1000
Fax (202) 319-1010
ryan_downer@washlaw.org
sarah_bessell@washlaw.org

Respectfully submitted,

_____/s/_____
Jonathan L. Backer (D. Md. 20000)
Rupa Bhattacharyya*
Julia Gegenheimer†
Joseph W. Mead (D. Md. 22335)
Mary B. McCord (D. Md. 21998)
Samuel P. Siegel†
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
  AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 661-6671
Fax: (202) 661-6730
jb2845@georgetown.edu
jg1370@georgetown.edu
jm3468@georgetown.edu
mbm7@georgetown.edu
rb1796@georgetown.edu
ss5427@georgetown.edu

*Attorneys for Plaintiff CASA, Inc.*

*Admitted pro hac vice.*

†*Admitted pro hac vice. DC Bar application pending, practice pursuant to Rule 49(c)(8), DC Courts, and supervised by DC Bar member.*