# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

CASA, INC.,

    Plaintiff,

    v.

KRISTI NOEM,
*Secretary of Homeland Security,*
*in her official capacity*, and
U.S. DEPARTMENT OF
HOMELAND SECURITY,

    Defendants.

Civil Action No. 25-1484-TDC

## MEMORANDUM OPINION

On May 13, 2025, approximately 11,700 nationals of Afghanistan residing in the United States under temporary protected status ("TPS"), an immigration status established to allow foreign nationals to remain lawfully in the United States when it would be unsafe to return to their native countries due to an ongoing armed conflict or for other extraordinary reasons, were informed through a public notice that their legal right to remain in the United States would be terminated in 60 days. On June 4, 2025, approximately 5,200 nationals of Cameroon with TPS were similarly informed that their legal status would end in 60 days. Plaintiff CASA, Inc. ("CASA") has filed suit against Defendants Secretary of Homeland Security Kristi Noem and the United States Department of Homeland Security ("DHS"), challenging those TPS terminations under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution. CASA has filed a Motion for Partial

Summary Judgment or a Stay of Agency Action, and Defendants (collectively, "DHS") have filed a Cross Motion for Summary Judgment and Motion to Dismiss, both of which are fully briefed. On June 24, 2025, the Court held a hearing on the Motions. For the reasons set forth below, CASA's Motion will be DENIED, and DHS's Motion will be DENIED.

## BACKGROUND

### I.    Temporary Protected Status

The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537, governs the admission of foreign nationals to the United States. In 1990, Congress amended the INA to establish TPS to provide temporary immigration relief, including legal status, work authorization, and protection against removal, for foreign nationals in the United States who cannot return to their home countries because of temporary and extraordinary circumstance in those nations. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, 5030 (codified at 8 U.S.C. § 1254a ("the TPS statute")). Specifically, the Secretary of Homeland Security ("the Secretary") may provide a TPS designation for a foreign nation, or part of a foreign nation, for an initial period of between 6 and 18 months if at least one of three conditions have been met, the following two of which are at issue in this case:

> (A) the [Secretary] finds that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety; [or]
>
> ***
>
> (C) the [Secretary] finds that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

2

8 U.S.C. § 1254a(b)(1), (b)(2)(B); 6 U.S.C. § 557 (conferring certain authorities granted by statute to the Attorney General, including those relating to TPS, to the Secretary of Homeland Security).

For an individual from a designated foreign nation to be eligible for TPS, that person must, among other requirements, have maintained continuous physical presence in the United States since the effective date of the TPS designation, have maintained continuous residency since a designated date, be "admissible" as an immigrant, and not have a prior conviction for certain criminal offenses. 8 U.S.C. § 1254a(c).

When a foreign nation has been designated for TPS, the TPS statute requires that the Secretary periodically review the designation and determine whether it should be extended or terminated. Specifically, the statute requires that at least 60 days before the expiration date of a TPS designation period, the Secretary, in consultation with appropriate federal agencies, must review the conditions in the foreign nation and determine whether the required conditions for a TPS designation continue to be met. *Id.* § 1254a(b)(3)(A). Notice of the Secretary's determination must be published in the Federal Register "on a timely basis." *Id.* If the conditions are no longer met, the Secretary is required to terminate the TPS designation through the publication of the notice of the Secretary's determination. *Id.* § 1254a(b)(3)(B). Any termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* If the Secretary fails to make the required determination, the TPS designation is automatically extended for a period of 6 months, or a period of 12 or 18 months at the discretion of the Secretary. *Id.* § 1254a(b)(3)(C).

## II.     Executive Orders

On January 20, 2025, President Donald J. Trump signed two executive orders of relevance to the present TPS terminations. Executive Order 14,150, entitled "America First Policy Directive

3

to the Secretary of State," declared that "the foreign policy of the United States shall champion core American interests and always put America and American citizens first." Exec. Order No. 14,150, § 1, 90 Fed. Reg. 8337 (Jan. 20, 2025). It directed the Secretary of State to "issue guidance bringing the Department of State's policies, programs, personnel and operations in line with an American First foreign policy, which puts America and its interests first." *Id.* § 2.

Executive Order 14,159, entitled "Protecting the American People Against Invasion," declared that "[i]t is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people." Exec. Order No. 14,159, § 2, 90 Fed. Reg. 8443 (Jan. 20, 2025). More specifically, it directed the Secretary of State, the Attorney General, and the Secretary of Homeland Security to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States." *Id.* § 16. As to TPS, Executive Order 14,159 directed those same officials to ensure that "designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. [§] 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* § 16(b).

## III. TPS Designations and Terminations

### A. Afghanistan

On May 20, 2022, Secretary of Homeland Secretary Alejandro Mayorkas designated Afghanistan for TPS for an initial period of 18 months, effective through November 20, 2023, based on findings of both an "ongoing armed conflict" and "extraordinary and temporary conditions" that would pose a serious threat to the personal safety of Afghan nationals if they were required to return to Afghanistan. Am. Compl. ¶¶ 40–44, ECF No. 41; Designation of Afghanistan

for Temporary Protected Status, 87 Fed. Reg. 30976, 30977 (May 20, 2022). Specifically, the notice of this designation described the armed conflict between the Taliban and ISIS-K, an insurgent group designated by the United States as a foreign terrorist organization, as well as further dangerous conditions, including internal displacement, economic instability, the inaccessibility of food and healthcare, and violence targeting woman and girls. 87 Fed. Reg. at 30978–84. On September 25, 2023, Secretary Mayorkas extended the Afghanistan TPS designation for an additional 18-month period, until May 20, 2025, and also redesignated the country for TPS, which allowed Afghan nationals who had not previously received TPS to register for that status. Am. Compl. ¶ 45; Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65728, 65729 (Sept. 25, 2023). The public notice of the Secretary's determination cited continuing armed conflict between the Taliban and ISIS-K and ongoing extraordinary and temporary conditions, including growing repression by the Taliban conducted in part through the killing and physical abuse of opponents of its regime and sexual violence against women and girls. 88 Fed. Reg. at 65730–33.

On March 21, 2025, Secretary of Homeland Security Kristi Noem signed an internal decision memorandum, prepared by United States Citizenship and Immigration Services ("USCIS"), a component agency of DHS, through which she approved the termination of Afghanistan's TPS designation on the basis that Afghanistan "no longer me[t] the extraordinary and temporary conditions statutory standard" and that there were "improved conditions as it relates to ongoing conflict." Joint Record ("J.R.") 140-41, ECF No. 64-2 to 64-22.

The memorandum was supported by several attachments and other related documents, including: (1) a November 2024 USCIS memorandum entitled "Afghanistan: Temporary Protected Status (TPS) Considerations" ("the Afghanistan TPS Considerations Memorandum")

5

that addressed the period from June 1, 2023 to November 13, 2024; (2) an undated USCIS Addendum to the Afghanistan TPS Considerations Memorandum covering the period from November 14, 2024 to February 20, 2025; (3) a November 20, 2024 letter and accompanying State Department recommendation memorandum from Secretary of State Antony Blinken to Secretary Mayorkas in which he recommended the extension and redesignation of Afghanistan for TPS for 18 months; and (4) an undated letter from Secretary of State Marco Rubio to Secretary Noem in which he recommended that the TPS designation for Afghanistan be terminated.

On May 13, 2025, seven days before Afghanistan's TPS designation was set to expire, a public notice entitled "Termination of the Designation of Afghanistan for Temporary Protected Status" ("the Afghanistan Notice"), 90 Fed. Reg. 20309 (May 13, 2025), was published in the Federal Register. The Afghanistan Notice stated that the Afghanistan TPS designation was being terminated effective July 14, 2025, 60 days after the date of the Afghanistan Notice. *Id.* at 20312. According to the Afghanistan Notice, Secretary Noem had determined that there had been "notable improvements in the security and economic situation such that requiring the return of Afghan nationals to Afghanistan does not pose a threat to their personal safety due to armed conflict or extraordinary and temporary conditions." *Id.* at 20310. In support of this determination, the Afghanistan Notice cited, among other factors, a decrease in the number of Afghan nationals in need of humanitarian assistance, improvements in the Afghanistan economy, and an increase in foreign tourists to Afghanistan, particularly tourists from China. *Id.* The Afghanistan Notice also stated that Secretary Noem had concluded that permitting Afghan nationals to remain in the United States pursuant to TPS was "contrary to the national interest of the United States." *Id.* In discussing the national interest, the Afghanistan Notice referenced the part of Executive Order 14,159 in which the President directed federal officials to rescind policies that increase or continue

6

"the presence of "illegal aliens in the United States" and to ensure that TPS designations are "made for only so long as may be necessary to fulfill the textual requirements of that statute." *Id.* at 20311. Referencing Executive Order 14,150, the Afghanistan Notice further stated that the Afghanistan TPS designation was contrary to the national interest because "U.S. foreign policy interests are best served and protected by curtailing policies that facilitate or encourage destabilizing migration." *Id.* The Afghanistan Notice also stated that, in making her determination, Secretary Noem considered that "DHS records indicate that there are Afghan nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." *Id.*

**B.    Cameroon**

On June 7, 2022, Secretary Mayorkas granted a TPS designation to Cameroon, with an initial designation period of 18 months, to run through December 7, 2023, based in part on an ongoing armed conflict between government forces and armed separatists as well as deadly attacks by terrorist organizations, including Boko Haram. Designation of Cameroon for Temporary Protected Status, 87 Fed. Reg. 34706, 34708–09 (June 7, 2022). On October 10, 2023, Secretary Mayorkas extended TPS for Cameroon for an additional 18 months until June 7, 2025 and also redesignated the country for TPS. Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69945, 69949 (Oct. 10, 2023). As justification for the extension, Secretary Mayorkas cited ongoing armed conflict between the government and both non-state armed groups and Anglophone separatists groups, which had led to widespread killing, kidnapping, displacement, and destruction of civilian infrastructure that left many Cameroonians without access to health services and education. *Id.* at 66947–48.

On April 7, 2025, Secretary Noem signed an internal decision memorandum prepared by USCIS through which she approved the termination of the Cameroon TPS designation. J.R. 4393. The memorandum's attachments included: (1) a USCIS memorandum entitled "Republic of Cameroon: Temporary Protected Status (TPS) Considerations ("the Cameroon TPS Considerations Memorandum"), addressing the period from June 15, 2023 to November 30, 2024; (2) a USCIS Addendum to the Cameroon TPS Considerations Memorandum covering the period from November 2024 to late February 2025, and (3) a December 2, 2024 letter and accompanying State Department recommendation memorandum from Secretary of State Blinken, through which he recommended the extension of the Cameroon TPS designation for 12 months.

On June 4, 2025, three days before Cameroon's TPS designation was set to expire, a public notice entitled "Termination of the Designation of Cameroon for Temporary Protected Status" ("the Cameroon Notice"), 90 Fed. Reg. 23697 (June 4, 2025), was published in the Federal Register. The Cameroon Notice stated that the TPS designation for Cameroon was being terminated effective August 4, 2025, 60 days after the date of the Cameroon Notice. *Id.* at 23698. As justification for the termination, the Cameroon Notice stated that present conditions "do not pose a serious threat to individual safety due to ongoing armed conflict" and do not render it unsafe for Cameroonians to return in part because although two major conflicts remain active, they are contained and only impact three of ten regions in Cameroon. *Id.* The notice further found that generalized criminal activity in those regions did not form a sufficient basis for extraordinary and temporary conditions for TPS and noted that Cameroon presently accepts the return of nationals with final removal orders. *Id.* It also concluded that regardless of whether such conditions exist, it is contrary to the national interest to permit Cameroonian nationals to remain temporarily in the

8

United States. *Id.* Like the Afghanistan Notice, the Cameroon Notice, in referencing the national interest, cited to Executive Order 14,159. *Id.*

## IV.    Plaintiff's Claims

Plaintiff CASA is a national nonprofit, membership-based immigrant rights organization that has more than 173,000 lifetime members who are predominantly noncitizens and include more than 100 members from Afghanistan and more than 5,700 members from Cameroon. Among the services that CASA provides are full legal representation and free legal consultations for members applying for TPS. Many of CASA's members are directly affected by the terminations at issue in this case. For example, A.F., M.A., and B.S. are Afghan CASA members who depend on TPS for their work authorizations to support their families. A.F. would suffer hardship if removed to Afghanistan because he has never lived there and has no familial or other ties to Afghanistan. M.A. and B.S. fear that they and their families would be targeted by the Taliban if they had to return to Afghanistan because of their connections to the United States, with B.S. particularly at risk because she had previously faced threats of violence while in Afghanistan.

J.K., O.M., C.N., D.L., and D.T. are Cameroonian CASA members. J.K. suffers from serious health issues and depends on TPS for work authorization to be able to afford her required medical care. O.M., who suffered physical abuse in Cameroon, and C.N. both fear that returning to Cameroon would put them in danger of physical violence. D.L. previously experienced persecution in Cameroon and depends on his TPS work authorization to support himself, his wife who is pregnant, and his brother. If D.T. loses TPS and is removed, he would be separated from his U.S. citizen children, who would then face significant economic hardship.

On May 7, 2025, based on media reports that Secretary Noem had made determinations that the TPS designations for Afghanistan and Cameroon were to be terminated, but prior to the

publication of any related notices in the Federal Register, CASA filed its original Complaint in this case. On May 13, 2025, the Afghanistan Notice was published.

On May 20, 2025, CASA filed an Amended Complaint to which it filed a Supplement on June 5, 2025 following the publication of the Cameroon Notice on June 4, 2025 (collectively, "the Complaint"). The presently operative Complaint asserts eight causes of action. In Counts 1 and 6, CASA asserts that DHS's termination of the TPS designations for Afghanistan and Cameroon, respectively, violated the APA because Secretary Noem did not comply with a statutory requirement to publish notices of the terminations in the Federal Register at least 60 days before the designations were set to expire. In Counts 3 and 4, CASA seeks a declaratory judgment, pursuant to the Declaratory Judgment Act, that because of the failure to meet those deadlines, the TPS designations for Afghanistan and Cameroon are automatically extended by at least six months pursuant to 8 U.S.C. § 1254a(b)(3)(C).

In Counts 2 and 7, CASA asserts that the terminations of the Afghanistan and Cameroon TPS designations violated the APA because they were arbitrary and capricious and not in accordance with law, on the grounds that they were part of a preordained decision by the President to reduce the number of non-white immigrants in the United States. In Counts 5 and 8, CASA alleges that the terminations violate the equal protection component of the Due Process Clause of the Fifth Amendment to the Constitution, because they were motivated in part by discrimination against non-white immigrants based on race, ethnicity, or national origin.

On May 20, 2025, CASA filed the present Motion for Partial Summary Judgment or a Stay of Agency Action. On June 3, 2025, Defendants filed a Cross Motion for Summary Judgment and Motion to Dismiss. On June 24, 2025, the Court held a hearing on the Motions.

## DISCUSSION

In its Motion for Partial Summary Judgment or a Stay of Agency Action, CASA seeks summary judgment on Counts 1, 3, 4, and 6 (collectively, "the timing claims") as well as Counts 2 and 7 (collectively, "the APA claims"), and thereby seeks an order declaring unlawful and setting aside the terminations of the TPS designations for Afghanistan and Cameroon and extending the TPS designations for at least six months from the otherwise applicable expiration dates. In the alternative, CASA seeks a stay under the APA, pursuant to 5 U.S.C. § 705, of the effective dates of the terminations pending additional factual development. CASA presently seeks no relief relating to Counts 5 and 8 (collectively, "the equal protection claims").

In its Cross Motion for Summary Judgment and Motion to Dismiss, DHS seeks dismissal or summary judgment on all counts on the grounds that the Court lacks jurisdiction over CASA's claims because the TPS statute includes a bar on judicial review of TPS determinations, as set forth in 8 U.S.C. § 1254a(b)(5)(A), and the INA includes a bar on injunctive relief relating to CASA's claims, as set forth in 8 U.S.C. § 1252(f)(1). DHS also seeks summary judgment on the merits on the timing claims in Counts 1, 3, 4, and 6 and the APA claims in Counts 2 and 7.

In its reply brief, DHS for the first time seeks dismissal of all of those counts on the separate ground that CASA failed to state a plausible claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court need not address that argument, particularly where CASA did not have the opportunity to respond to it. *See De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) ("Generally, 'new arguments cannot be raised in a reply brief' before the district court." (quoting *United States v. Smalls*, 720 F.3d 193, 197 (4th Cir. 2013))). Nevertheless, where the Court's analysis relating to summary judgment will necessarily address the Rule 12(b)(6) argument, the Court will address that argument as well.

11

## I.    Legal Standards

As to DHS's Motion to Dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), it is the plaintiff's burden to show that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co., Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). Rule 12(b)(1) allows a defendant to move for dismissal when it believes that the plaintiff has failed to make that showing.  When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  When a defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d at 192.

To defeat a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Legal conclusions or conclusory statements do not suffice.  *Id.*  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).  When considering a Rule 12(b)(6) motion, a court may consider only the complaint and its attachments, as well as other documents that are integral to and explicitly relied upon in the complaint and that

are of unchallenged authenticity. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015). Here, the Court finds that the Afghanistan Notice and the Cameroon Notice, which are specifically referenced in the Complaint, are integral to the Complaint.

As for the parties' Cross Motions for Summary Judgment pursuant to Rule 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing a summary judgment motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.    Bars on Judicial Review

In its Motion, DHS seeks dismissal of all claims based on the argument that this Court cannot adjudicate any of CASA's claims because two provisions in the INA, 8 U.S.C. § 1254a(b)(5)(A) and 8 U.S.C. § 1252(f)(1), bar courts from doing so. The Court will consider each provision in turn.

13

A.     **8 U.S.C. § 1254a(b)(5)(A)**

DHS first argues that all of CASA's claims are barred by 8 U.S.C. § 1254a(b)(5)(A), a provision within the TPS statute which states that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). DHS asserts that this language "commits to the Secretary's unreviewable authority any and all determinations concerning TPS designation, extension, and termination." Defs.' Opp'n & Cross Mot. at 9, ECF No. 53.

In assessing whether a statute bars judicial review of an Executive Branch action, a court should apply the "well-settled and strong presumption [that] when a statutory provision is reasonably susceptible to divergent interpretation," the court is to "adopt the reading that accords with traditional understandings and basic principles:  that executive determinations generally are subject to judicial review." *Lovo v. Miller*, 107 F.4th 199, 206 (4th Cir. 2024) (quoting *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020)). "The presumption can only be overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Id.* (quoting *Guerrero-Lasprilla*, 589 U.S. at 229).

In assessing whether such evidence exists, a court must first consider the "relevant text." *Id.* Notably, the United States Supreme Court, in considering similar language within different provisions of the INA, declined to find absolute bars to judicial review of any claim arising from the relevant statutory provisions. *See, e.g.*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 483–84 (1991); *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993). In *McNary*, the Court considered whether 8 U.S.C. § 1160(e) precluded a district court from exercising jurisdiction over an action alleging "a pattern or practice of procedural due process violations" by the Immigration

14

and Naturalization Service ("INS") in its administration of the special agricultural worker ("SAW") amnesty program, which "required the Attorney General to adjust the status of any alien farmworker" under certain circumstances. *McNary*, 498 U.S. at 483. Section 1160(e) provides in relevant part that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection" and permits "judicial review of such a denial only in the judicial review of an order of exclusion or deportation." 8 U.S.C. § 1160(e)(1), (3)(A). Focusing on the "critical words" of § 1160(e), specifically "a determination," "an application," and "judicial review of such a denial," the Court found that the provision applied to "a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 491–92. The Court thus concluded that § 1160(e) barred "direct review of individual denials of SAW status" but not review of "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications," including the failure to provide applicants with the opportunity to challenge adverse evidence, the denial of the opportunity to present witnesses, and the failure to provide interpreters needed by applicants. *Id.* at 488, 492.

In reaching this conclusion, the Court further reasoned that "had Congress intended the limited review provisions of [§ 1160(e)] to encompass challenges to INS procedures and practices, it could easily have used broader statutory language," such as language in other provisions barring judicial review of "all causes . . . arising under any of the provisions" of a statute, or prohibiting review "on all questions of law and fact" arising from the statute. *Id.* at 494 (quoting 8 U.S.C. § 1329 and 38 U.S.C. § 211(a)). The Court also relied in part on the fact that the plaintiffs had no other means by which "to obtain meaningful judicial review" of their claims, because in light of the limited language of § 1160(e) and the "well-settled presumption favoring interpretations of

15

statutes that allow judicial review of administrative action," it was "most unlikely that Congress intended to foreclose all forms of meaningful judicial review." *Id.* at 496. Finally, the Court considered the fact that in their claims, the plaintiffs did not "seek a substantive declaration that they [were] entitled to SAW status" but instead, if successful, would "only be entitled to have their case files reopened and their applications reconsidered in light of the newly prescribed INS procedures." *Id.* at 495.

Similarly, in *Reno*, the Supreme Court considered whether 8 U.S.C. § 1255a(f)(1), which provides that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection," barred judicial review of a challenge to the legality of INS regulations relating to a legalization program established pursuant to the Immigration Reform and Control Act of 1986, Pub. L. 99-603, 100 Stat. 3359, under which undocumented immigrants who met certain requirements for continuous physical presence and residency in the United States could apply for temporary resident status and later for permanent resident status. *Reno*, 509 U.S. at 46. The Court held that § 1255a(f)(1) did not bar review of the plaintiffs' claim, which asserted that INS regulations relating to the program, including one addressing when "brief, casual, and innocent absences from the United States" prevent an immigrant from meeting the continuous physical presence requirement, were inconsistent with the statute. *Id.* at 47–48. The Court noted that, as in *McNary*, the "critical language" in § 1255a(f)(1) was "a determination respecting an application for adjustment of status," which referred to a "single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 55–56 (quoting *McNary*, 498 U.S. at 492). Accordingly, it concluded that the district court could review the plaintiffs' claim because it did not challenge a "determination" on a single application but instead presented a challenge to

"the legality of a regulation" that could be asserted "without referring to or relying on the denial of any individual application." *Id.* at 56.

Here, the language in the TPS statute identifying the type of government action for which judicial review is barred is nearly identical to the comparable language at issue in *McNary* and *Reno*: "any determination . . . with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A). Applying *McNary* and *Reno*, the Court concludes that this language is best read as barring judicial review only of "a single act rather than a group of decisions or a practice or procedure employed in making decisions," specifically the act of authorizing, extending, or terminating a TPS designation for a particular foreign state. *Reno*, 509 U.S. at 56 (quoting *McNary*, 498 U.S. at 492). As in *McNary*, the language of the bar on judicial review is notably narrower than other similar provisions within the INA, such as 8 U.S.C. § 1252(b)(9), which bars judicial review of "all questions of law and fact, including interpretation and application of constitutional and statutory provisions," arising from any removal action, except as provided in 8 U.S.C. § 1252. *See McNary*, 498 U.S. at 494. Thus, the text of the statute supports the conclusion that § 1254a(b)(5)(A) does not bar challenges to a general policy, practice, or procedure used by DHS in making TPS determinations. This conclusion is bolstered by the fact that, as acknowledged by DHS at the hearing, there is no other means by which judicial review of any aspect of a TPS designation can be advanced, and the fact that CASA seeks only new determinations to be made without applying the allegedly impermissible policy or practice, not judicial orders barring the terminations. *See id.* at 495–96.

Various federal district courts have relied on *McNary* or *Reno* to reach similar conclusions. *See Centro Presente v. U.S. Dep't of Homeland Security*, 332 F. Supp. 3d 393, 402–04, 408–09 (D. Mass. 2018) (finding that § 1254a(b)(5)(A) did not bar a challenge to DHS's "new policy"

17

allegedly applied across three different TPS determinations); *Saget v. Trump* ("*Saget I*"), 345 F. Supp. 3d 287, 295 (E.D.N.Y. 2018) (concluding that § 1254a(b)(5)(A) "refers to an individual designation, termination, or extension of a designation with respect to a particular country" and not to DHS's "determination practices" or the "adoption of general policies or practices employed in making such determinations"); *Ramos v. Nielsen* ("*Ramos I*"), 321 F. Supp. 3d 1083, 1102 (N.D. Cal. 2018) (in resolving a motion to dismiss, concluding that § 1254a(b)(5)(A) does not bar judicial review of "general procedures or criteria," "collateral practices and policies," or DHS's "general interpretation of the TPS statute"); *Ramos v. Nielsen* ("*Ramos II*"), 336 F. Supp. 3d 1075, 1082 (N.D. Cal. 2018) (in resolving a motion for a preliminary injunction, incorporating the conclusion of *Ramos I*), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023); *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-CV-1464 (BMC), 2025 WL 1808743, at *5–6 (E.D.N.Y. July 1, 2025) (concluding that § 1254a(b)(5)(A) does not apply to a challenge to "a pattern or practice" or to the "procedures followed in making TPS decisions" that are "collateral to and distinct from" a specific TPS designation). Although *Ramos II* was vacated by a panel decision of the United States Court of Appeals for the Ninth Circuit that was itself later vacated in advance of *en banc* review, the initial three-judge panel, relying on *McNary*, adopted a similar distinction in concluding that § 1254a(b)(5)(A), while precluding judicial review over the Secretary's determinations, does not bar claims that broadly challenge DHS's "procedures or practices," or a "pattern or practice" that is "collateral to, and distinct from, the specific TPS decisions and their underlying rationale." *Ramos v. Wolf*, 975 F.3d 872, 891–92 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

The Court therefore concludes that § 1254a(b)(5)(A), while barring judicial review of the Secretary's specific determinations on TPS designations, extensions, or terminations relating to Afghanistan and Cameroon, does not bar challenges to general policies, procedures, or practices used by DHS in making TPS determinations. It does not, however, find that the text of § 1254a(b)(5)(A) and *McNary* establish that it can review a challenge to a TPS determination simply because it contests "the process of the adjudication and whether an evidence-based determination" was made. Pl.'s Opp'n & Reply at 3–5, ECF No. 58 (citing *Saget I*, 345 F. Supp. 3d at 294–96, and *Saget v. Trump* ("*Saget II*"), 375 F. Supp. 3d 280, 332 (E.D.N.Y. 2019))).

Turning to whether CASA's claims are of the type barred by § 1254a(b)(5)(A), the Court addresses three categories of claims asserted in the Complaint: (1) the timing claims in Counts 1, 3, 4, and 6; (2) the APA claims in Counts 2 and 7; and (3) the equal protection claims in Counts 5 and 8. First, as to the timing claims, the Court finds that they are not barred by § 1254a(b)(5)(A) because they do not challenge the "determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" in that they in no way contest the Secretary's analysis and decision to terminate the TPS designation. 8 U.S.C. § 1254a(b)(5)(A). Rather, they challenge a collateral issue, specifically the proper interpretation and application of the timing requirements of the TPS statute. The claim is therefore more akin to the legal questions at issue in *Reno*, in which the plaintiffs raised a challenge to whether regulations interpreting the INA were consistent with the statutory language without "referring to or relying on the denial of any individual application." *Reno*, 509 U.S. at 47–48, 56; *see also Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 831 (N.D. Cal. 2025) (concluding that a challenge to DHS's "decision to vacate" a prior grant of an extension of a TPS designation only two weeks after it was approved by a prior Secretary of Homeland Security was not barred by § 1254a(b)(5)(A) because that decision was

"literally and textually, not a 'designation, or termination or extension of a designation, of a foreign state under this subsection'"), *stay granted*, *Noem v. Nat'l TPS All.*, No. 24A1059, 2025 WL 1427560 (U.S. May 19, 2025).

Further, the timing claims, which are asserted as to the terminations of the TPS designations of both Afghanistan and Cameroon, effectively challenge "a group of decisions or a practice or procedure employed in making decisions," *McNary*, 498 U.S. at 492, specifically, the practice of failing to grant an automatic six-month extension pursuant to § 1254a(b)(3)(C) when the termination notice is published in the Federal Register within 60 days of the expiration date of the TPS designation. Because the timing claims advance a legal challenge to DHS's interpretation of the provisions governing the timing of terminations and extensions and do not seek review of the Secretary's individual determinations on whether to terminate the TPS designations, the Court finds that judicial review of these claims is not barred by § 1254a(b)(5)(A).

Second, as to the APA claims in Counts 2 and 7, the Court finds that they are not barred if construed narrowly. Based on CASA's arguments in its briefs, Counts 2 and 7 arguably advance direct challenges to the Secretary's determinations to terminate the TPS designations for Afghanistan and Cameroon, including contesting Secretary Noem's analysis and ultimate conclusions. For example, CASA appears to argue in part that the termination of the Afghanistan TPS designation should be set aside in part because Secretary Noem considered and relied in part on "vague presidential pronouncements" relating to placing "American interests first," overly relied upon the assessment that the TPS designation "was contrary to the national interests of the United States," and relied on the fact that certain Afghan TPS holders "have been the subject of administrative investigations for fraud, public safety, and national security" without adequately explaining the relevance of this fact or why this issue could not be mitigated through other means.

Pl.'s Mot. at 24–25, ECF No. 42-1. To the extent that these APA claims seek to set aside Secretary

Noem's terminations of the TPS designations based on such facts, they directly challenge the

Secretary's determinations and would likely be subject to the bar on judicial review.

At the hearing, however, CASA clarified that Counts 2 and 7 are limited to the more general

claim that the TPS terminations were the result of a "preordained decision" by the President, which

the Complaint characterizes as part of a "broader effort to reduce the number of non-white

immigrants in this country." Am. Compl. ¶ 119. To the extent that these claims are construed as

alleging and challenging a general policy or practice to terminate TPS designations on a

preordained basis in order to reduce the number of non-white immigrants in the United States, they

are not barred by § 1254a(b)(5)(A) because they contest not "a single act" but "a group of decisions

or a practice or procedure employed in making decisions." *McNary*, 498 U.S. at 492.

Several federal district courts have found, based on *McNary*, that a challenge to a general

policy or practice used in making TPS determinations was sufficiently collateral to the

determination itself that it was not barred by § 1254a(b)(5)(A). *See, e.g.*, *Centro Presente*, 332 F.

Supp. 3d at 408–09 (concluding that the plaintiffs' APA claim was not barred where it challenged,

in relation to three separate TPS determinations relating to three different countries, an allegedly

"new policy that TPS designation determination are to be made solely on the basis of whether the

conditions that created the initial designation persist rather than a broader view of whether the

country is safely able to accept returning nationals"); *Ramos I*, 321 F. Supp. 3d at 1092, 1099–

1100, 1104 (finding that a claim contesting the termination of the TPS designations for four

countries was not barred by § 1254a(b)(5)(A) where the challenge was to the alleged adoption of

a "new interpretation of the TPS statute" that prohibited consideration of "intervening natural

disasters, conflicts, and other serious social and economic problems as relevant factors when

deciding to continue or instead terminate a TPS designation" and instead based determinations on racial animus and "alleged disdain for non-white immigrants"). Accordingly, the Court concludes that CASA's APA claims in Counts 2 and 7, narrowly construed to be limited to challenging the alleged policy or practice or making preordained determinations to terminate TPS designations in order to reduce the number of non-white immigrants in the United States, are not barred by § 1254a(b)(5)(A).

Third, although CASA does not through its Motion seek relief on the equal protection claims in Counts 5 and 8, DHS appears to seek dismissal of these claims as barred by § 1254a(b)(5)(A). Where these claims overlap significantly with the APA claims in Counts 2 and 7 in that they allege that the terminations of the TPS designations were based on racial animus, the Court finds that for the same reasons discussed above in relation to those counts, Counts 5 and 8 are not barred by § 1254a(b)(5)(A) to the extent they are construed as asserting a challenge to a general policy or practice of terminating TPS designations based on racial animus.

Further, the claims may proceed because 8 U.S.C. § 1254a(b)(5)(A) does not clearly preclude judicial review of constitutional claims. Generally, the "presumption in favor of judicial review is particularly important in regards to constitutional claims." *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 317 (D. Md. 2018). Thus, DHS must make a "heightened showing" that Congress intended this provision to bar review of constitutional challenges in order "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Here, the fact that § 1254a(b)(5)(A) does not contain any "clear congressional language mandating preclusion" of constitutional claims supports CASA's argument that it does not bar review of the equal protection claims. *McNary*, 498 U.S. at 484 (relying in part on the lack of such language in

the judicial review provision relating to the SAW amnesty program in concluding that it did not bar review of the plaintiff's constitutional claims). Indeed, the absence of any such language contrasts with other provisions of the INA that explicitly bar judicial review of constitutional claims, such as 8 U.S.C. § 1252(b)(9), which specifically precludes review of "all questions of law and fact, including interpretation and application of constitutional and statutory provisions" except as provided in that section. *Id.*

Moreover, the fact that, as DHS acknowledged at the hearing, there is no other forum in which a plaintiff may advance constitutional challenges relating to the TPS designation also weighs against precluding judicial review of CASA's equal protection claims. *See McNary*, 498 U.S. at 496. Notably, based on these same or similar considerations, multiple courts have held that that § 1254a(b)(5)(A) does not bar constitutional challenges. *See, e.g.*, *CASA de Maryland, Inc.*, 355 F. Supp. 3d at 321 (holding that "§ 1254a(b)(5)(A) does not bar review of Plaintiffs' Equal Protection, Substantive Due Process, or Administrative Procedure Act claims"); *NAACP v. U.S. Dep't of Homeland Security*, 364 F. Supp. 3d 568, 575 (D. Md. 2019) ("Plaintiffs' claim is a constitutional challenge to the Secretary's determination, which the scope of 8 U.S.C. § 1254a(b)(5)(A) does not clearly prohibit."); *Ramos I*, 321 F. Supp. 3d at 1106, 1108 ("Section 1254a does not reflect a clear Congressional intent to preclude this Court from reviewing Plaintiffs' constitutional challenges to the Secretary's determinations."). DHS has identified no contrary legal authority. Accordingly, where Counts 5 and 8 are properly construed to challenge a general policy or practice of race discrimination in TPS determinations and assert constitutional claims, the Court will not dismiss them as barred by 8 U.S.C. § 1254a(b)(5)(A).

**B.    8 U.S.C. § 1252(f)(1)**

DHS also argues that CASA's claims should be dismissed because 8 U.S.C. § 1252(f)(1)

bars this Court from granting CASA's requested injunctive relief.  8 U.S.C. § 1252, entitled

"Judicial review of orders of removal," includes the following subsection:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of part
> IV of this subchapter, as amended by the Illegal Immigration Reform and
> Immigrant Responsibility Act of 1996, other than with respect to the application of
> such provisions to an individual alien against whom proceedings under such part
> have been initiated.

8 U.S.C. § 1252(f)(1).  Section 1252(f)(1) falls within Subchapter II, of Chapter 12 of Title 8 of

the United States Code.  Part IV of Subchapter II is entitled "Inspection, Apprehension,

Examination, Exclusion, and Removal."  Here, the conduct at issue in CASA's Motion—the

termination of a foreign state's TPS designation—is governed by 8 U.S.C. § 1254a, which falls

outside of Part IV and is instead located in Part V, entitled "Adjustment and Change of Status."

Thus, based on the plain language of the statute, it is not subject to the bar of § 1252(f).

Nevertheless, DHS argues that "the U.S. Code is inconsistent with the INA, wherein the

TPS provisions in Section 244 appear in Chapter 4 . . . of title II of the INA."  Defs.' Opp'n &

Cross Mot. at 12 n.7.  Although 8 U.S.C. § 1252(f)(1) does not refer to Chapter 4 of Title II and

instead refers to "part IV of this subchapter" in the United States Code, DHS points to the text of

the original public law that enacted this provision, which refers to "chapter 4 of title II," and an

additional provision that appears to move the TPS statute into chapter 4 of the INA.  *See* Illegal

Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104–208,

Div. C, §§ 306, 308, 110 Stat. 3009-546, 3009-611, 3009-614.  Although the Court understands

the basis for DHS's argument, the Supreme Court has repeatedly and consistently identified the

portion of the INA subject to the bar on injunctive relief in § 1252(f)(1) as either "part IV of subchapter II" or as "8 U.S.C. §§ 1221–1232," the specific sections that are presently contained within Part IV of Subchapter II. *See Biden v. Texas*, 142 S. Ct. 2528, 2538–39 (2022); *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064 (2022); *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). Although these cases did not necessarily address the precise argument presently offered by DHS, this Court will not deviate from the Supreme Court's longstanding reading of § 1252(f)(1).

Further, the Court agrees with CASA that there is no basis to conclude that Congress intended for § 1252(f)(1) to apply to TPS designations and terminations made under 8 U.S.C. § 1254a. Whether § 1252(f)(1) is construed as applying to "part IV of this subchapter" of the United States Code, or as applying to "chapter 4 of title II" of the INA, both Part IV and Chapter 4 are entitled "Inspection, Apprehension, Examination, Exclusion, and Removal," and 8 U.S.C. § 1252 itself is entitled "Judicial review of orders of removal." The provisions identified by the Supreme Court as subject to § 1252(f)(1) all relate to "the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Aleman Gonzalez*, 142 S. Ct. at 2064 (discussing 8 U.S.C. §§ 1221–1232). In contrast, the TPS statute, 8 U.S.C. § 1254a, addresses the designation of foreign states and the eligibility of individuals from those nations to receive TPS but does not address inspection, apprehension, examination, or removal of noncitizens and thus bears no relationship to the topics covered by Part IV, Chapter 4, and § 1252, or those identified in *Aleman Gonzalez*. *See Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (recognizing section headings as tools available for ascertaining the meaning of a statute). Indeed, section 306 of IIRIRA, in which the provision in question was included, is entitled "Appeals from Orders of Removal," a category that

25

cannot fairly be construed to be related to the authorities in the TPS statute. *See* § 306, 110 Stat. at 3009-607. Notably, where § 1252(f)(1) includes an exception in that it does not apply "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated," 8 U.S.C. § 1252(f)(1), the TPS statute does not relate to individual proceedings against an alien. In contrast, the TPS statute is significantly related to Part V, "Adjustment and Change of Status," which includes numerous other provisions that govern the means by which to adjust the status of a noncitizen in order to have lawful presence in the United States. *See, e.g.*, 8 U.S.C. §§ 1255–1258. The fact that 8 U.S.C. § 1254a is not presently in Part IV and bears no relationship to the other provisions in Part IV further supports the conclusion that § 1252(f)(1) does not apply to bar CASA's claims.

Finally, even if 8 U.S.C. § 1252(f)(1) were to apply to 8 U.S.C. § 1254a, that provision only "withdraws a district court's 'jurisdiction or authority' to grant a particular form of relief," specifically injunctive relief. *Biden*, 142 S. Ct. at 2539. "It does not deprive the lower courts of all subject matter jurisdiction over claims" brought pursuant to the covered provisions in cases where, as here, plaintiffs seek forms of relief beyond injunctive relief, including declaratory relief and vacatur. *Id.*; *see Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021) (concluding that "declaratory relief remains available under section 1252(f)(1)"); *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022) ("As an initial matter, § 1252(f)(1) does not apply to vacatur."); *Nat'l TPS All.*, 773 F. Supp. 3d at 824–29 (rejecting the "contention that § 1252(f)(1) is a bar to Plaintiffs' request for relief" in the context of a challenge seeking vacatur of DHS's actions involving Venezuela's TPS designation); *Haitian Evangelical Clergy Ass'n*, 2025 WL 1808743, at *7 (distinguishing orders of vacatur under 5 U.S.C. § 706(2) from injunctions in finding that § 1252(f)(1) did not bar a challenge to the partial vacatur of Haiti's TPS designation). Thus,

26

regardless of whether § 1252(f)(1) can apply to limit the available remedies in this case, it does not provide a basis for outright dismissal of this case. *See Biden*, 142 S. Ct. at 2539.

For the reasons stated above, the Court will not dismiss CASA's claims as barred by either 8 U.S.C. § 1254a(b)(5)(A) or 8 U.S.C. § 1252(f)(1) and will deny DHS's Motion to the extent that it relies on either provision.

## III.   The Timing Claims

Both CASA and DHS seek summary judgment on the timing claims, through which CASA seeks a ruling that the termination of the TPS designations for Afghanistan and Cameroon must be extended by six months because Secretary Noem failed to publish notices of termination in the Federal Register within 60 days of the expiration dates of those designations. CASA argues that this result is required by the procedural requirements for reviewing, extending, and terminating TPS designations set forth in 8 U.S.C. § 1254a(b)(3). Section 1254a(b)(3)(A) ("subparagraph (A)"), entitled "Periodic review," requires that:

> At least 60 days before [the] end of the initial period of designation, and any extended period of designation, of a foreign state (or part thereof) under this section the [Secretary], after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state (or part of such foreign state) for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met. The [Secretary] shall provide on a timely basis for the publication of notice of each such determination (including the basis for the determination, and, in the case of an affirmative determination, the period of extension of designation under subparagraph (C)) in the Federal Register.

8 U.S.C. § 1254a(b)(3)(A).

Under 8 U.S.C. 1254a(b)(3)(B) ("subparagraph (B)"), entitled "Termination of designation," if the Secretary determines under subparagraph (A) that a foreign state "no longer continues to meet the conditions" for TPS designation, then the statute requires that:

> [T]he [Secretary] shall terminate the designation by publishing notice in the Federal Register of the determination under this subparagraph (including the basis for the determination). Such termination is effective in accordance with subsection (d)(3), but shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C).

*Id.* § 1254a(b)(3)(B).

Under 8 U.S.C. § 1254a(b)(3)(C) ("subparagraph (C)"), entitled "Extension of designation," if the Secretary "does not determine under subparagraph (A) that a foreign state . . . no longer meets the conditions for designation . . . the period of designation of that foreign state is extended for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.* § 1254a(b)(3)(C).

CASA argues that these provisions, read together, require the Secretary to review a foreign state's TPS designation, make a determination on whether that designation may continue, and publish a notice of the determination in the Federal Register no later than 60 days prior to the expiration date of the TPS designation, and that the failure to publish the notice by that 60-day deadline triggers the automatic six-month provision referenced in § 1254a(b)(3)(C). In contrast, DHS argues that the plain language of these provisions within § 1254a(b)(3) establishes that, in order to terminate a country's TPS designation, the Secretary need only complete the periodic review and make a determination on whether the conditions for TPS continue to be met by the deadline of 60 days prior to a country's TPS expiration date, then provide for publication in the Federal Register of that determination "on a timely basis" after it is made. *Id.* § 1254a(b)(3)(A). DHS asserts that because Secretary Noem signed decision memoranda through which she made the determinations that the statutory conditions for TPS were no longer met for Afghanistan and Cameroon in advance of the respective 60-day deadlines, the terminations pursuant to § 1254a(b)(3)(B) that were later effectuated through the publication of the Afghanistan Notice and

28

the Cameroon Notice (collectively, "the TPS notices") were timely, and no automatic six-month extensions of the TPS designations are warranted.

This dispute presents a matter of first impression. The parties have not identified, and the Court has not found, any opinion by any federal court addressing this issue of statutory interpretation. When interpreting a statute, courts must "begin with the plain language." *Hately v. Watts*, 917 F.3d 770, 784 (4th Cir. 2019) (quoting *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013)). "To determine a statute's plain meaning," courts "not only look to the language itself, but also 'the specific context in which the language is used, and the broader context of the statute as a whole.'" *Id.* (quoting *In re Total Realty Mgmt., LLC*, 706 F.3d at 251); *see Schilling v. Schmidt Baking Co.*, 876 F.3d 596, 601–02 (4th Cir. 2017) (in interpreting a federal statute, considering the interplay of the various subsections based on the principle that the analysis is "informed by the specific context in which that language is used, and the broader context of the statute as a whole").

Based on the plain language of the relevant subparagraphs in § 1254a(b)(3), the Court agrees with DHS's reading. Starting with subparagraph (A), the first sentence of that provision establishes a deadline of "[a]t least 60 days before" the end of a period of TPS designation, but only as to the requirements that the Secretary "shall *review* the conditions" of the foreign state in question "after consultation with appropriate agencies of the Government," and "shall *determine* whether the conditions for such designation . . . continue to be met." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). There is no reference in that sentence to publication of a notice of that determination. Such publication is referenced in the next sentence, which states that the Secretary "shall provide on a timely basis for the publication of notice of each such determination . . . in the Federal Register." *Id.* The construction of this subparagraph as split into two sentences

demonstrates that the publication of the notice in the Federal Register is a distinct requirement, separate and apart from the 60-day deadline established in the prior sentence. Indeed, the use of separate timing language, "on a timely basis," in relation to the publication requirement demonstrates that the Federal Register notice has a different, more flexible, timing requirement. *Id.*; *Timely*, Webster's New World Dictionary 1401 (3d College ed., Simon & Schuster, Inc. 1988) (defining "timely" as "happening, done, said, etc. at a suitable time; well-timed; opportune" or "appearing in good time; early"); *see United States v. Santos*, 553 U.S. 507, 511 (2008) (using dictionaries in statutory construction); *Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 129 (4th Cir. 2023) ("Searching for the plain meaning of a statute's text often starts with reading dictionaries published close in time to when it was enacted.").

CASA argues that the phrase "timely basis" incorporates the 60-day requirement in the preceding sentence and thus means that the publication must occur before the 60-day deadline. While not entirely implausible, such a reading is far from the most natural reading of the statute. If Congress had meant for the 60-day deadline to apply to the requirement of publication of the notice, it could have done so through multiple other means that more clearly conveyed that intent. It could have included the publication notice requirement in the preceding sentence, in which the 60-day deadline was established, or it could have directly referenced that 60-day deadline in the same sentence in which the publication notice requirement was established. *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 156 (2013) ("We have recognized, as a general rule, that Congress's use of 'certain language in one part of the statute and different language in another' can indicate that 'different meanings were intended.'" (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004)). *Cf. Dean v. United States*, 556 U.S. 568, 573 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is

30

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))). Where Congress instead placed the requirements of a "determination" and "publication of notice" into two separate sentences with different language relating to timing, the most reasonable reading of subparagraph (A) is that the 60-day deadline applies only to the "determination." 8 U.S.C. § 1254a(b)(3)(A).

This reading is confirmed upon consideration of subparagraph (B), which addresses the termination of a TPS designation by providing that if, upon the Secretary's statutorily mandated review under subparagraph (A), the Secretary "determines . . . that a foreign state . . . no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation by publishing notice in the Federal Register of the determination." *Id.* § 1254a(b)(3)(B). Significantly, this subparagraph specifies that such a termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension under subparagraph (C)." *Id.* If, as CASA argues, subparagraph (A) requires the Secretary to publish the notice in the Federal Register 60 days prior to the expiration of a TPS designation in order to effectuate a termination of that designation, Congress did not need to include the first part of this provision and could have instead stated only that the effective date of a termination would be the date of the expiration, as that date would always be 60 or more days after the publication of the notice. Where CASA's reading of the statute would render unnecessary and superfluous the phrase "shall not be effective earlier than 60 days after the date the notice is published," it runs afoul of the canon against surplusage, pursuant to which courts generally do not adopt a reading that renders part of a statute superfluous over a reading that give effect to a statute's "every clause and word." *See United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019) (quoting *United States v. Mensache*, 348 U.S. 528, 539–38 (1955)). Rather, the inclusion of the

31

language stating that the termination "shall not be effective earlier than 60 days after the date the notice is published," which sets a minimum period of 60 days between the date of the publication of the notice and the effective date of the termination, makes sense only as a means to ensure that such a minimum period would apply even when the publication of the notice occurs within the 60-day period prior to an expiration, a circumstance that is permissible under only DHS's reading of the statute.

Finally, the plain language of subparagraph (C), which addresses extensions of a TPS designation, further supports this reading. This subparagraph provides that if the Secretary "does not *determine* under subparagraph (A) that a foreign state . . . no longer meets the conditions for designation," the period of designation of that foreign state "is extended" for an additional period of 6, 12, or 18 months. 8 U.S.C. § 1254a(b)(3)(C) (emphasis added). This provision makes no reference to the publication of the notice in the Federal Register. Congress's use of the word "determine" is notable because it is a direct reference to the use of the word "determine" in § 1254a(b)(3)(A). *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning."). Where, as discussed above, subparagraph (A) draws a distinction between the Secretary's determination that a foreign state no longer meet the conditions for TPS designation on the one hand and the publication of a notice of that determination on the other, the plain language of subparagraph (C) necessarily bases the imposition of an automatic extension on a failure to make the determination prior to the 60-day deadline referenced in subparagraph (A), not a failure to publish the notice by the deadline.

Based on this analysis, the Court finds that, under the plain language of § 1254a(b)(3), the 60-day deadline applies only to the Secretary's determination of whether the conditions necessary

for TPS designation continue to apply, and if that determination is timely made, there is no automatic six-month extension under § 1254a(b)(3)(C).

Nevertheless, CASA offers several arguments to convince the Court to adopt its position. First, CASA argues that under DHS's reading, and as occurred here, the Secretary's setting of the effective dates of the Afghanistan and Cameroon TPS terminations at 60 days after the issuance of the TPS notices amounted to a 55-day extension for Afghanistan (from May 20, 2025 to July 14, 2025) and a 58-day extension for Cameroon (from June 7, 2025 to August 4, 2025). Such extensions, CASA argues, run afoul of § 1254a(b)(3)(C), which requires that any extensions must be made in increments of 6, 12, or 18 months. This argument fails because in setting the effective dates of the terminations at 60 days after the publication of the TPS notices, Secretary Noem specifically invoked subparagraph (B), which addresses the procedures for "Termination of designation," and with which those timelines are fully consistent, not subparagraph (C), which addresses the requirements for an "Extension of designation." 8 U.S.C. §§ 1254a(b)(3)(B), (C); Afghanistan Notice, 90 Fed. Reg. at 20312; Cameroon Notice, 90 Fed. Reg. at 22699; *see also Florida Dep't of Revenue*, 554 U.S. at 47 (recognizing section headings as tools available for ascertaining the meaning of a statute). Indeed, the setting of an effective date for a termination is contemplated by both subparagraph (B) and 8 U.S.C. § 1254a(b)(2)(B), the latter of which provides that a TPS designation "shall remain in effect until the effective date of the termination of the designation." *Id.* Where, as here, Secretary Noem was terminating a designation, set an effective date consistent with the requirements of subparagraph (B), and did not refer to her action as an extension or otherwise rely on authority relating to extensions, the procedures and timelines set forth in subparagraph (C) do not apply.

33

CASA also argues that its reading better aligns with congressional intent because setting a 60-day deadline for publication of the Federal Register notice "ensures that TPS holders receive adequate notice of any termination so that they can make the necessary arrangements to reorder their lives," and permitting such publication within the last 60 days prior to an expiration date would upend the certainty Congress attempted to afford TPS holders. Pl.'s Mot. at 17–20. In particular, CASA notes that under DHS's reading, those individuals would be forced to continue to check for the publication of a Federal Register notice during the final 60 days of the TPS designation period. While CASA persuasively argues that DHS should provide TPS holders with well more than 60 days of notice of the effective date of a termination, even under CASA's reading, there are circumstances under which a termination could take effect only 60 days after public notice of that termination, specifically, if the Federal Register notice was issued exactly 60 days before the expiration date and DHS declined to extend the effective date as a matter of discretion to provide "for an orderly transition." 8 U.S.C. § 1254a(d)(3). The fact that Congress chose to allow for a termination with only 60 days of public notice undermines CASA's claim that DHS's interpretation is contrary to legislative intent regarding the provision of advanced notice. Further, under either reading, there would necessarily be a period of time during which TPS holders would have to endure uncertainty over whether the TPS designation would be extended, and there is no particular reason that such a period must end 60 days before the expiration of the designation rather than on the expiration date itself.

Although CASA also notes that DHS's reading may allow for the period of uncertainty to extend even beyond the expiration date, as DHS arguably could delay the publication of a notice of a termination made more than 60 days before the expiration date until after the expiration, DHS would have little incentive to do so because such an action would just further delay the effective

date of the TPS termination, which under § 1254a(b)(3)(B) cannot occur until 60 days after the publication of the notice.

CASA also argues that its reading of the statute is consistent with past agency practices, under which Federal Register termination notice have generally been issued more than 60 days before the expiration of the TPS designation, and notices issued less than 60 days before the expiration, or after the expiration, have typically granted at least a six-month extension. CASA acknowledges, however, that on February 8, 1993, a TPS designation for Lebanon set to expire on March 28, 1993 was terminated pursuant to the same procedure employed in the present case— through the publication of a Federal Register notice less than 60 days before the expiration date that set an effective date of 60 days after the date of publication. *See* Termination of Designation of Lebanon Under Temporary Protected Status Program, 58 Fed. Reg. 7582 (Feb. 8, 1993). Although CASA has identified multiple examples in which a notice of a TPS termination was published within the 60-day window and the effective date of the termination was set to occur at least six months later, in those instances, DHS characterized the granting of a later effective date as appropriate to "provide for an orderly transition," a discretionary basis recognized in 8 U.S.C. § 1254a(d)(3), and did not state that it was a required extension under 8 U.S.C. § 1254a(b)(3)(C) resulting from a late Federal Register notice. *See, e.g.*, Termination of the Designation of Nicaragua for Temporary Protected Status, 82 Fed. Reg. 59636, 59637 (Dec. 15, 2017); Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47228, 47230 (Oct. 11, 2017)).

Indeed, when DHS has invoked an "automatic" extension under 8 U.S.C. § 1254a(b)(3)(C), the Federal Register notices have explicitly stated that the Secretary did not make a determination prior to the 60-day statutory deadline on whether the conditions for a TPS designation continued

to be met. *See, e.g.*, Extension of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 19217, 19217 (May 6, 2025) (in a Federal Register notice published three days after the expiration date, stating that the TPS designation was "automatically extended" for an additional six months because the Secretary "was unable to make an informed determination" by the 60-day statutory deadline); Extension of the Designation of Honduras for Temporary Protected Status, 82 Fed. Reg. 59630, 59631 (Dec. 17, 2017) (in a Federal Register notice published 22 days before the expiration date, extending the TPS designation for an additional six months because the Secretary "did not make a determination on Honduras's designation by November 6, 2017, the statutory deadline").

Such cases include several in which the Federal Register notice was not issued until after the expiration date for the TPS designation. *See, e.g.*, Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program, 65 Fed. Reg. 52789, 52789 (Aug. 30, 2000) (in a Federal Register notice published 20 days after the expiration date, stating that "because this determination was not made at least 60 days before the termination date, the designation of Bosnia-Herzegovina for TPS is automatically extended for a period of 6 months, valid until February 10, 2001"); Six-Month Extension and Termination of Designation of Guinea-Bissau Under the Temporary Protected Status Program, 65 Fed. Reg. 15016 (Mar. 20, 2000) (published 10 days after the expiration date); *see also* Termination of Designation of Rwanda Under Temporary Protected Status Program After Final 6-Month Extension, 62 Fed. Reg. 33442 (June 19, 1997) (published 13 days after the expiration date and granting a final six-month extension with the termination effective at the expiration of that extension). However, CASA has not cited, and this Court has not found, any instance in which a Federal Register notice published less than 60 days before the expiration date stated directly or indirectly that the failure to publish the notice before that 60-day

deadline required an automatic extension of six months. Thus, past agency practices, even if relevant to the Court's determination, do not provide a basis to adopt an interpretation that is inconsistent with the plain language of the statute.

CASA also argues that under DHS's reading, 8 U.S.C. § 1254a(b)(3)(A) "serves no practical purpose" because its "sole function is to set a deadline for the Secretary to make a secret determination" not available to the public. Pl.'s Opp'n & Reply at 12. Although CASA is correct that the results of the Secretary's determination are not necessarily made public until the publication of the Federal Register notice, there is nothing illogical about Congress's imposition of an internal deadline for the completion of the periodic review and determination, particularly where the next step in the process, publication in the Federal Register, requires actions by entities outside of DHS's direct control, such as the Office of the Federal Register within the National Archives Records Administration and the Office of Management and Budget ("OMB"). *See* 44 U.S.C. §§ 1502, 1505 (designating the Archivist of the United States and the Office of the Federal Register as responsible for publication of the Federal Register); U.S. Gov't Accountability Off., GAO-20-134, Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions 30, 32 & n.53 (2020) (stating that "once the Secretary of Homeland Security makes a TPS decision, time frames for publishing the Federal Register notice may vary" due in part to OMB interagency review).

Indeed, courts have previously referenced the determination on a TPS designation as a separate event that predated the publication of a notice in the Federal Register by days or weeks. *See, e.g., Saget I*, 345 F. Supp. 3d at 292–93 (stating that the Secretary terminated Haiti's TPS designation on November 20, 2017 as referenced in a press release and that the Federal Register notice was published on January 18, 2018); *Ramos II*, 336 F. Supp. 3d at 1083 (stating that "in

37

early September 2017" the Secretary made the decision to terminate Sudan's TPS designation, but the Federal Register notice was published on October 11, 2017, and that on or about November 5, 2017 the Secretary made the decision to terminate Nicaragua's TPS designation, but the Federal Register notice was published on December 15, 2017); *see also Documented v. Dep't of Homeland Security*, No. 21-cv-3142, 2024 WL 4253130, at *2 (D.D.C. Sept. 20, 2024) (describing the Secretary's decision memoranda relating to TPS); U.S. Gov't Accountability Off., GAO-20-134, *supra*, at 27 & n.47 (noting that, in GAO's study of 26 TPS decisions, "DHS provided memorand[a] or notices documenting the Secretary's decisions for all 26 decisions" consisting of either signed memoranda or signed draft Federal Register Notices).

The related claim that DHS's reading allowing for an internal "determination" to satisfy the 60-day requirement "would render enforcement of the statute's procedural requirements nearly impossible" does not alter the Court's conclusion. Pl.'s Opp'n & Reply at 13. Under either reading, there would be a minimum of 60 days from the public notice of a termination until the effective date of the termination during which a challenge could be brought. Where, as here, the public notice was issued late enough to raise a question whether the determination was timely, DHS would have the burden to produce evidence to demonstrate the timeliness of the determination, and as has occurred in this case, the decision memoranda memorializing the determination can be identified and considered.

In the end, although CASA offers persuasive arguments that DHS's reading allows for termination of a TPS designation on a timeline that does not afford TPS holders a reasonable amount of time to react to such a termination and may cause great upheaval in their lives, the Court cannot find that any such arguments allow it to overlook the plain language of 8 U.S.C. § 1254a(b)(3), which clearly provides that DHS may terminate a TPS designation with only 60 days

of notice, provided that the Secretary makes a determination more than 60 days before its expiration that the conditions for such a designation do not continue to be met, even if the publication of the notice of that determination occurs within 60 days of that expiration date. In turn, if the Secretary's determination is made before that 60-day deadline, even if the notice is published after that deadline, there is no automatic six-month extension of the TPS designation pursuant to 8 U.S.C. § 1254a(b)(3)(C).

Here, DHS has presented redacted decision memoranda, signed by Secretary Noem and dated at least 60 days prior to the expiration of the TPS designations for Afghanistan and Cameroon, that state that she approved the termination of TPS for Afghanistan on the basis of "improved conditions as it relates to ongoing conflict" and "no longer meeting the extraordinary and temporary conditions statutory standard," J.R. 140–41, and that she approved the option to "[t]erminate Cameroon's designation," J.R. 4393. CASA stated at the hearing that for purposes of the pending Motions, it is not disputing that the decision memoranda establish that Secretary Noem made those determinations on the identified dates. Accordingly, the Court declines to grant summary judgment to CASA on the timing claims in Counts 1, 3, 4, and 6 seeking automatic six-month extensions of the TPS designations.

Although the Court agrees with DHS's interpretation of the statute, it will not grant summary judgment to DHS on these claims because the record is insufficiently complete to find that there are no genuine issues of material fact. For example, although CASA is not presently contesting whether the decision memoranda actually effectuated a determination by Secretary Noem on whether the conditions for TPS designations continued to be met, CASA has not had the opportunity to review the unredacted decision memoranda to confirm that final determinations were actually made on the identified dates. Indeed, where DHS has described those memoranda

as subject to the deliberative process privilege reserved for predecisional documents, the Court cannot presently make a definitive finding in favor of DHS. Accordingly, DHS's Cross Motion for Summary Judgment will be denied as to the timing claims in Counts 1, 3, 4, and 6.

## IV.   The APA Claims

As to the APA claims in Counts 2 and 7, the parties each seek summary judgment on these counts. In Counts 2 and 7, CASA asserts that DHS's terminations of the Afghanistan and Cameroon TPS designations violate the APA, which requires a court to "hold unlawful and set aside agency action" that was "arbitrary [and] capricious" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency rule or action may be deemed arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983). Arbitrary-and-capricious review is "highly deferential, with a presumption in favor of finding the agency action valid" but does not "reduce judicial review to a rubber stamp of agency action." *Casa de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 703 (4th Cir. 2019) (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)).

As discussed above, construed so as to be subject to judicial review, Counts 2 and 7 assert that the TPS terminations were unlawful because DHS relied on factors not intended to be considered by applying a general policy or practice of terminating TPS designations on a preordained basis as part of a broader effort to reduce the number of non-white immigrants in the United States. *See supra* part II.A. For its part, DHS "emphatically rejects" CASA's characterization of DHS's actions and motivations. Defs. Opp'n & Cross Mot. at 15 n.8.

To the extent that DHS seeks dismissal or summary judgment in its favor on these claims, the Court finds that CASA has alleged sufficient facts to state an APA claim on this basis. First,

CASA has asserted facts in support of the conclusion that DHS acted with an intent to reduce the number of non-white immigrants in the United States.  In the Complaint, CASA recounts numerous public statements made by President Trump, during his presidential campaign and as president, in which he disparately disparaged non-white immigrants.  For example, in June 2024, President Trump described "a series of horrific murders" by individuals who "come in here so illegally, they just walk across, not vetted not checked," "from the Congo and Africa," "from Asia," "from the Middle East," "from South America," "from all over the world," and who are "in many cases, very, very bad, very bad people."  Am. Compl. ¶ 87; *id.* Ex. P at 233, ECF No. 41-2. CASA asserts that in September 2024, President Trump falsely claimed that Haitian immigrants in Springfield, Ohio were "eating the pets of the people that live there," Am. Compl. ¶ 89, and that on February 7, 2025, President Trump stated that "[m]any, many, thousands and thousands of murderers" had entered United States and falsely claimed that countries from Africa, Asia, and South America had "allowed every single prisoner" to be put on buses or planes to be sent to the United States. *Id.* ¶ 90; *id.* Ex. T at 330, ECF No. 41-2.

Further, CASA emphasizes President Trump's repeated statements that immigrants are "poisoning the blood of our country" and asserts that they track the rhetoric of white supremacists. Am. Compl. ¶¶ 94–95 (citing Russell Contreras, *Axios Explains: The Racist History of Trump's "Poisoning the Blood,"* Axios (Dec. 30, 2023), Am. Compl. Ex. CC at 507, ECF No. 41-2)).  For example, in December 2023, President Trump stated that the Biden Administration had allowed "15, 16 million people into our country" who are "poisoning the blood of our country," referenced South America, and stated that they were coming "from Africa, from Asia, all over the world." Am. Compl. ¶ 95; *id.* Ex. FF at 529, ECF No. 41-2.  By contrast, in April 2024, President Trump made a statement "lamenting the dearth of immigrants from nice countries like Denmark,

Switzerland, and Norway." Am. Compl. ¶ 99 (citing Maggie Haberman & Michael Gold, *Trump, at Fund-Raiser, Says He Wants Immigrants From 'Nice' Countries*, N.Y. Times (Apr. 7, 2024), Am. Compl. Ex. KK at 551, ECF No. 41-2).

For her part, Secretary Noem has stated that Venezuela "emptied their prisons and sent criminals to America" and stated at her January 2025 confirmation hearing that the extension of TPS to Venezuelans "is alarming when you look at what we've seen in different states including Colorado with gangs doing damage and harming the individuals and the people that live there." Am. Compl. ¶ 103 (citing *Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), Am. Compl., Ex. OO at 551, ECF No. 41-2).

Second, CASA has identified multiple examples of actions by the Trump Administration to curtail immigration from countries viewed as having non-white populations. Since January 2025, DHS has sought to vacate the most recent extensions of TPS designations for Haiti and Venezuela. DHS has also "announced the termination of parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela" and "revoked over 1,000 visas for students participating in the Student and Exchange Visitor Information System Program," which would most affect students from "India, China, South Korea, Saudi Arabia, Nigeria, Nepal, Bangladesh, [Colombia], Mexico, and Iran." *Id.* ¶¶ 71, 72.

By contrast, CASA alleges that the Trump Administration has removed immigration barriers for white immigrants. Specifically, President Trump directed the Secretary of State and Secretary of Homeland Security to take action to allow white Afrikaners from South Africa who were allegedly victims of race discrimination through land expropriation laws to be admitted to the United States through the United States Refugee Admissions Program ("USRAP"), and on May 12, 2025, after having their applications expedited, the first group arrived on a flight chartered

by the U.S. government. *Id.* ¶ 73. CASA also references President Trump's proposed "gold card" visa program, pursuant to which noncitizens would be able to "purchase a visa for $5 million that allows them to live permanently in the United States and provides them with a pathway to citizenship." *Id.* ¶ 75. CASA alleges that because Western Europe has the highest percentage of millionaires outside the United States, this program would "disproportionately reduce immigration barriers to white individuals." *Id.* ¶ 75.

Third, CASA has identified facts relating to the process leading to Secretary Noem's termination decisions that circumstantially support its claim that they were "preordained by White House directive," potentially in service of the policy or practice of reducing the number of non-white immigrants. Pl.'s Mot. at 23. For example, the Afghanistan Notice relies significantly on overarching policies of the Trump Administration that arguably preordain the termination of TPS designations, specifically Executive Order 14,150, which provides that "the foreign policy of the United States shall champion core American interests and always put America and American citizens first," and Executive Order 14,159, which directs the Secretary of Homeland Security and other Cabinet officials to "rescind policies that led to increased or continued presence of illegal aliens in the United States," including by "ensuring that the TPS designations are consistent with the TPS statute and are 'made for only so long as may be necessary to fulfill the textual requirements of that statute.'" Afghanistan Notice, 90 Fed. Reg. at 20311 (quoting Exec. Order 14,150, § 1, 90 Fed. Reg. at 8337, and Exec. Order 14,159, § 16, 90 Fed. Reg. at 8446). The Cameroon Notice relies on the same part of Executive Order 14,159. Cameroon Notice, 90 Fed. Reg. at 23697. At the same time, where TPS holders have legal status in the United States and thus are not actually "illegal aliens," invocation of the stated policy of Executive Order 14,159 of curtailing illegal immigration reveals a "mismatch between the decision the Secretary made and

the rationale [she] provided." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (considering such a mismatch as relevant to the issue of whether the stated reason for a decision was pretextual or contrived).

Further, CASA alleges that DHS "bypassed the standard process for conducting TPS reviews." Am. Compl. ¶ 76; *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (in considering a claim of race discrimination, noting that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role"). Although "TPS review typically begins with career specialists preparing an objective conditions report, a process spanning months," Am. Compl. ¶ 77, and by statute requires consultation with the State Department and other appropriate agencies, DHS itself has claimed that Secretary Noem made her determinations to terminate the Afghanistan and Cameroon TPS designations on March 21, 2025 and April 7, 2025, respectively, less than three months into the Trump Administration. Indeed, in the Addendum to the Afghanistan TPS Considerations Memorandum, which was prepared to provide updated information relating to the most recent time period of November 2024 to February 2025, USCIS provided no additional information relating to eight listed topics of analysis on the grounds that it was not able to gather new information "within the limited time constraints," including on the topics of "International Aid and Corruption," "Internal Displacement," "Infrastructure Challenges," "Explosive Remnants of War including Landmines," "Taliban Governance – Damage to Security and Society," "Challenges for Women and Girls," "Lack of Access to Healthcare," and "Challenges for Persons with Disabilities." J.R. 143–46. Likewise, the comparable USCIS Addendum to the Cameroon TPS Considerations Memorandum, covering the same time period, noted that USCIS was not able to gather new information on a key topic, "Security Situation & Armed Conflict," "within the limited

time parameters." Cameroon Administrative Record ("A.R.") 45, ECF No. 70-3. The compressed timeline that prevented a key agency from gathering current information on identified topics for analysis provides additional support for CASA's claim that the TPS terminations were made as part of the alleged preordained practice.

Finally, Secretary Noem's findings appear to be inconsistent with certain information in the administrative record. For example, in the Afghanistan TPS Considerations Memorandum covering the time period from June 1, 2023 to November 13, 2024, USCIS concluded that:

> Afghanistan's civilian population faces dire challenges, including a collapsing economy and health care system, ubiquitous food insecurity exacerbated by drought, and widespread insecurity due to decades of armed conflict and insurgency that is entering a new, dangerous phase. The Taliban's August 2021 takeover continues to pose substantial impediments to meeting these challenges. Taliban authorities violently target citizens and foster continued armed conflict and inter-ethnic strife. International cooperation and the receipt of aid have been compromised, leading to the further displacement of civilians. The severe restrictions, ranging from education to employment, on women foreclose the meaningful participation of half the population in remedying these concerns.

J.R. 182. In the November 20, 2024 letter from Secretary of State Blinken to Secretary Mayorkas which was accompanied by a seven-page State Department memorandum analyzing the conditions in Afghanistan, Secretary Blinken recommended that DHS extend and redesignate Afghanistan for TPS for 18 months based in part on the "ongoing armed conflict in Afghanistan, primarily between the Taliban and ISIS-K," which "continues to result in significant violence and instability" and has "caused numerous civilian casualties," and on the humanitarian situation which "has continued to deteriorate." J.R. 120–28. Although Secretary Noem later received an undated letter from Secretary of State Rubio recommending that DHS terminate the Afghanistan TPS designation based on the conclusion that "the armed conflict in Afghanistan has abated to such an extent that it is now possible to return Afghan nationals to Afghanistan without posing a serious threat to their

personal safety," J.R. 129–30, that letter provided no specific facts in support of that conclusion and was not accompanied by a State Department memorandum.

As to Cameroon, Secretary Noem had access to a December 2, 2024 letter from Secretary Blinken to Secretary Mayorkas, accompanied by a 12-page memorandum, in which he recommended that DHS extend the Cameroon TPS designation for 12 months in part because of "ongoing armed conflict" between the Government of Cameroon and terrorist groups such as Boko Haram, "ongoing violence" between the Government and multiple armed separatist groups, and human rights abuses by both Government forces and armed groups. *See* Cameroon A.R. 49–50. Unlike for Afghanistan, there is no evidence that Secretary Noem received a letter or other updated State Department recommendation from Secretary Rubio relating to Cameroon. The fact that Secretary Noem's findings appear to be in conflict with key facts and recommendations from the State Department and USCIS provides additional circumstantial support for CASA's assertion that DHS was acting pursuant to a general policy or practice of making preordained terminations to reduce the number of non-white immigrants. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

As to DHS's request for dismissal or summary judgment, the Court must view the allegations and facts in the light most favorable to CASA and draw all reasonable inferences in its favor. *See Albright*, 510 U.S. at 268; *Lambeth*, 407 F.3d at 268. Upon consideration of the allegations and facts described above that were contained in the Complaint and its attachments, as well as the TPS notices which are fairly construed as integral to the Complaint, the Court finds that CASA has plausibly alleged an APA violation on the grounds that the Afghanistan and

Cameroon terminations were made pursuant to a general policy or practice of engaging in preordained terminations of TPS designations in order to reduce the number of non-white immigrants and thus were arbitrary and capricious in that they relied on factors Congress did not intend for it to consider. *See State Farm*, 463 U.S. at 43. Indeed, in challenges to TPS terminations based on similar theories, federal district courts have relied on similar allegations in denying motions to dismiss. *See CASA de Maryland, Inc.*, 355 F. Supp. 3d at 326, 328 (denying a motion to dismiss APA and equal protection claims where the plaintiff had alleged that the termination of El Salvador's TPS designation was motivated by race discrimination, based in part on statements of racial animus by the President); *NAACP*, 364 F. Supp. 3d at 577–78 (denying a motion to dismiss equal protection claims where the plaintiff had alleged that the termination of Haiti's TPS designation was motivated by race discrimination, based in part on statements of racial animus by the President); *Centro Presente*, 332 F. Supp. 3d at 402–04, 415 (denying a motion to dismiss APA and equal protection claims where the plaintiff had alleged that the terminations of the TPS designations of El Salvador, Haiti, and Honduras were made pursuant to an "unreasoned shift" to a new policy motivated by race discrimination, based in part on statements of racial animus by the President and the inconsistency of the Secretary's determinations with conditions in the countries); *Saget I*, 345 F. Supp. 3d at 299 (concluding that the plaintiffs had "plausibly alleged that to the extent [DHS] engaged in any process of review, it was to identify facts to support a pre-determined decision to terminate TPS for Haiti"). Any motion to dismiss Counts 2 and 7 will therefore be denied.

DHS's Cross Motion for Summary Judgment on these counts will also be denied because the addition to the analysis of the facts from the administrative record discussed above only bolsters CASA's arguments such that, when the present record is viewed in the light most favorable

to CASA, the Court cannot conclude that DHS is entitled to judgment as a matter of law on these claims. Further, any grant of summary judgment is premature at this time where the factual record cannot be deemed complete for purposes of the Motions. The administrative records for the Afghanistan and Cameroon TPS determinations were submitted only during or, in the case of Cameroon, after the completion of briefing on the Motions, such that the parties have not had a full opportunity to present arguments based on those records. Moreover, neither the Court nor the parties have had the opportunity to consider whether additional factual development is warranted in this case.

At the same time, based on the present record, the Court will not grant summary judgment to CASA on these claims. Although CASA's allegations and identified facts are sufficient to permit these claims to proceed, they are not sufficient to entitle CASA to judgment as a matter of law at this time or, as relevant below, to demonstrate that they are likely to succeed on the merits of these claims. *See infra* part V. While the statements by the President and Secretary Noem relating to immigrants provide some evidence in support of a discriminatory animus, they do not relate specifically to the TPS determinations at issue, and where many are intertwined with assertions of general policy interests in curtailing immigration or concerns about crime by immigrants, such statements are not alone sufficient to demonstrate a discriminatory intent in relation to these TPS designations. While the favorable treatment of white South Africans in relation to a different program, USRAP, draws a stark contrast that appears difficult to explain, the parties have not yet presented facts relating to the similarities and differences between the standards for that program as compared to TPS, or the specific facts underlying that decision, to allow for any conclusion that these TPS designations amount to disparate treatment motivated by race discrimination. *Cf. Myers v. Hose*, 50 F.3d 278, 284 (4th Cir. 1995) (stating that where a

48

protected class and another class of persons are subject to disparate treatment and "the classes are similarly situated in most relevant respects except their protected status (e.g., gender or race), there arises a rational inference of discrimination on the basis of that status").

Moreover, the executive orders referenced by the TPS notices, even while expressing a policy position that illegal immigration and migration more generally should be curtailed, notably do not preordain any particular determinations relating to TPS designations.  Rather, Executive Order 14,159, on its face, directs only that the Secretary "ensur[e] that designations of Temporary Protected Status are consistent with the provisions of . . . 8 U.S.C. § 1254a . . . and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."  Exec. Order 14,159, § 16, 90 Fed. Reg. at 8446.

Further, the record reflects that the TPS notices made specific findings on the two relevant statutory bases for a TPS designation, that any "ongoing armed conflict" did not pose "a serious threat to [the] personal safety" of TPS holders returning to those nations, and that there were not "extraordinary and temporary conditions . . . that prevent" such safe return, which cannot support a TPS designation if allowing the TPS holders to remain in the United States was "contrary to the national interest of the United States."  8 U.S.C. § 1254a(b)(1); *see* Afghanistan Notice, 90 Fed. Reg. at 20309–12; Cameroon Notice, 90 Fed. Reg. at 23697–99.  The Afghanistan Notice referenced specific facts in support of both bases, including that although armed conflict continues to occur, there is "a reported decrease in armed conflict since the end of the Taliban's insurgency" and "large-scale violence is at its lowest level in decades," and that there has been a significant decrease in the number of Afghans in need of humanitarian assistance. *See* Afghanistan Notice, 90 Fed. Reg. at 20310.  Indeed, the Addendum to the Afghanistan TPS Considerations Memorandum includes certain information consistent with these conclusions, including that "[t]he

overall security situation in Afghanistan has significantly improved since the end of large-scale conflict in 2021," as evidenced by a 60 percent drop in reports by households of "conflict-related shocks" since 2021.  J.R. 144.

As for the Cameroon Notice, it states that while there remain armed conflicts in Cameroon, "they are contained in limited regions that primarily impact only three of the ten regions comprising Cameroon."  Cameroon Notice, 90 Fed. Reg. at 23698.  CASA has not identified any statement within the administrative record that contradicts this fact.  Indeed, although Secretary Blinken recommended a 12-month extension of the Cameroon TPS designation, he affirmatively did "not recommend that Cameroon be redesignated for TPS" and recommended a reevaluation in 12 months, Cameroon A.R. 49–50, and the State Department memorandum attached to his letter stated that "Nationals of Cameroon can return in safety to much of the country, including the two most populous cities," even while it was "unsafe to return to some parts of the country," *id.* at 61.

Finally, particularly where the Secretary made findings on the other statutory factors, CASA's criticism of the TPS notices' references to the "national interest," a recognized consideration that can preclude a TPS designation pursuant to the "extraordinary and temporary conditions" basis set forth in 8 U.S.C. § 1254a(b)(1)(C) and that largely falls within the purview of the Executive Branch, is of limited impact.  Although the Afghanistan Notice's reference to examples of Afghan TPS holders having been the subject of investigations relating to fraud, public safety, and national security may not be a particularly compelling fact, CASA has not demonstrated how consideration of this fact is impermissible or unrelated to the national interest. Where Counts 2 and 7 require more than a demonstration that the TPS determinations were not well-reasoned or were inconsistent with certain facts in the administrative records, but instead require a showing that, whether because they were particularly flawed or otherwise, they must

have been made as part of an impermissible general policy or practice of automatically terminating

TPS designations in order to reduce the number of non-white immigrants in the United States,

CASA's criticisms of the TPS notices and their inconsistency with certain other facts provide only

limited evidence in support of such a conclusion.

Accordingly, the Court finds that based on the present arguments and record, CASA is not

entitled to summary judgment on Counts 2 and 7 and that, as relevant below, it has not established

a likelihood of success on these claims. *See infra* part V. As discussed above in relation to DHS's

Cross Motion for Summary Judgment, the Court likewise concludes that a ruling on summary

judgment is also premature because the factual record was not sufficiently developed at the time

of the briefing on the Motions and may still require further development. The Court will therefore

deny summary judgment to either party at this time.

## V.    Motion for a Stay of Agency Action

In the alternative, CASA seeks a stay of the TPS terminations pursuant to the APA, which

provides that "[o]n such conditions as may be required, and to the extent necessary to prevent

irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to

postpone the effective date of an agency action or to preserve status or rights pending conclusion

of the review proceedings." 5 U.S.C. § 705. The factors governing issuance of a preliminary

injunction also govern issuance of a § 705 stay. *See Humane Soc'y of United States v. Gutierrez*,

558 F.3d 896, 896 (9th Cir. 2009); *Cronin v. U.S. Dep't of Agriculture*, 919 F.2d 439, 446 (7th

Cir. 1990); *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *Dist.*

*of Columbia v. U.S. Dep't of Agriculture*, 444 F. Supp. 3d 1, 16 (D.D.C. 2020)). Correspondingly,

to obtain a stay of agency action pursuant to 5 U.S.C. § 705, moving parties must establish that (1)

they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence

of preliminary relief; (3) the balance of equities tips in their favor; and (4) a stay is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).

CASA's request for a stay fails based on the first factor. As discussed above, the Court agrees with DHS on the proper interpretation of the timing requirements relating to a TPS termination set forth in 8 U.S.C. § 1254a(b)(3)(C). *See supra* part III. Accordingly, the Court cannot conclude that CASA has presently demonstrated a likelihood of success on the merits of the timing claims in Counts 1, 3, 4, and 6.

As to the APA claims in Counts 2 and 7, as discussed above, although the Court finds that CASA has stated plausible claims for relief as required by Rule 12(b)(6), it has concluded that neither party is presently entitled to summary judgment on these claims, and that CASA has not demonstrated that it is likely to succeed on the merits of these claims. *See supra* part IV; *see Winter* 555 U.S. at 20. Where proof of these claims requires more than just a showing that the TPS termination decisions were rushed, based on incomplete information, or based on conclusions that were inconsistent with certain facts made available to the Secretary, but instead requires that the Court find that these decisions were actually made pursuant to a policy or practice of terminating TPS designations on a preordained basis in order to reduce the number of non-white immigrants in the United States, the Court cannot conclude that CASA has presently made the required showing.

As discussed above, several courts that have considered similar claims grounded in part on the allegation that TPS determinations were motivated by racial animus have found that plaintiffs have made sufficient allegations to state a plausible claim for relief. *See, e.g., CASA de Maryland,*

*Inc.*, 355 F. Supp. 3d at 326, 328; *NAACP*, 364 F. Supp. 3d at 577–78; *Centro Presente*, 332 F. Supp. 3d at 415–16; *Saget I*, 345 F. Supp. 3d at 299. However, courts that have issued preliminary injunctions or stays relating to TPS terminations in cases involving similar claims have done so only after the development of a more robust record including specific evidence that more directly addressed the relevant issues. *See, e.g., Ramos II*, 336 F. Supp. 3d at 1092–1104 (concluding that the plaintiffs were "entitled to a preliminary injunction based on their showing on the merits of the APA claim" where based on an extensive record including testimony of former agency officials, numerous internal emails regarding designation decisions, and numerous decision memoranda relating to the TPS designation terminations at issue, there was a "wealth of record evidence to support Plaintiffs' position that the DHS changed its practices with regard to TPS designations" and "serious questions on the merits on the Equal Protection Claim"); *Saget II*, 375 F. Supp. 3d at 347–53, 360–61 (concluding that the plaintiffs were "likely to succeed in their claim [DHS] violated the TPS statute by failing to make a 'real merits determination' and by instead issuing 'a pretextual edict,'" on the basis of "significant evidence," including a "bench trial" in which the court "heard testimony from eight witnesses" and an administrative record that included the Secretary's handwritten notes and emails to and from the Secretary). Here, by contrast, the present record is significantly more limited.

Because a likelihood of success on the merits is a necessary element for the requested stay of agency action, the Court must deny the Motion for a Stay regardless of the remaining factors. The Court notes, however, that certain CASA members will likely face irreparable harm from these actions. For example, B.S., an Afghan TPS holder, faced death threats in Afghanistan because of her work as an interpreter for United States and international agencies, such that she may well face retribution from the Taliban if forced to return. M.A., another Afghan TPS holder

who fled Afghanistan in 2021 after having worked on U.S.-funded programs in Afghanistan, also reasonably fears retribution if he returns.

In light of such grave risks, even considering the national interests articulated by DHS, the balance of the equities and the public interest likely weigh in CASA's favor, especially in light of the United States' long and proud history as a haven for the displaced and dispossessed. *See Foley v. Connelie*, 435 U.S. 291, 294 (1978) ("As a Nation we exhibit extraordinary hospitality to those who come to our country, which is not surprising for we have often been described as 'a nation of immigrants.'" (footnote omitted)). This is particularly true where CASA's primary request is for the postponement of the effective date of any termination by six months in order to allow for a more humane transition, and the United States, acting as the good and generous nation that it typically strives to be, has regularly provided transition periods that have significantly exceeded the statutory minimum of two months of notice when terminating a TPS designation. *See, e.g., Ramos I*, 321 F. Supp. 3d at 1095–98 (noting that the TPS terminations for Haiti, El Salvador, Nicaragua, and Sudan were announced over a year in advance of their effective dates); Cameroon Notice, 90 Fed. Reg. at 23699 n.15 (identifying four TPS terminations with transition periods between 6 and 18 months). More specifically, in the case of Afghanistan, there is also the moral imperative of protecting Afghans who participated in actions that directly or indirectly supported American troops and interests, because great nations do not leave their allies behind.

In light of these public interests, the President and the Secretary can still extend the effective dates of the terminations if they so choose, *see* 8 U.S.C. § 1254a(d)(3), which would allow for full consideration of claims for other forms of immigration relief asserted by TPS holders, particularly those from Afghanistan who face persecution or retribution for having provided assistance to American troops and interests. Congress could also take additional actions, as it has

in the past, to protect such individuals. *See, e.g.*, Afghan Allies Protection Act of 2009, Pub. L. No. 111–8, § 602, 123 Stat. 807, 807–811. Nevertheless, because the requirements for a stay have not all been satisfied, this Court may not grant the requested relief. The Motion for a Stay will be denied.

## CONCLUSION

For the foregoing reasons, CASA's Motion for Partial Summary Judgment or a Stay of Agency Action, will be DENIED, and DHS's Cross Motion for Summary Judgment and Motion to Dismiss will be DENIED. A separate Order shall issue.

Date: July 10, 2025

THEODORE D. CHUANG
United States District Judge