**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| CASA, INC.,<br><br>        *Plaintiff*,<br><br>   v.<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, & UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>        *Defendants*. | **Case No.** 8:25-cv-1484 |

**<u>PLAINTIFF CASA INC.'S MOTION TO COMPLETE THE ADMINISTRATIVE
RECORD AND FOR EXTRA-RECORD DISCOVERY AND
MEMORANDUM IN SUPPORT</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.    Afghanistan and Cameroon TPS Designations and Terminations ............. 2

    II.    Typical Process for TPS Determinations ..................................................... 3

    III.    Procedural Background .............................................................................. 4

ARGUMENT ...................................................................................................................... 5

    I.    CASA Is Entitled to Complete Administrative Records ............................ 6

    II.    CASA Is Entitled to Extra-Record Discovery ........................................... 13

    A.    Secretary Noem Engaged in Improper Behavior in Terminating Afghanistan's and Cameroon's TPS designations ...................................... 14

    B.    Secretary Noem Acted with Bad Faith in Terminating Afghanistan's and Cameroon's TPS designations ...................................... 18

    C.    The Bare Record Does Not Reveal the Extent to Which the Afghanistan and Cameroon Terminations Were Manifestations of a General Policy or Practice to Terminate TPS Designations on a Preordained Basis ................................................................................. 19

CONCLUSION ................................................................................................................... 21

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Bar MK Ranches v. Yuetter*,
  994 F.2d 735 (10th Cir. 1993) ................................................. 6

*Boston Alliance of Gay, Lesbian & Transgender Youth v. United States*
  *Department of Health & Human Services*, 557 F. Supp. 3d 224 (D. Mass. 2021).................. 19

*Campuzano v. United States*,
  Nos. 24-cv-1652, 24-cv-2714, 2024 WL 5331992 (D.D.C. Dec. 30, 2024) ............................ 9

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)......................................................... *passim*

*Committee of 100 on the Federal City v. Foxx*,
  140 F. Supp. 3d 54 (D.D.C. 2015) ............................................ 15

*Cook County v. Wolf*,
  461 F. Supp. 3d 779 (N.D. Ill. 2020) ........................................ 19

*Department of Commerce v. New York*,
  588 U.S. 752 (2019)........................................................ 14, 16

*In re United States*,
  875 F.3d 1200 (9th Cir.) ..................................................... 9

*Mayor & City Council of Baltimore v. Trump*,
  429 F. Supp. 3d 128 (D. Md. 2019) .......................................... 14, 19

*Maine Care Services, Inc. v. USDA*,
  No. Civ. 00-358, 2001 WL 261558 (D. Me. Mar. 15, 2001).................... 14

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975)......................................................... 9

*Oak Grove Technologies, LLC v. United States*,
  156 Fed. Cl. 594 (2021) ..................................................... 9

*Occidental Petroleum Corp. v. SEC*,
  873 F.2d 325 (D.C. Cir. 1989)............................................... 6, 8

*Oceana, Inc. v. Ross*,
  No. 17-cv-5146, 2018 WL 5276297 (C.D. Cal. Aug. 20, 2018) ............... 9

**Page(s)**

*Outdoor Amusement Bus. Ass'n, Inc. v. DHS*,
    No. 16-cv-1015, 2017 WL 3189446 (D. Md. July 27, 2017) ................................... 6

*Ramos v. Nielsen*,
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) ................................................................. 13

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000) ................................................................................................ 19

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................................... 18

*Save Our Sound OBX, Inc. v. North Carolina Department of Transportation*,
    914 F.3d 213 (4th Cir. 2019) ................................................................................. 14

*Thomson v. United States Department of Labor*,
    885 F.2d 551 (9th Cir. 1989) ................................................................................... 6

*United States Fish & Wildlife Service v. Sierra Club, Inc.*,
    592 U.S. 261 (2021) .................................................................................................. 9

*University of Colorado Health v. Azar*,
    486 F. Supp. 3d 185 (D.D.C. 2020) ......................................................................... 7

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ................................................................................................ 19

**Statutes**

5 U.S.C.
    § 551 *et seq.* ............................................................................................................ 1
    § 705 .................................................................................................................... 4, 5
    § 706 .................................................................................................................... 1, 6

8 U.S.C.
    § 1254a(b)(1) ......................................................................................................... 15
    § 1254a(b)(3) ......................................................................................................... 15
    § 1254a(b)(3)(A) .................................................................................................... 10
    § 1254a(b)(3)(C) .................................................................................................... 17

28 U.S.C. § 2201 ............................................................................................................. 4

**Other Authorities**

87 Fed. Reg. 30,976 (May 20, 2022) ............................................................................. 2

87 Fed. Reg. 34,706 (June 7, 2022) ............................................................................... 2

**Page(s)**

88 Fed. Reg. 65,728 (Sept. 25, 2023) .................................................................................. 2

88 Fed. Reg. 69,945 (Oct. 10, 2023) .................................................................................. 2

90 Fed. Reg. 8337 (Jan. 20, 2025) ..................................................................................... 15

90 Fed. Reg. 8443 (Jan. 20, 2025) ..................................................................................... 15

90 Fed. Reg. 9040 (Feb. 5, 2025) ....................................................................................... 17

90 Fed. Reg. 19,217 (May 6, 2025) .................................................................................... 17

90 Fed. Reg. 20,309 (May 13, 2025) ............................................................................. 3, 17

90 Fed. Reg. 23,697 (June 4, 2025) ............................................................................... 3, 17

90 Fed. Reg. 24,151 (June 6, 2025) .................................................................................... 17

90 Fed. Reg. 28,760 (July 1, 2025) .................................................................................... 17

90 Fed. Reg. 30,086 (July 8, 2025) .................................................................................... 17

90 Fed. Reg. 30,089 (July 8, 2025) .................................................................................... 17

Aram A. Gavoor & Steven A. Platt, *U.S. Department of Justice Executive Branch Engagement on Litigating Administrative Procedure Act*, 75 Admin. L. Rev. 429 (2023) ........................... 8

Dep't of Homeland Sec., Off. of the Chief Readiness Support Officer, *Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Protection Act (NEPA)* (2014), https://tinyurl.com/mpeycm73 ....................................................................... 10

Ted Hesson et al., *Exclusive: US Diplomats Asked if Non-Whites Qualify for Trump Refugee Program for South Africans*, Reuters (July 25, 2025), https://tinyurl.com/5cc2usvv ............. 20

United States Departmetn of Justice, Environment & Natural Resources Division, *Guidance to Federal Agencies on Compiling the Administrative Record* (1999), https://tinyurl.com/2ks42c9w ....................................................................................................... 8

United States Government Accountability Office, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (2020), https://tinyurl.com/ysb5fkmy ............................................................................................... *passim*

iv

## INTRODUCTION

This case concerns Secretary of Homeland Security Kristi Noem's termination of Afghanistan's and Cameroon's Temporary Protected Status (TPS) designations. Among other claims, Plaintiff CASA, Inc., challenges those terminations under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* In denying CASA postponement of agency action under 5 U.S.C. § 705, this Court found that, with respect to these claims, "the factual record was not sufficiently developed at the time of briefing . . . *and may still require further development*." Mem. Op. Den. Cross-Mots. (Op.) 51, ECF No. 76 (emphasis added). CASA now seeks the further factual development that this Court deemed necessary to resolve this case.

Defendants have designated administrative records for each termination decision. But those records are demonstrably incomplete: they not only lack key documents that are part of the typical TPS determination process and that have been produced in the administrative records in other cases challenging TPS determinations, but they also omit the factual bases and reasoning that underpinned the decisions themselves. Because the agency has not produced the "whole record[s]" upon which Secretary Noem's decisions were based, it is impossible for the Court to judge the lawfulness of her actions. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971) (quoting 5 U.S.C. § 706). Separate and apart from those missing documents, CASA is entitled to extra-record discovery both because the existing evidence establishes CASA's right to more-probing discovery than is permitted in mine-run APA cases and because—as Defendants have conceded—CASA is entitled to ordinary civil discovery on its equal protection claims if they survive Defendants' pending motion to dismiss (ECF No. 99).

## BACKGROUND

### I.    Afghanistan and Cameroon TPS Designations and Terminations

As this Court has previously set forth in greater detail, Op. 4–9, former Secretary of Homeland Security Alejandro Mayorkas designated both Afghanistan and Cameroon for TPS in 2022 based on "ongoing armed conflict" and "extraordinary and temporary conditions." Designation of Afghanistan for Temporary Protected Status, 87 Fed. Reg. 30,976, 30,977 (May 20, 2022); Designation of Cameroon for Temporary Protected Status, 87 Fed. Reg. 34,706, 34,711 (June 7, 2022).  In 2023, Secretary Mayorkas extended those designations and redesignated each country for TPS.  Extension and Redesignation of Afghanistan for Temporary Protected Status, 88 Fed. Reg. 65,728, 65,729 (Sept. 25, 2023); Extension and Redesignation of Cameroon for Temporary Protected Status, 88 Fed. Reg. 69,945, 69,946 (Oct. 10, 2023).

As of late 2024, both Afghanistan and Cameroon appeared to be on track for further extension of their TPS designations.  The Department of State issued country conditions reports recommending extensions of both countries' designations, *see* Afghanistan AR, J.R. 122–128, ECF No. 59-3; Cameroon AR 51–58, ECF No. 70-3; and former Secretary of State Antony Blinken wrote letters to Secretary Mayorkas recommending the same, *see* Afghanistan AR, J.R. 120–121; Cameroon AR 49–50.  The United States Citizenship and Immigration Services (USCIS) similarly issued country conditions reports finding the conditions that had led to designation of Afghanistan and Cameroon for TPS remained present between June 2023 and November 2024.  *See* Afghanistan AR, J.R. 147–182; Cameroon AR 14–44.

President Donald J. Trump took office on January 20, 2025, before a final determination had been made about whether to further extend Afghanistan's or Cameroon's TPS designations. Contrary to the apparent position of Executive Branch officials in late 2024, Secretary Noem terminated Afghanistan's and Cameroon's TPS designations.  Termination of the Designation of

Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20,309, 20,309 (May 13, 2025); Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23,697, 23,697 (June 4, 2025); Afghanistan AR, J.R. 140–141; Cameroon AR 11.

## II.    Typical Process for TPS Determinations

When the expiration of a country's TPS designation is approaching, "[t]he Secretary of Homeland Security initiates a review" of the country in question. Ex. A, U.S. Gov't Accountability Off., *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* 15 (2020), https://tinyurl.com/ysb5fkmy [hereinafter GAO Report]. The Department of Homeland Security (DHS) "collects information on country conditions and recommendations" from DHS's subagency, USCIS, and from the State Department to inform the Secretary's decision. *Id.* at 16.

"DHS collects similar information for each review of a country." *Id.* at 18. Those materials include:  (1) "a country conditions report compiled by USCIS"; (2) a decisional memorandum "with a recommendation from the USCIS Director to the Secretary of Homeland Security"; (3) "a country conditions report compiled by State"; and (4) "a letter with a recommendation from the Secretary of State to the Secretary of Homeland Security." *Id.* at 18. USCIS's Refugee, Asylum and International Operations Directorate compiles the information for the USCIS country conditions report, while State's Bureau of Population, Refugees, and Migration does so for State's report. *Id.* at 21–23.

The Bureau of Population, Refugees, and Migration generates input for State's report by "direct[ing] the relevant regional bureau to reach out to overseas posts for information about country conditions." *Id.* at 23. "[O]ther internal DHS components, government agencies, and other entities may also provide information about country conditions or other factors to inform the Secretary of Homeland Security's decisions." *Id.* at 19. For example, DHS's Office of Intelligence

and Analysis in the past has "developed an intelligence assessment that provided an overview of implications, including homeland security considerations and operational considerations for law enforcement, if TPS were to expire for certain countries." *Id.* at 25 n.41.  Department of Defense combatant commands also have provided input "about the security situation, humanitarian challenges, and implications of terminating TPS for a country." *Id.*  In addition, members of Congress, foreign government officials, and nongovernmental organizations have provided input regarding TPS determinations. *Id.* at 25.

### III.    Procedural Background

CASA filed suit challenging the Afghanistan and Cameroon terminations under the APA, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Fifth Amendment's equal protection component on behalf of its Afghan and Cameroonian members who rely on TPS for lawful immigration status and work authorization. *See generally* Am. Compl., ECF No. 41; Supp. Compl., ECF No. 55.  Shortly after this lawsuit commenced, CASA moved for summary judgment on its statutory claims or, in the alternative, for postponement of agency action under 5 U.S.C. § 705. ECF No. 42.  Defendants moved to dismiss those claims or, in the alternative, for summary judgment.  ECF No. 51.  This Court denied both sides' cross-motions.  Op. 55.  In doing so, the Court recognized that "CASA has alleged sufficient facts to state an APA claim" based on the premise that "the TPS terminations were unlawful because DHS relied on factors not intended to be considered by applying a general policy or practice of terminating TPS designations on a preordained basis as part of a broader effort to reduce the number of non-white immigrants in the United States." *Id.* at 40; *see also id.* at 41–46 (detailing the allegations that support CASA's arbitrary-and-capricious claims).  This Court further concluded that "the facts from the administrative record . . . only bolster[ ] CASA's arguments." *Id.* at 47.  But this Court found "the present record" insufficient to grant CASA summary judgment on its APA claims or temporary

4

relief under Section 705. *Id.* at 48, 52. According to this Court, "the factual record was not sufficiently developed at the time of the briefing on the Motions and may still require further development." *Id.* at 51.

## ARGUMENT

CASA now seeks the "further development" of the factual record that this Court deemed necessary to resolve CASA's statutory claims. Op. 51. The administrative records of the Afghanistan and Cameroon TPS terminations are both demonstrably incomplete. The core documents in each administrative record are as follows: (1) heavily redacted decisional memos that omit all facts and analysis setting forth the rationale for that decision, Afghanistan AR, J.R. 131–141; Cameroon AR 4–11; (2) 2024 USCIS country conditions reports confirming that the conditions that led to each country's TPS designation remain present, Afghanistan AR, J.R. 147–182; Cameroon AR 14–44; (3) 2024 letters from former Secretary of State Antony Blinken recommending extension of both countries' TPS designations, Afghanistan AR, J.R. 120–121; Cameroon AR 49–50; (4) 2024 country conditions reports from the State Department recommending extension of both countries' TPS designations, Afghanistan AR, J.R. 122–128, Cameroon AR 51–58; Cameroon AR 51–58; (5) an undated letter from Secretary of State Marco Rubio recommending termination of Afghanistan's TPS designation (but no similar letter concerning Cameroon's TPS designation), Afghanistan AR, J.R. 129–130; and (6) addenda to USCIS's 2024 country conditions reports covering reporting periods between November 2024 and February 2025, Afghanistan AR, J.R. 142–146; Cameroon AR 45–48. The rest of each administrative record largely consists of publicly available news articles and other sources cited in the 2024 USCIS country conditions reports and materials from the Federal Register.

The Afghanistan and Cameroon administrative records thus contain a great deal of information from 2024, when both USCIS and State appeared to favor extension of both countries' TPS designations. But they include little information setting forth why Secretary Noem cast aside those recommendations and decided to terminate both countries' TPS designations instead. Based on the typical process that governs TPS determinations, as well as the administrative records in past cases challenging such determinations, CASA has identified several documents that seem to have been improperly excluded in whole or in part from the Afghanistan and Cameroon administrative records and are likely to shed light on how Secretary Noem came to her conclusion. In addition to those documents, CASA is entitled to extra-record discovery because the preliminary evidence strongly suggests that the Afghanistan and Cameroon terminations were a product of "bad faith [and] improper behavior" on DHS's part and that the "bare record" would not allow this Court to assess the full scope of CASA's claims. *Overton Park*, 401 U.S. at 420.

## I.     CASA Is Entitled to Complete Administrative Records

Judicial review in APA cases must be based on "the *whole* record," 5 U.S.C. § 706 (emphasis added), meaning "the *full* administrative record that was before the Secretary at the time [s]he made [her] decision," *Overton Park*, 401 U.S. at 420 (emphasis added). "[M]eaningful judicial review" is possible only if the agency "produce[s] an administrative record that delineates the path by which it reaches its decision." *Occidental Petrol. Corp. v. SEC*, 873 F.2d 325, 338 (D.C. Cir. 1989). A complete administrative record thus "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, No. 16-cv-1015, 2017 WL 3189446, at *7 (D. Md. July 27, 2017) (emphasis in original) (quoting *Thomson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)); *accord Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993).

An agency "is entitled to a strong presumption of regularity that it properly designated an administrative record." *Univ. of Colo. Health v. Azar*, 486 F. Supp. 3d 185, 199 (D.D.C. 2020) (citation omitted). But this presumption can be "overcome" where a plaintiff "put[s] forth concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers.'" *Id.* at 200 (citation omitted). This standard can be met through identification of "reasonable, *non-speculative grounds* for [the plaintiff's] belief that the documents were *considered* by the agency and not included in the record." *Id.* (citation omitted).

CASA has met that standard with respect to the following categories of documents:[1]

***Unredacted decisional memoranda.*** The core document in any administrative record for a TPS determination is a decisional memorandum from the USCIS Director to the Secretary that contains relevant facts, analysis, and USCIS's recommendation on whether to extend or terminate a country's designation. *See* GAO Report 18. Defendants themselves have identified these memoranda as the documents that memorialize Secretary Noem's decisions to terminate Afghanistan's and Cameroon's TPS designations, *see* ECF No. 53 at 13–14; ECF 60 at 8, but they have produced them in the Afghanistan and Cameroon administrative records in almost entirely redacted form. Afghanistan AR, J.R. 131–141; Cameroon AR 4–11. The only unredacted portions of the Afghanistan decisional memo are its date, title, from and subject lines, and signature lines purportedly reflecting Secretary Noem's conclusion that Afghanistan no longer is experiencing an ongoing armed conflict or extraordinary and temporary conditions and her decision to terminate the country's TPS designation. Afghanistan AR, J.R. 131, 140–141. Defendants took a nearly

---

[1] The absence of these enumerated documents also gives rise to an inference that the Afghanistan and Cameroon administrative records omit additional documents that DHS decisionmakers considered directly or indirectly in terminating those countries' TPS designations. CASA reserves the right to seek further completion of the administrative records should additional improperly omitted documents come to light.

identical approach to the Cameroon decisional memo, except that the unredacted portions there do not reflect any finding by Secretary Noem that Cameroon is no longer experiencing an ongoing armed conflict or extraordinary and temporary conditions.  Cameroon AR 11.  If the Secretary made such findings, they are redacted.

Defendants' redaction of the key documents that reflect the *culmination* of the agency's decisionmaking process is as irregular as it is extraordinary.  Production of the full decisional memorandum for each country is the *bare minimum* necessary to discern the "path by which" Secretary Noem reached her purported decision to terminate Afghanistan's and Cameroon's TPS designations.  *Occidental Petrol. Corp.* 873 F.2d at 338.  Thus, unredacted decisional memoranda are routinely produced in challenges to agency action across the federal government; indeed, they have been produced as part of administrative records in past cases challenging TPS determinations. *See* Ex. B (2017 El Salvador); Ex. C (2017 Haiti); Ex. D (2017 Nicaragua).[2]

That is no surprise.  The Department of Justice's Environment and Natural Resources Division issued guidance in 1999 to "create uniform measures in compiling the administrative record."  Aram A. Gavoor & Steven A. Platt, *U.S. Department of Justice Executive Branch Engagement on Litigating Administrative Procedure Act*, 75 Admin. L. Rev. 429, 460 (2023). That guidance provides that a complete administrative record must "[i]nclude decision documents."  Ex. F, U.S. Dep't of Justice, Env't & Nat. Res. Div., *Guidance to Federal Agencies on Compiling the Administrative Record* 4 (1999), https://tinyurl.com/2ks42c9w.  Although the 1999 guidance is "not binding" and was abruptly and "inexplicably rescinded" during the first Trump administration, courts have "nevertheless" continued to "find it persuasive as a statement

---

[2] In the administrative record of the 2017 termination of Sudan's TPS designation, the decisional memo signed by the Secretary of Homeland Security was redacted.  But the record also contained the unsigned memo in unredacted form.  Ex. E.

by the Department of Justice as to what should be included in a completed administrative record."

*In re United States*, 875 F.3d 1200, 1208 (9th Cir.), *cert. granted, judgment vacated on other grounds*, 583 U.S. 29 (2017) (per curiam); *see also Oak Grove Techs., LLC v. United States*, 156 Fed. Cl. 594, 599–601 (2021) (relying on the 1999 guidance in a decision sanctioning the United States for failing to properly compile an administrative record and noting that "courts have routinely relied upon [the guidance] in explaining what materials must be included in an administrative record"), *aff'd in relevant part*, 116 F.4th 1364 (Fed. Cir. 2024).

Defendants invoke the deliberative process privilege to justify their redactions. Afghanistan AR 131–141; Cameroon AR 4–11.  The deliberative process privilege shields from disclosure documents that are both (1) "deliberative," meaning that "they were prepared to help the agency formulate its position," and (2) "predecisional," meaning that "they were generated before the agency's final decision on the matter."  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021).  But the privilege "of course" does not apply to "documents reflecting an agency's final decision *and the reasons supporting it*."  *Id.* (emphasis added); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 155 (1975) ("Disclosure of [final] memoranda would not intrude on predecisional processes, and protecting them would not improve the quality of agency decisions[.]").  Agencies thus often invoke the deliberative process privilege with regard to *draft* decisional memoranda, *Oceana, Inc. v. Ross*, No. 17-cv-5146, 2018 WL 5276297, at *3–*4 (C.D. Cal. Aug. 20, 2018), or *pre*-decisional memoranda, *Campuzano v. United States*, Nos. 24-cv-1652, 24-cv-2714, 2024 WL 5331992, at *2 (D.D.C. Dec. 30, 2024).  But the privilege plainly does not apply to documents like the decisional memos here that "communicate[] the agency's settled position" and represent "the agency's final view" on the matter.  *Sierra Club*, 592 U.S. at 268; *cf.* Ex. G, Dep't of Homeland Sec., Off. of the Chief Readiness Support Officer, *Instruction Manual*

*023-01-001-01, Revision 01, Implementation of the National Environmental Protection Act (NEPA)* at IV-17 (2014), https://tinyurl.com/mpeycm73 ("Once an agency decision has been made, the 'deliberative, pre-decisional' basis for keeping certain internal agency documents which are part of the administrative record protected from public release under FOIA disappears and these documents may, and generally do, become publically [sic] releasable"). Shielding from this Court's view the very basis for the Secretary's decision would evade the purpose of arbitrary-and-capricious review.[3]

*Records of clearance and approval.*   On information and belief, the Afghanistan and Cameroon administrative records should each contain a document that indicates the officials who were part of the decisionmaking process.  The document is often titled "Record of Clearance and Approval."  This sort of document routinely appears in administrative records, including those in other cases challenging TPS determinations.  Ex. I (2025 Haiti Partial Vacatur); Ex. J (2017 Nicaragua Termination).

*Secretary of State Marco Rubio's recommendation regarding Cameroon's TPS designation.*  The TPS statute requires the Secretary of Homeland Security to "consult[] with appropriate agencies of the Government" before terminating a country's TPS designation. 8 U.S.C. § 1254a(b)(3)(A).  In light of that obligation, DHS typically obtains a letter from the Secretary of State with a recommendation concerning each TPS determination.  GAO Report 18. Both the Afghanistan and Cameroon administrative records contain letters from former Secretary of State Antony Blinken recommending extension of those countries' TPS designations in

---

[3] During the July 25, 2025, case management conference, the Court asked the parties to identify any cases supporting an agency's attempt to redact the underlying decisional memo itself.  Ex. H (July 25, 2025, Case Mgmt. Conf. Tr. 13:18–14:3).  CASA has not found any such authority, or even any cases discussing an attempt by a federal agency to do so.  This is unsurprising given the requirement for a reviewing court to consider the "whole record."  *Overton Park*, 401 U.S. at 420.

November and December 2024, respectively. Afghanistan AR, J.R. 120–121; Cameroon AR 49–50. The Afghanistan administrative record also contains an undated letter from Secretary of State Marco Rubio recommending termination of that country's TPS designation. J.R. 129–130. No such letter from Secretary Rubio appears in the Cameroon administrative record as produced.

*State Department country conditions reports.* The aforementioned letters from the Secretary of State typically are accompanied by country conditions reports compiled by State's Bureau of Population, Refugees, and Migration. GAO Report 18, 23. The Afghanistan and Cameroon administrative records include such reports that were attached to former Secretary Blinken's 2024 letters recommending extension of both countries' TPS designations. Afghanistan AR, J.R. 122–128; Cameroon AR 51–58. But the Afghanistan administrative record contains no such report that accompanied Secretary Rubio's 2025 letter recommending termination of that country's TPS designation. And because the Cameroon administrative record contains no letter from Secretary Rubio, the record also lacks any accompanying country conditions report.

*DHS Office of Intelligence and Analysis assessments.* In connection with past TPS determinations, DHS's Office of Intelligence and Analysis (I&A) has "developed an intelligence assessment that provided an overview of implications, including homeland security considerations and operational considerations for law enforcement, if TPS were to expire for certain countries." GAO Report 25 n.41; *see also* Ex. K (I&A's analysis regarding the 2017 El Salvador, Honduras, Haiti, and Nicaragua terminations). No such assessment appears in the Afghanistan or Cameroon administrative records, an omission that is particularly glaring with respect to Afghanistan given the United States' long history of military involvement there.

*Input from Department of Defense combatant commands.* Department of Defense combatant commands also have previously provided input "about the security situation,

11

humanitarian challenges, and implications of terminating TPS for a country." GAO Report 25 n.41; *see also* Ex. L (2017 Haiti), Ex. M (2017 El Salvador). No such assessment from U.S. Central Command with respect to Afghanistan or from U.S. Africa Command with respect to Cameroon appear in the administrative records.

*Input from United States embassies.* As part of its process for compiling country conditions reports, State's Bureau of Population, Refugees, and Migration "directs the relevant regional bureau to reach out to overseas posts for information about country conditions." GAO Report 23. Input from United States embassies accordingly has been included in past administrative records in cases challenging TPS determinations. Ex. N (cable from U.S. Mission to El Salvador recommending extension of that country's TPS designation); Ex. O (similar from the U.S. Mission to Honduras). No documents reflecting such input are present in the Afghanistan or Cameroon administrative records. The absence of such input would run contrary to the typical process for TPS determinations.

*Input from foreign government officials, members of Congress, and nongovernmental organizations.* Foreign government officials, members of Congress, and nongovernmental organizations also provide input to DHS regarding TPS terminations. GAO Report 25; *see also* Ex. P (letter from Ambassador of Haiti to the United States and memorandum from Embassy of the Republic of Haiti requesting extension of that country's TPS designation); Ex. Q (letter from El Salvador's Minister of Foreign Relations requesting extension of that country's TPS designation); Ex. R (letter from Senator Bill Nelson urging extension of Haiti's TPS designation); Ex. S (letter from the United States Conference of Mayors requesting extension of TPS designations for Honduras, Nicaragua, Haiti, and El Salvador); Ex. T (letter from Evangelical

12

Immigration Table requesting the same).  No such documents appear in the Afghanistan or Cameroon administrative records.

*Rejected Decisional Memos.*  The administrative record of the 2017 termination of Sudan's TPS designation included decisional memoranda that the Secretary of Homeland Security rejected while asking USCIS to adopt a different recommendation.  *E.g.*, Ex. U; *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1101–1103 (N.D. Cal. 2018).  In light of the State Department's 2024 country conditions report recommending extension of Afghanistan's and Cameroon's TPS designations, former Secretary of State Blinken's letters recommending the same, and USCIS's 2024 country conditions reports finding that the conditions that led to the designation of Afghanistan and Cameroon for TPS remained present, CASA reasonably believes that USCIS submitted to the Secretary of Homeland Security decisional memos recommending extensions of each country's designation.  Such rejected decisional memos do not appear in the administrative records.

*Non-Concur Memoranda.*  Administrative records in previous cases challenging TPS determinations have included memoranda from DHS officials who did not concur with USCIS's recommendations.  For example, former Assistant Secretary for International Affairs James Nealon submitted a non-concur memo in 2017 urging the Acting Secretary of Homeland Security to extend the TPS designations of Honduras, Nicaragua, and El Salvador.  Ex. V.  Again, based on the 2024 USCIS and State documents, CASA reasonably believes that Executive Branch officials issued non-concur memos similar to Assistant Secretary Nealon's that are absent from the administrative records.

## II.    CASA Is Entitled to Extra-Record Discovery

Separate and apart from the documents CASA seeks in order to complete the Afghanistan and Cameroon administrative records, CASA also seeks extra-record discovery in support of its

APA claims. And—as Defendants have conceded, July 25, 2025, Case Mgmt. Conf. Tr. 21:6–15—CASA will be entitled to ordinary civil discovery on its equal protection claims if they survive Defendants' pending motion to dismiss (ECF No. 99).

In the mine-run of APA claims, "a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019). "But, there are cases that do not fit the mold." *Mayor & City Council of Balt. v. Trump*, 429 F. Supp. 3d 128, 137 (D. Md. 2019). Specifically, extra-record discovery is permitted in APA cases upon "a strong showing of bad faith or improper behavior." *Overton Park*, 401 U.S. at 420; *accord Department of Commerce*, 588 U.S. at 781–782. Extra-record discovery is also permissible where "the 'bare record' does not reveal the agency's reasoning." *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 226 (4th Cir. 2019) (quoting *Overton Park*, 401 U.S. at 420). All three of those reasons support extra-record discovery here.

### A. Secretary Noem Engaged in Improper Behavior in Terminating Afghanistan's and Cameroon's TPS designations

CASA is entitled to extra-record discovery because it has made a strong showing that Secretary Noem engaged in "improper behavior" by terminating Afghanistan's and Cameroon's TPS designations on a preordained basis unrelated to the statutorily mandated considerations. *Overton Park*, 401 U.S. at 420; *see also Dep't of Commerce*, 588 U.S. at 783 (approving extra-record discovery on evidence that decisionmaker had prematurely "made up his mind," "and did so for reasons unknown but unrelated to" the stated rationale); *Me. Care Servs., Inc. v. USDA*, No. Civ. 00-358, 2001 WL 261558, at *3–*4 (D. Me. Mar. 15, 2001) (permitting extra-record discovery based on a strong showing of improper behavior—specifically, due-process violations—despite finding no evidence of bad faith). "Strong evidence of unalterably closed minds" is

evidence of improper behavior that can "justify discovery into the agency's decisionmaking process." *Comm. of 100 on the Fed. City v. Foxx*, 140 F. Supp. 3d 54, 59 (D.D.C. 2015) (cleaned up). The existing record contains ample preliminary evidence from which such predetermined and pretextual decisionmaking can be inferred.

Under the TPS statute, termination decisions must be based on conditions on the ground in the countries in question. 8 U.S.C. § 1254a(b)(1), (b)(3). In resolving the parties' cross-motions, this Court held that "CASA alleged sufficient facts" that Secretary Noem terminated Afghanistan's and Cameroon's TPS designations based not on those statutorily-mandated considerations but instead "on a preordained basis as part of a broader effort to reduce the number of non-white immigrants in the United States." Op. 40. The "facts from the administrative record . . . only bolster[] CASA's arguments." *Id.* at 47.

Specifically, this Court found that the Afghanistan and Cameroon termination notices published in the Federal Register "rel[y] significantly on overarching policies of the Trump Administration"—as set forth in Executive Orders 14,150 and 14,159—that "arguably preordain the termination of TPS designations." Op. 43. Executive Order 14,150 provides that "the foreign policy of the United States shall champion core American interests and always put America and American citizens first," 90 Fed. Reg. 8337, 8337 (Jan. 20, 2025), while Executive Order 14,159 directs the Secretary of Homeland Security and other Cabinet officials to "rescind the policy decisions of the previous administration that led to the increased presence of illegal aliens in the United States," including by "ensuring that designations of Temporary Protected Status . . . are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of [the TPS] statute," 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025). This Court also noted that because "TPS holders have legal status in the United States and thus are not actually

15

'illegal aliens,'" the notices' invocation of Executive Order 14,159 "reveal a 'mismatch between the decision the Secretary made and the rationale [she] provided'" that suggest pretextual or contrived reasoning.   Op. 43–44 (brackets in original) (quoting *Dep't of Commerce*, 588 U.S. at 783).

This Court found additional evidence of a preordained decision from the "compressed timeline" during which Secretary Noem decided to terminate Afghanistan's and Cameroon's TPS designations Op. 45.  Whereas "USCIS generally starts the review process for an existing TPS designation about 6 months to a year before the end date of the country's current designation," GAO Report 20, Secretary Noem terminated Afghanistan's and Cameroon's designations "less than three months into the Trump Administration."  Op. 44.  The impression of a rushed process is reinforced by references to "limited time constraints," Afghanistan AR, J.R. 143–144, 146, and "limited time parameters," Cameroon AR 45, to gather information in USCIS's addenda to its country conditions reports.

Finally, this Court found circumstantial evidence of preordained decisionmaking from the fact that "Secretary Noem's findings appear to be inconsistent with certain information in the administrative record."  Op. 45.  As this Court noted, the administrative records contain detailed reports and recommendations from USCIS and State issued in 2024 that document ongoing armed conflict and dire humanitarian conditions in Afghanistan and Cameroon.  Op. 45–46; *see also* Afghanistan AR, J.R. 120-128, 147–182; Cameroon AR 14–44, 49–58.  Although Secretary Rubio sent an undated letter to Secretary Noem stating that conditions had improved in Afghanistan, he "provided no specific facts or support of that conclusion," and his letter "was not accompanied by a State Department memorandum."  Op. 45–46; *see also* Afghanistan AR, J.R. 129–130.  And, as mentioned, no letter or State Department country conditions report supporting termination of

Cameroon's TPS designation appears in the Cameroon administrative record.  Op. 46.  The scant evidence in the administrative record supporting the conclusion that country conditions had improved in Afghanistan and Cameroon supports an inference that Secretary Noem was determined to terminate those countries' TPS designations no matter what the evidence showed.

That conclusion is reinforced by Secretary Noem's TPS determinations writ large.  With only one partial exception, Secretary Noem has terminated the TPS designation for every country for which a TPS designation or extension expired during her time in office.  Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30,086 (July 8, 2025); Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30,089 (July 8, 2025); Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28,760 (July 1, 2025); Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24,151 (June 6, 2025); 90 Fed. Reg. at 23,697 (Cameroon); 90 Fed. Reg. at 20,309 (Afghanistan); Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040 (Feb. 5, 2025).  The only partial exception to this streak of terminations is Secretary Noem's *nondecision* with respect to South Sudan.  By operation of statute, 8 U.S.C. § 1254a(b)(3)(C), South Sudan received an "automatic six-month extension" of its TPS designation because "the record of country conditions and consultation from the Department of State for South Sudan was not able to be updated prior to" the statutory deadline. Extension of South Sudan Designation for Temporary Protected Status, 90 Fed. Reg. 19,217, 19,217–19,218 (May 6, 2025).  Notwithstanding this dearth of information, the Federal Register notice of South Sudan's extension nevertheless "encouraged" South Sudanese TPS holders "to prepare for their return to South Sudan" during the six-month reprieve.  *Id.* at 19,217.

This strong preliminary evidence of improper, preordained decisionmaking demands extra-record discovery to confirm that Secretary Noem did not make her decision to terminate Afghanistan's and Cameroon's TPS determinations based on country conditions, as required by the TPS statute and as the language of the termination notices was designed to suggest. Indeed, another court granted extra-record discovery in a case challenging a TPS termination based on similar evidence that "DHS, USCIS, and the Department of State reverse engineered the TPS process with the principal aim of 'getting to no.'" *Saget v. Trump*, 375 F. Supp. 3d 280, 343–344 (E.D.N.Y. 2019).

**B.    Secretary Noem Acted with Bad Faith in Terminating Afghanistan's and Cameroon's TPS designations**

CASA also is entitled to extra-record discovery because "bad faith" in the form of racial animus infected the decisionmaking process with respect to Afghanistan's and Cameroon's TPS designations. *Overton Park*, 401 U.S. at 420. As this Court noted, "CASA has asserted facts in support of the conclusion that DHS acted with an intent to reduce the number of non-white immigrants in the United States." Op. 41. Specifically, CASA has documented "numerous public statements made by President Trump, during his presidential campaign and as president, in which he disparately disparaged non-white immigrants." *Id.* CASA has documented similar statements by Secretary Noem. *Id.* at 42. And "CASA has identified multiple examples by the Trump Administration to curtail immigration for countries viewed as having non-white populations," while at the same time "removing immigration barriers for white immigrants." *Id.* at 42–43 (comparing the Trump Administration's vacatur of TPS designations for Venezuela and Haiti, its termination of parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela, and revocation of visas for students participating in the Student and Exchange Visitor Information System Program, with the Administration's admission of white Afrikaners from South Africa

18

through the United States Refugee Admissions Program and its proposed "gold card" visa program).  Moreover, the procedural departures discussed *supra* pp. 15–16, provide circumstantial evidence of discriminatory intent.  *See* Op. 44–46 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).

Where allegations of racial or other animus are at issue, courts have permitted extra-record discovery because "evaluating whether an official act was motivated by animus cannot be determined by examining the administrative record."  *Mayor & City Council of Balt.*, 429 F. Supp. 3d at 140; *see also Bos. All. of Gay, Lesbian & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 245 (D. Mass. 2021) (considering extra-record evidence of animus in case that was "constitutional in substance" despite being brought under the APA because "limiting the scope of review to the administrative record makes little sense in the context of an inquiry into illicit animus"); *Cook Cnty v. Wolf*, 461 F. Supp. 3d 779, 793–796 (N.D. Ill. 2020) (holding that plaintiffs satisfied the "strong showing standard" based in part on preliminary evidence that DHS's "real reason" for promulgating an immigration rule was to "disproportionately suppress[] nonwhite immigration" (cleaned up)).  This Court should follow suit.

### C.    The Bare Record Does Not Reveal the Extent to Which the Afghanistan and Cameroon Terminations Were Manifestations of a General Policy or Practice to Terminate TPS Designations on a Preordained Basis

Extra-record discovery also is warranted here because the "bare record" does not address the complete scope of CASA's arbitrary-and-capricious claims.  *Overton Park*, 401 U.S. at 420.  Those claims challenge the Afghanistan and Cameroon terminations not in isolation but as two manifestations of "a general policy or practice of terminating TPS designations on a preordained basis as part of a broader effort to reduce the number of non-white immigrants in the United States."

Op. 40.  Discovery beyond the administrative record produced here is necessary to demonstrate that the Administration has adopted such a policy.

For example, discovery concerning Secretary Noem's other TPS determinations would reveal whether the procedural irregularities that infected the Afghanistan and Cameroon terminations similarly afflicted other TPS determinations.  Discovery concerning DHS's implementation of Executive Orders 14,150 and 14,159 would shed light on whether the agency understood those Orders as compelling termination of TPS designations irrespective of country conditions.  And discovery concerning the Trump Administration's admission of white Afrikaners from South Africa through the United States Refugee Admissions Program is likely to yield additional evidence of racial animus underlying the Administration's immigration policies.  *See* Ex. W, Ted Hesson et al., *Exclusive: US Diplomats Asked if Non-Whites Qualify for Trump Refugee Program for South Africans*, Reuters (July 25, 2025), https://tinyurl.com/5cc2usvv (reporting that the highest-ranking official in the State Department's refugee and migration bureau said in an email that mixed-race South Africans who speak Afrikaans could not apply to the Refugee program because, as the article paraphrased, "the program is intended for white people").

## CONCLUSION

For all of the foregoing reasons, CASA respectfully requests that this Court order Defendants to complete the administrative record with the categories of documents enumerated above, subject to the procedures set forth in the Court's July 29, 2025, order, ECF No. 98.  CASA further requests that this Court authorize extra-record discovery.


August 13, 2025

Ryan C. Downer*
Sarah L. Bessell (D. Md. 30969)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. #400
Washington, D.C. 20005
Tel. (202) 319-1000
Fax (202) 319-1010
ryan_downer@washlaw.org
sarah_bessell@washlaw.org

Respectfully submitted,

_____/s/_____
Jonathan L. Backer (D. Md. 20000)
Rupa Bhattacharyya*
Julia Gegenheimer*
Joseph W. Mead (D. Md. 22335)
Mary B. McCord (D. Md. 21998)
Samuel P. Siegel*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
   AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 661-6671
Fax: (202) 661-6730
jb2845@georgetown.edu
jg1370@georgetown.edu
jm3468@georgetown.edu
mbm7@georgetown.edu
rb1796@georgetown.edu
ss5427@georgetown.edu

*Attorneys for Plaintiff CASA, Inc.*


*Admitted pro hac vice.*